**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JOSEPH ROSEMOND,  )<br>     Plaintiff  )<br>  )<br>v.  )<br>  )<br>STOP AND SHOP SUPERMARKET  )<br>COMPANY,  )<br>  )<br>     Defendant.  )<br>  ) | C.A. No. 04-30072- KPN |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

**Introduction**

Plaintiff Joseph Rosemond ("Rosemond") brings this action against his employer, The Stop & Shop Supermarket Company LLC ("Stop & Shop" or "Company"), asserting claims of race discrimination, based on racial harassment, under Title VII of the Civil Rights Act of 1964 ("Title VII") and Massachusetts General Laws Chapter 151B ("Chapter 151B"). Rosemond's claims fail as a matter of law; he cannot establish that he experienced a sufficiently severe or pervasive racially hostile work environment for which Stop & Shop should be held liable.

Rosemond's claims are based on his discovery of a rope in the shape of a noose hanging in a common area of the store, across the room from his desk, next to a water cooler and near the desk of fellow manager at Stop & Shop's Chicopee store. Stop & Shop's prompt investigation revealed that two subordinates, in a rash prank, had hung the noose. Notwithstanding the lack of any racial animus motivating the two workers' misconduct, Rosemond contends that the presence of a noose hanging near his workspace constitutes racial harassment. Rosemond's claim, however, lacks merit because Stop & Shop had no reason to know that two of its

employees would engage in this kind of conduct and because the conduct, although insensitive, is simply insufficient to establish a claim for racial harassment. In short, while the employees' conduct was regrettable and inappropriate, this isolated incident is wholly insufficient as a matter of law to establish liability. Stop & Shop is entitled to summary judgment.

## Summary of Facts[1]

Rosemond, an African-American, has been employed as a manager with Stop & Shop since 1994. Rosemond Dep. 15-16[2]. Rosemond initially worked at the Company's Northampton Distribution Center. *Id.* at 16. In 2001, the Company offered him the position of Customer Service Manager ("CSM") at its Chicopee store[3] where he remained until July 2004 when he transferred voluntarily to the West Springfield store in the same position. *Id.* at 6, 9-10, 121. As CSM, Rosemond was one of the senior managers at the Chicopee Store who reported directly to the Store Manager. *Id.* at 11-12, 19.

On December 10, 2003, Rosemond was the manager in charge of the store because Store Manager Brian Whalen ("Whalen") was not scheduled to work. Rosemond Dep. at 31. When he arrived and went to his work area in the store's mezzanine, Rosemond found a rope in the shape of a noose hanging from the ceiling across the room from his desk, about a foot away from the desk of fellow senior manager Marcy Wutka ("Wutka"), a Caucasian female.[4] Rosemond Dep. at 37, 42; Bidwell Dep. at 19. After finding the rope, Rosemond spoke to several employees

---

[1] A complete recitation of the facts is provided in Stop & Shop's Rule 56.1 Statement of Facts.

[2] All deposition transcripts and exhibits cited herein are included in the Appendix filed with Stop & Shop's motion.

[3] The Chicopee store is sometimes referred to in the depositions as Store 36.

[4] Rosemond had seen the rope in a store mail pouch a few days earlier. Bidwell Dep. at 21. Wutka's desk was near the water cooler and the time clock while Rosemond's desk is at the other end of the mezzanine area. Stop & Shop's Answers to Plaintiff's First Set of Interrogatories, attached as Appendix "Ex. A", Nos. 3 and 8; Barsolou Dep. at 29.

who had arrived at work earlier than he had in an effort to find out whether they had observed the noose as well.[5]  Rosemond Dep. at 42-43, 47-49.  He also took pictures of the rope, put it in a plastic bag and placed the bag in his desk.  *Id*. at 45.  After he removed the rope, Rosemond went about his normal management duties.  Rosemond Dep. at 55-56.

That same day, Whalen decided to come in on his day off to work on budgets.  Whalen Dep. at 10.  An hour or so after finding the rope, when Rosemond found out that Whalen was in the store, he showed him the rope and told him where he found it.  In response, Whalen, who initially assumed that the night crew was playing a joke and thought that Rosemond was concerned that someone was going to hang himself, told Rosemond that he would have security review the videotapes and returned to his work.  Rosemond Dep. at 62; Whalen Dep. at 11.  Whalen's initial response upset Rosemond who expected Whalen to show a little more concern about what had occurred.  Rosemond at 63.  After this discussion, Rosemond put the rope in his car.  *Id.* at 65.  A short while later, the store's head of security, John Vey ("Vey"),[6] informed Whalen that Rosemond believed the rope was meant for him.  *Id*. at 12.  When Whalen realized that Rosemond was personally offended, he immediately apologized, twice, to Rosemond and told him "it didn't click" with him what the rope meant to Rosemond.  Rosemond Dep. at 64, 74.  Whalen immediately initiated a full-scale investigation into the incident.  He contacted District Manager Kathy Collins to report the incident and directed Vey to review the videotapes in an effort to determine who had hung the rope.  *Id*. at 64, 71; Whalen Dep. at 13-14; Collins Dep. at 12.  Despite Rosemond's initial anger at Whalen's response to the incident, he acknowledged

---

[5] One of the cashiers to whom he spoke told him that she was upset at seeing the rope because it reminded her of her brother-in-law who hung himself in a closet.  Rosemond Dep. at 49.

[6] Security is officially known as the Loss Prevention Department.

that Whalen had never done or said anything that would make him believe that Whalen harbored

any kind of racial animus or hatred.  Rosemond Dep. at 70-71, 75-76.

> Q.    Had Brian ever done anything to you or said anything to you that
>       made you believe that he harbored any kind of racial animus or
>       hatred?
> A.    He's never done anything like that.
> Q.    Never said anything?
> A.    No.
>
> * * *
>
> Q.    I'm just asking from your dealings with him and your perceptions
>       with him.
> A.    I didn't think he was a racist at that point.
> Q.    Do you feel right now looking back on it that Mr. Whalen was a
>       racist?
> A.    I would have to say no, I don't think so.

Late into Wednesday night, December 10, and during Thursday, December 11, Vey and

his manager Mary Downing, the Loss Prevention Manager for the region, and Scott Ziter, Loss

Prevention Manager for the Connecticut Division, reviewed security tapes and compiled a list of

the associates who had worked the night shift between December 9 and 10.  Ex. C.  Vey also

contacted the Chicopee police.  *Id*.

In addition to these efforts, Stop & Shop dispatched Bidwell, a Human Resources

Manager from the Company's North Haven, Connecticut District Headquarters, to Store 36 to

investigate the incident.  Bidwell Dep. at 13.  Bidwell interviewed Rosemond who told Bidwell

about his discovery of the rope.  *Id.* at 17.  Bidwell Dep. Ex. 2, attached as Appendix "Ex. B".

Bidwell asked Rosemond what he did after he found the rope.  Ex. B.  Rosemond indicated that

he spoke with several associates to see whether they saw the rope.  Rosemond Dep. at 42, 46.

He then took a picture of the rope, put the rope in a bag with the picture and eventually put the

bag in his car.  *Id.* at 62, 65.  When Bidwell asked Rosemond to turn over the rope to security,

-4-

Rosemond told him that he would have to "check" and see if he could give the rope back.  Ex. B.

When Bidwell asked, Rosemond did not want to divulge with whom he had to check.  *Id.*

Bidwell testified that he told Rosemond:

> I said.  Well, Joe, I'm concerned.  You're a member of management, you have company property, which is this rope.  We're trying to conduct an investigation, you're telling me this rope was hanging over Marcy's desk.  I'm concerned for Marcy as well here, so I would expect you to have that back here tomorrow . . .

Bidwell Dep. at 15, 23; Ex. B.  Rosemond eventually relented and returned the rope.

Barsolou Dep. Ex. 1, attached as Appendix "Ex. C".

On Friday, December 12, Downing, Vey and Cindy Flannery, a Human Resources

Manager based at the Company's North Haven Headquarters, interviewed a number of

employees, including the two employees who, during their interviews, admitted to hanging the

rope – Charles Ingalls, head meat cutter, and Jeramie Rankin, seafood clerk.  Flannery Dep. Ex.

1, attached as Appendix "Ex. D"; Flannery Dep. at 17-31.

Ingalls and Rankin told investigators, and testified at their deposition, that the noose was

simply a joke and was not aimed at Rosemond, Wutka or anyone else.[7]  Flannery Dep. at 31-32;

37; Ex. D; Rankin Dep. at 20-27; Ingalls Dep. at 11, 21, 23-24; Collins Dep. at 24-25.

According to Rankin, a group of employees, including Ingalls, Rankin and Stan Kaleta, a union

associate who was the store's meat manager, would meet in the parking lot and walk into work

together.  Rankin Dep. at 18-19, 31.  On December 10, Kaleta stopped to get his newspaper,

while Ingalls, Rankin and several others continued upstairs to the mezzanine area where they

punch in on the time clock.  While waiting to punch in, Ingalls and Rankin noticed a rope tied in

a noose sitting on Wutka's desk.  On the spur of the moment, Rankin helped Ingalls hang the

rope in the ceiling.  After they had hung the rope, Kaleta came upstairs, and said something like,

---

[7] The store's employees were known to play a lot of jokes.  Whalen Dep. at 11; Ingalls Dep. at 11, 21, 23-24; Kaleta Dep. at 16; Rankin Dep. at 21-27.

"who's the wise guy." Rankin, Ingalls and Kaleta each punched in and went to work. Rankin Dep. at 18-19, 31; Ingalls Dep. at 10-11; Kaleta Dep. at 13-14, 22. When Kaleta entered the mezzanine, everyone waiting to punch in was giggling, and he thought a joke was being played on him. Kaleta Dep. at 13-14, 17, 21-23. Someone put a hand up, Kaleta looked up, saw the rope and said "who's the joker." *Id*. at 22. Kaleta did not see who had hung the rope; it was done before he got upstairs. *Id.*

Both Ingalls and Rankin got along well with Rosemond. They expressed surprise and remorse that Rosemond or anyone else would be upset by their prank and stated that they did not intend to hurt or offend anyone. Ingalls Dep. at 17, 21, 23-24; Rankin Dep. at 30, 35, 40-43, 47; Russello Dep. at 22-23; Flannery Dep. 31-32. Once they realized the import of their conduct, both Ingalls and Rankin were mortified by it. Ingalls Dep. at 23-24; Rankin Dep. at 46-47; Kaleta Dep. at 31-32; Flannery Dep. at 37; Russello Dep. at 18-19; Russello Dep. Ex. 1, attached as Appendix "Ex. G"; Collins Dep. at 24-25. For example, Rankin testified:

> Charlie [Ingalls], he comes off as a big bear but he is really like a teddy bear. He worries about everything, wants to make sure everything is done and stuff like that. He was really upset about it. He was worried that people like perceived him as this big, evil guy and his wife would call me and ask me to talk to him. I'm like – I'd call him and say Charlie, look, it's okay, it will be alright, don't worry about it.
>
> For the first week, I didn't even get out of bed because I couldn't believe – these people that I work with, it's a second family type thing, to think I did anything with the intention to hurt somebody . . . .

Rankin Dep. at 34-35. Rosemond himself felt that he had a good relationship with Ingalls, Rankin and Kaleta, and never experienced any animosity from them, racial or otherwise. Rosemond Dep. at 81-85, 105.

Within minutes after Ingalls and Rankin admitted to hanging the noose, Stop & Shop suspended them without pay pending further investigation. Flannery Dep. Ex. 4, attached as

-6-

Appendix "Ex. E"; Ingalls Dep. at 20; Rankin Dep. at 32. The same day, Flannery issued Kaleta a written warning for failing to address the situation and report it to store management. Flannery Dep. at 39; Ex. D; Flannery Dep. Ex. 3, attached as Appendix "Ex. F".

On Friday, December 12, Ziter and Flannery met with Rosemond and Wutka to update them on the investigation. They told Rosemond that the rope was meant as a joke and that neither Rankin nor Ingalls meant to harm anyone. Rosemond said he was relieved that it was not directed at him and thanked them for following through. Wutka told them she did not take the rope personally and thought it was a joke. Ex. D; Flannery Dep. at 45. Flannery believed that Rankin and Ingalls had behaved inappropriately, but that neither had intended to intimidate or threaten anyone or had acted with racial animosity. Flannery Dep. at 45.

Stop & Shop's investigation did not end there. To get perspective on the matter from someone outside the region, Allan Cave, Vice President of Human Resources, asked Kathy Russello, Human Resource Director for the New York metropolitan division, to conduct her own investigation of the incident. Russello Dep. at 9; Collins Dep. at 26. On December 18, Russello conducted a further round of interviews, meeting with Rosemond, Whalen, Wutka, Ingalls, Rankin, Kaleta and others. Ex. G. Russello concluded, as the prior investigators had, that while the conduct was insensitive and inappropriate, Ingalls and Rankin had not acted with racial animosity, malice or an intent to harm or hurt anyone. Russello Dep. at 23; Collins Dep. at 22. Taking into account the nature of their conduct and their work history, Stop & Shop determined that the two and a half week period that Ingalls and Rankin had each been suspended without pay, the final warnings, and the transfers to different locations constituted appropriate disciplinary action. Ex. G; Russello Dep. at 29; Barsolou Dep. at 16-18, 29. In addition, Stop &

Shop put all Store 36 employees, including Rankin and Ingalls, through sensitivity training.  Ex. A, Answer No. 3; Flannery Dep. at 49-50.

Rosemond's complaints concerning the noose incident focus on the fact that (i) Whalen did not show sufficient concern when Rosemond first informed him of the noose; (ii) Stop & Shop did not terminate Ingalls, Rankin or Kaleta; and (iii) the Company did not provide sensitivity classes prior to the incident.[8]  Rosemond Dep. at 63, 122-125.   Except for the noose incident and two isolated comments made by a subordinate, David Terranova,[9] Rosemond testified that he got along with everyone at the Chicopee store; he did not believe there was anyone in the store who harbored any racial animosity towards him; and he did not experience any other conduct that he perceived as racially harassing at that store.  *Id.* at 52, 58.  He also

---

[8] Stop & Shop requires all associates, supervisors and managers to attend anti-harassment training.  The Company trains all new employees as part of its orientation program.  In addition, the Company distributes its anti-harassment policy to all employees each year.  Ex. A, Answer No. 1; Barsolou Dep. at 39.

[9] In an apparent attempt to bolster the noose incident with racial overtones that are otherwise absent, Rosemond, one of the most senior managers in the store, focuses on two comments allegedly made by Terranova, a subordinate bakeshop employee.  Rosemond Dep. at 22.  Sometime in the summer of 2003, Rosemond arrived for a meeting with then Store Manager, Mike Leach, with two coffees, not expecting Terranova to be present.  Terranova asked, "Where is my coffee?  What am I, black?"  After the meeting, Rosemond told Terranova that he did not appreciate the comment and instructed him never to say anything like that again.  Terranova apologized, and Rosemond considered the issue closed.  Rosemond Dep. at 24-25.  The second comment occurred sometime before Thanksgiving in 2003.  Rosemond Dep. at 27.  During a discussion about a shortage of help, Terranova allegedly commented that if Stop & Shop would stop putting minorities in management positions, it would not have this problem.  *Id.* at 25-26. Rosemond was angry over the incident but admits that he never reported it to anyone in Stop & Shop management even though he understood that it was a violation of Stop & Shop policy.  Needless to say, as a senior manager of the store, Rosemond had the authority and ability to discipline Terranova, but as he testified, he did not.  *Id.* at 11-12, 24, 28.

Terranova confirmed his comment about the coffee and his apology, stating that it was intended as a joke. Terranova Dep. at 9-10.  Terranova, however, denies the "minorities" comment altogether.  He testified that Rosemond complained to him about women who had been promoted above him.  It was Rosemond's opinion, Terranova testified, that there were certain people who were incompetent, specifically referring to Wutka.  Terranova testified that he said something like, "that's what happens when they put women that don't know what to do in these jobs," but denies that he ever mentioned minorities.  *Id.* at 11-12. Solely for the purpose of this summary judgment motion, Stop & Shop credits Rosemond's version of the second comment.

testified that he had never experienced any other alleged racially harassing incidents in his career with Stop & Shop nor had he heard of any other racial incidents happening at the Company. *Id.* at 52-53.

After the incident, Rosemond took a seven-month medical leave of absence. When he returned to work, he voluntarily transferred to another store, assuming a CSM position there. *Id.* at 114, 118-19.

## <u>Argument</u>

To prevail on his Title VII and Chapter 151B hostile working environment claims, Rosemond must establish that he was subjected to severe or pervasive racial harassment that materially altered the conditions of his employment.[10] *Noviello v. City of Boston*, 398 F.3d 76, 92 (1st Cir. 2005), *citing Farragher v. City of Boca Raton*, 524 U.S. 775 (1998); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Cerqueira v. Corning Net Optix*, 2004 U.S. Dist. LEXIS 17308, at *15 (D. Mass. Aug. 13, 2004) (Chapter 151B); *Muzzy v. Cahillane Motors, Inc.*, 434 Mass. 409, 411-12 (2001). The harassment must be objectively and subjectively offensive; that is, "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Noviello*, 398 F.3d at 92; *Muzzy*, 434 Mass. at 412 n.2 ("To constitute actionable harassment, the claimed conduct must be both objectively and subjectively offensive") *citing Messina v. Araserve, Inc*., 906 F. Supp. 34, 36 (D. Mass. 1995), *citing Ramsdell v. Western Mass. Bus Lines, Inc*., 415 Mass. 673, 678 (1993). The inquiry is based on the totality of the circumstances and considers, among other factors, the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere

---

[10] As this Court has noted, the showing required under Chapter 151B does not differ greatly from the Federal standard. *Brissette v. Franklin County Sheriff's Office*, 235 F. Supp. 2d 63, 85 (D. Mass. 2003). Thus, according to the Supreme Judicial Court, a hostile working environment is one that is pervaded by harassment and abuse with the resulting intimidation, humiliation, and stigmatization, and one that poses formidable barriers to the full participation of an individual in the workplace. *Id.*

offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Noviello*, 398 F.3d at 92.

Even if a hostile work environment is shown to exist, an employer is not strictly liable under either Title VII or Chapter 151B for coworkers' harassing conduct. "An employer's potential liability is negated if, upon receiving actual or constructive notice of the harassment, the employer responds with immediate and effective remedial action." *Cerqueira*, 2004 U.S. Dist. LEXIS 17308, at *15-16; *see also Noviello*, 398 F.3d at 95, 96-97 (no liability for coworker harassment unless "there is sufficient evidence to permit a finding that the employer knew or should have known about the alleged hostile work environment, yet failed to stop it").

**A.    Rosemond Cannot Satisfy the "Knew or Should Have Known" Standard.**

Given the fact that the individuals who hung the noose were Rosemond's subordinates, Stop & Shop cannot be liable for their allegedly harassing conduct because it neither knew nor should have known that they would engage in this type of conduct, let alone any harassing conduct. There is no evidence they had ever done so before. Even Rosemond admits that he had no reason to believe they would engage in what he perceived as racially harassing conduct.[11] Rather, the noose incident "was isolated, unannounced and not preceded by any conduct brought to the attention of [Stop & Shop] which would have placed [the Company] on notice that such was about to occur." *Miller v. Rowan Cos., Inc.*, 55 F. Supp.2d 568, 573 (S.D. Miss. 1998).[12]

---

[11] Any argument by Rosemond that Stop & Shop had constructive knowledge fails. An employer will be charged with constructive knowledge "[o]nly when the acts of harassment are 'so egregious, numerous, and concentrated as to add up to a campaign of harassment.'" *Ford v. West*, 222 F.3d 767, 776 (10th Cir. 2000). The single incident in this case cannot satisfy that standard.

[12] Rosemond may argue that Terranova's two comments put the Company on notice of a racially hostile atmosphere. This argument fails because no nexus exists between Terranova's comments and the unrelated conduct of Rankin and Ingalls. Further, reliance by Rosemond on Terranova's alleged comment about minority managers is unavailing because Rosemond, a senior manager, did nothing to discipline Terranova, nor did he ever report the comment to Stop & Shop management. Accordingly, at

Given the absence of any evidence that Stop & Shop knew or should have known that possible racially harassing conduct could occur, the relevant inquiry is whether Stop & Shop took prompt and effective remedial action once it found out what had occurred.  *Cerqueira*, 2004 U.S. Dist. LEXIS 17308, at *15-16; *Ford*, 222 F.3d at 775-76 (remedial action must be reasonably calculated to end the harassment); *Glenn v. Horgan Bros., Inc*., Civil Action No. 03-6578, slip op. at 9-12 (E.D. Pa. June 24, 2005) (where remedial action was reasonably calculated to stop harassment, employer's response adequate).[13]  The evidence establishes a prompt and thorough investigation and a remedial action that was both timely and substantial, notwithstanding Rosemond's insistence that Ingalls, Rankin and Kaleta should have been fired.

"When assessing the reasonableness of an employer's remedial actions, the court may consider the amount of time that elapsed between the notice of the harassment and the remedial measures taken, including any disciplinary action against the harasser or other options available to the employer such as employee training sessions."  *Robinson v. Valmont Industries*, 238 F.3d 1045, 1047 (8th Cir. 2001) (citation omitted).  Moreover, the most effective way to measure the adequacy of an employer's response "is not the victim's own personal sense of justice, but rather . . . whether the behavior that gave rise to the complaint has ceased and does not threaten to reoccur."  *Cerqueira*, 2004 U.S. Dist. LEXIS 17308, at *20 (quoting *Saad v. Stanley St. Treatment & Resources*, 1994 U.S. Dist. LEXIS 20728 (D. Mass. May 20, 1994)).

In this case, the investigation began the day Rosemond reported the incident and was completed within two and a half weeks.  Initial remedial action occurred within two days of his complaint.  Stop & Shop immediately involved high level management and security personnel to

---

most, Stop & Shop was aware of a single inappropriate comment by a subordinate employee from a different department than Rankin and Ingalls.

[13] A copy of the *Glenn* decision is included in the Appendix.

investigate and conduct numerous interviews.  Moreover, the Company conducted a second investigation to ensure that it received an objective and full assessment of what had occurred. Given these facts, the investigation and remedial action were prompt.  *Cerqueira*, 2004 U.S. Dist. LEXIS 17308, at *19 (citing cases in which investigations started within a few days to one week and action taken within a month are prompt).

Further, despite Rosemond's reservations, Stop & Shop's response was not only effective, it was substantial.  Stop & Shop suspended Ingalls and Rankin, both hourly employees, without pay for more than two weeks during the holiday season.  Both received final warnings and were transferred to other locations.  All Store 36 employees including Ingalls and Rankin received sensitivity training.  Ex. G; Russello Dep. at 29; Barsolou Dep. at 16-18; Ex. A, Answer No. 3.  *See Lewis v. Snow*, 2003 U.S. Dist. LEXIS 15700, at *28 (S.D.N.Y. 2003) (in response to noose incident employer appropriately conducted investigation, transferred employee and issued notices warning that future misconduct would result in disciplinary action).  Finally, the Company's response was effective because, by his own admission, Rosemond experienced no further conduct of this nature.  Moreover, Ingalls, Rankin and Kaleta came away from the incident understanding the seriousness of their rash conduct or inaction and the need to be sensitive to the perceptions of others.  It is simply irrelevant that Rosemond would have preferred the Company terminate them.  *Cerqueira*, 2004 U.S. Dist. LEXIS 17308, at *20.  In sum, Rosemond cannot establish a basis for imposing liability on Stop & Shop, and for this reason, the Company is entitled to summary judgment.

**B.    Plaintiff Cannot Attribute Kaleta's Actions to Stop & Shop.**

Rosemond will likely argue that the coworker standard for liability should not apply because Kaleta, the meat department head, saw the rope after it was hung but did nothing to remedy the situation, and that Stop & Shop should thereafter be held strictly liable.  This

argument must fail for several reasons. First, Kaleta is a non-exempt union employee and although he has some supervisory responsibilities (Kaleta Dep. at 8, 29), he is not a member of Stop & Shop management for purposes of establishing employer liability. Second, even if the Court finds that Kaleta was a member of management, Kaleta's omission is not sufficient to support strict liability because he was not "on notice" of racial harassment. *See College-Town v. MCAD*, 400 Mass. 156, 167 (1987).

### 1. Kaleta was a union associate.

The "key to determining supervisory status is the degree of authority possessed by the putative supervisor." *Noviello*, 378 F.3d. at 95. Where the putative supervisor has no ability to affect or control the terms and conditions of a plaintiff's employment, strict liability cannot ensue. In *Noviello*, the Court determined that a shift supervisor who had no power to terminate or discipline the plaintiff was not a supervisor for purposes of *respondeat superior* liability. The absence of the authority to affect the terms of the plaintiff's employment in any meaningful way reduced the claims to one of coworker harassment. *See id.* at 96. *See also College-Town*, 400 Mass. at 165-66 (without the authority to affect the terms and conditions of another employee's employment, employee does not qualify as a supervisor for purposes of imputing vicarious liability in harassment case); *Glenn*, *supra*, Civil Action No. 03-6578, slip op., pp. 10-11 (construction foreman who heard coworker use pejorative terms towards plaintiff was not supervisor for purposes of *respondeat superior* liability where he did not have the authority to fire, hire or discipline workers).

Similar to the shift supervisors in *Noviello*, Kaleta, a unionized associate, did not have any authority to hire or terminate employees nor could he affect the terms of Rosemond's employment. 378 F.3d. at 96; *College-Town,* 400 Mass. at 165-66; Rosemond Dep. at 84-85,

128.  Kaleta could not reward, punish or give Rosemond, or any other employee, any time off. In fact, during the "noose" incident, Rosemond, as the senior member of management on duty, was in charge of running the store that day.  Kaleta Dep. at 27, 38-39; Rosemond Dep. 84-85, 128.

> **2.    Kaleta's inaction does not provide a basis for employer liability.**

Even if Kaleta were a member of management, Plaintiff's claims must fail because Kaleta's inaction in the several seconds in which he viewed the "noose" cannot provide a basis for employer liability under federal or state law.  To establish supervisor liability, Rosemond must show that Kaleta engaged in or condoned the harassment of which Rosemond complains. *Weston v. Town of Middleborough,* 2002 Mass. Super. LEXIS 20, at *30 (Mass. Super. Ct. Feb. 15, 2002).  Because Kaleta clearly did not engage in the allegedly harassing conduct, Rosemond must show that Kaleta was "on notice" of it and of Plaintiff's complaint.

When Kaleta arrived in the mezzanine area to punch in before work, he noticed several employees on line in front of him laughing.  Kaleta Dep. at 14.  He initially thought his coworkers were playing a joke on him and then he saw the rope.  Kaleta asked, "Who's the joker?" and receiving no answer, he went downstairs and began his duties.  Kaleta Dep. at 14, 22.  Plaintiff does not allege that Kaleta hung the rope or that Kaleta knew that the rope was directed at any particular individual.  In fact, Kaleta testified that he initially thought the rope was a joke directed at him.  Moreover, this is not a situation where Plaintiff, the senior manager, complained to Kaleta, a unionized associate, and Kaleta did not take action.  At best, Kaleta was not cognizant of a situation that Rosemond, when he later discovered it, would find personally upsetting.  Kaleta simply did nothing to remedy a  situation in which he did not suspect racial

animus was involved.  Under these circumstances, Kaleta's inaction, without anything more, does not provide a basis for liability.[14]

In short, given the status of the individuals involved in the noose incident, and the absence of any prior allegedly harassing conduct, Stop & Shop may not be held liable for racial harassment.

## C.    The Conduct That Rosemond Challenges was not Targeted at him and was not Based on his Race.

Unfortunately, there are a number of cases where a noose plays a prominent role in claims of racial harassment.  *See Ford*, 222 F.3d 767; *Robinson*, 238 F.3d 1045; *Pedigo v. National Cart Co., Inc*., 2004 U.S. App. LEXIS 8230 (8th Cir. 2004); *Vance v. Southern Bell Tel. & Tel. Co*., 863 F.2d 1503 (11th Cir. 1989); *Glenn, supra*, Civil Action No. 03-6578, slip op. (E.D. Pa. June 2004); *Hardy v. USF Reddaway, Inc*., 2004 U.S. Dist. LEXIS 10179 (D. Or. 2004); *Wilson v. Dana Corp.*, 210 F. Supp. 2d 867 (W.D. Ky. 2002); *Lewis*, 2003 U.S. Dist. LEXIS 15700; *Miller*, 55 F. Supp. 2d 568; *Settle v. Baltimore County*, 34 F. Supp. 2d 969 (D. Md. 1999).  These cases, however, demonstrate that the application of the exacting standard for assessing racially hostile work environment claims requires that the employee demonstrate both that the harassing conduct be racial or stem from racial animus and that it be sufficiently severe or pervasive to change the terms or conditions of plaintiff's employment.

In all of the cases cited above, and in striking contrast to the situation in this matter, the noose was part of an alleged pattern of racial harassment and discrimination, supporting findings that its use was motivated by racial animus and, in some cases, that the conduct was sufficiently severe or pervasive.  *See, e.g.*, *Snell v. Suffolk County*, 782 F.2d 1094, 1098, 1101 (2d Cir. 1986) (picture of black man with a noose around his neck part of what the court described as a virtual

---

[14] To the extent Rosemond relies on the Terranova comments, there is no evidence Kaleta knew of them.

barrage of racially offensive slurs and demeaning epithets aimed at minority corrections officers that directly affected their work); *Hardy*, 2004 U.S. Dist. LEXIS 10179, at *22-23 (listing a litany of racially offensive slurs and symbols of violence, slavery and racism); *Pedigo*, 2004 U.S. App. LEXIS 8230, at *2-3 (racist remarks and graffiti).  Here, these factors are utterly lacking. In cases across the country, when the plaintiff, like Rosemond, cannot establish severe or pervasive racial harassment or a legal basis for imputing liability to the employer, courts enter judgment as a matter of law.[15]

 1.     **Rosemond Cannot Establish Conduct Tainted by Racial Animus.**

Rosemond's discrimination claims rest on the fundamental proposition that, because he is African American, the presence of a noose in the workplace, without more, establishes a racially hostile work environment.  That proposition cannot stand.  Actionable harassment requires more than mere self-perceived racial hostility.  A claim of racial harassment necessarily rests on intentional conduct, and requires, in the first instance, at least some conduct committed with the intent to demean, intimidate, threaten or oppress on account of race.  It is well-established that general harassment, if not racial, is not actionable.  *Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir. 1994); *Henderson v. International Union*, 263 F. Supp. 2d 1245, 1275 (D. Kan. 2003) (same); *Ellis v. Wal-Mart*, 952 F. Supp. 1522, 1527 (M.D. Ala. 1996) (plaintiff failed to show that alleged incidents of harassment were racially motivated).  Here, the evidence does not support a finding that Rosemond experienced harassment, let alone harassment based on his race.

Rosemond simply relies on the noose as a horrible symbol of cruelty and injustice towards African Americans and ignores the actual circumstances surrounding the noose.  The

---

[15] *See e.g., Ford*, 222 F.3d 767 (motion to dismiss affirmed); *Robinson*, 238 F.3d 1045 (summary judgment affirmed); *Glenn, supra,* Civil Action No. 03-6578, slip op. (summary judgment granted); *Wilson*, 210 F. Supp. 2d 867 (summary judgment granted); *Lewis*, 2003 U.S. Dist. LEXIS 15700 (summary judgment granted); *Miller*, 55 F. Supp. 2d 568  (Rule 50 judgment granted); *Settle,* 34 F. Supp. 2d 969 (summary judgment granted).

hanging of the noose, however, without some evidence of racial animus, is insufficient to support his claims. *See Settle*, 34 F. Supp. 2d at 1001 ("Here as with others of their claims, plaintiffs seem to rest on the unarticulated premise that because they are African American, and because they subjectively perceive that defendants have inflicted employment injuries upon them, they have satisfied the requirements of a prima facie case. This will not do."). In this case, there is no evidence that the noose was intended as a threat, warning, message or act of hostility toward Rosemond (or Wutka for that matter) or that Ingalls or Rankin were motivated by racial animus when they hung it. The evidence establishes that hanging the noose was a thoughtless, rash, and inappropriate act, intended as a joke. Rosemond himself testified that he had a good relationship with both Ingalls and Rankin, and that he saw no evidence they harbored or acted with any racial animosity towards him or anyone else at the store. Rosemond Dep. at 81-85. Rosemond got along with everyone at the Chicopee store, did not believe there was anyone in the store who harbored any racial animosity towards him and did not experience any other racially harassing conduct at that store. Rosemond Dep. at 52, 58. Further, the noose was hung, not near Rosemond's desk, but near the desk of Wutka, who, Rosemond testified, had issues with some associates. Rosemond Dep. at 34.

Moreover, Rosemond testified that he believed the noose was racially motivated not because of the people involved or where it was hung, but merely because it involved a noose:

> Q.    Did you have any ideas or thoughts about why these guys might have done this?
> A.    I have no idea why they would do that.
> Q.    Did you think it was racially motivated?
> A.    Yes; I did.
> Q.    Why?
> A.    That's the only way that I can relate to a rope.

* * * *

Q.      Because as I understand what we've talked about this morning, there wasn't anything that happened in the store and nothing that had happened with the people in the store that made you think they were racist?
A.      No.
Q.      It was the rope, itself?
A.      Yes.

Rosemond Dep. at 85, 105.  While Rosemond seems to believe that the noose was racial in nature because Ingalls and Rankin should have understood that an African American would have found that it carried racial overtones, he also acknowledges that the noose was not self-evidently a racist symbol:

Q.      You talked about the rope, itself, as being the racist Act.  My question to you is: Is it possible based on somebody's ethnic or cultural background that they might have looked at that rope and not have considered it to be racist?

Ms. Saperstein: Objection.

A:  I don't – how do I know that?  I don't know that.  That rope means different things to different people.

(Emphasis added.)  *Id*. at 127.

In short, the factual circumstances surrounding the hanging of the rope, including the evidence that it was not targeted at Rosemond, do not support a finding that this conduct was tainted by racial animus – a necessary element for this claim.  *See Wilson*, 210 F. Supp. 2d at 878 (whether plaintiff was intended target of offending conduct informs analysis of whether harassment suffered was severe and persuasive); *Ford*, 222 F.3d at 778 (exhaustive investigation established that work release prisoner hung noose as a practical joke on a white co-worker with no intent to racially harass the plaintiff).

**C.      The Conduct was not Severe or Pervasive.**

Rosemond's claims also fail because the factual circumstances, taken as a whole, simply fail to establish racial harassment that was severe or pervasive enough to have altered the terms

-18-

or conditions of employment and to have created an abusive working environment.[16] *Robinson*, 238 F.3d at 1047; *Bolden*, 43 F.3d at 551. While no particular number of incidents is required to meet this standard, it is clear that in cases involving few incidents, a court will closely analyze the severity of the incidents to assess whether the standard is met.[17] *Gnerre v. MCAD*, 402 Mass. 502, 509 (1988) (in housing case, distinguishing between threatening behavior or physical contact as opposed to offensive speech); *Medina v. New York City Dep't of Parks and Recreation*, 2002 U.S. Dist. LEXIS 23923, at *9 (S.D.N.Y. Dec. 12, 2001) ("[i]solated acts, unless very serious, do not meet the threshold of severity or pervasiveness"), quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002). Thus, a "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" would not sufficiently alter terms and conditions of employment to violate Title VII. *Farragher*, 524 U.S. at 787, *quoting Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971). Title VII is not a general civility code, and a lack of racial sensitivity does not amount to actionable harassment. *Id*. at 787-88, *see also Wilson*, 210 F. Supp.2d. at 878.

Assuming the noose is infused with some racial significance, the fact that it was hung, even if combined with Terranova's comments,[18] is not conduct that is <u>objectively</u> severe or

---

[16] The SJC has suggested that to establish a hostile work environment a plaintiff must show conduct that is sufficiently "severe and pervasive." *Muzzy*, 434 Mass. at 411. Regardless of which standard applies, Rosemond cannot meet it.

[17] As the Court in *Wilson* observed, the severe and pervasive requirement for liability imposes a heightened evidentiary burden on the plaintiff to filter out complaints attacking the ordinary tribulations of the workplace. 210 F. Supp. 2d at 878.

[18] Terranova was not involved in the noose incident and only heard about it afterwards from talk in the store. Terranova Dep. 14.

pervasive enough to have altered the terms of Rosemond's employment.[19]  Given the evidence that the noose was hung near Wutka's, not Rosemond's desk, it cannot reasonably be construed as a threat to him.  Similarly, the evidence establishes that the noose did not hang for a long period of time, and there is no evidence of physical contact or intimidating conduct that Rosemond experienced.  While Terranova's comments might be seen to have racial implications, they do not support Rosemond's claims because Rosemond clearly did not consider them to be significant.  He chose to handle them himself and did not request that the Company address them.  In sum, no reasonable jury could find on the evidence considered in the light most favorable to Rosemond that he was subjected to severe or pervasive racial harassment, and his claims must be dismissed on this ground as well.

## Conclusion

For the reasons set forth herein, Stop & Shop is entitled to summary judgment on all of Rosemond's claims, and the complaint must be dismissed with costs and attorneys' fees awarded.

THE STOP & SHOP SUPERMARKET COMPANY LLC

By their attorneys,

/s/ Yvette Politis
Lisa J. Damon (BBO # 558843)
Yvette Politis (BBO # 644986)
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
Dated:  July 8, 2005                                      (617) 946-4800

---

[19] The fact that Rosemond took a significant leave of absence after the noose incident only supports an argument that he subjectively found the conduct offensive.  He must still establish that a reasonable person in his position would have felt the same way.