**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JOSEPH ROSEMOND,<br>    Plaintiff<br><br>v.<br><br>STOP AND SHOP SUPERMARKET<br>COMPANY,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)   C.A. No. 04-30072- KPN<br>)<br>)<br>)<br>)<br>) |

**RULE 56.1 STATEMENT OF MATERIAL FACTS IN
SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, the defendant The Stop and Shop Supermarket Company LLC ("Stop & Shop" or "Company") submits this statement of material facts as to which there is no genuine issue to be tried.

1. Joseph Rosemond ("Rosemond") has been a manager with Stop & Shop since 1994. Rosemond Dep. at 15-16. He was a supervisor with Cove Management, a Stop & Shop Distribution Contractor from 1990 to 1994, at which time Stop & Shop invited him to join the Company. *Id.* at 16. Rosemond initially worked in Stop & Shop's Northampton Distribution Center. In 2001, Stop & Shop offered him the position of Customer Service Manager ("CSM") at its Chicopee retail supermarket store (sometimes designated as "Store 36") and he worked in that position until July 2004 when he became the CSM of the West Springfield store. *Id*. at 6, 9-10, 121. As a CSM, Rosemond has managed between 80 and 110 "front end" employees. *Id.* at 12-13.

2. As CSM, Rosemond was one of the senior managers at the Chicopee Store who reported directly to the Store Manager. *Id.* at 11-12, 19. On December 10, 2003, Rosemond was

the manager in charge of the Chicopee store because store manager Brian Whalen ("Whalen") was not on duty that day. After arriving at work around 7:15 a.m., Rosemond went to his work area in the upstairs mezzanine where he found a rope cinched in a noose, and hanging from the ceiling near the water cooler about a foot away from the desk of Marcy Wutka ("Wutka"), the Perishables Manager.[1] Rosemond Dep. at 31, 36-37, 42; Deposition of Gerald ("Jerry") Bidwell ("Bidwell") at 19.

3. The mezzanine area is an open common area overlooking the retail shopping floor. Stop & Shop's Answers to Plaintiff's First Set of Interrogatories, attached as Appendix "Ex. A," Answer No. 8. The Chicopee store's time clock and an employee water cooler are located there. *Id*.

4. In December 2003, Wutka and Rosemond each had a desk in this open area. Wutka's desk was next to the water cooler while Rosemond's desk was at the opposite end of the room. *Id*; Deposition of Donald Barsolou ("Barsolou") at 29. In between their desks was another desk sometimes used by the Cash Department Head. Ex. A, Answer Nos. 3 and 8. This desk has a phone, a work surface and a chair, which are used by store employees as needed. *Id*.

5. After seeing the rope, Rosemond called Jen Gatto in the cash office who would have been among the first to arrive that morning at 6:00 a.m. Rosemond Dep. at 42-43. Gatto told Rosemond that she did not see the rope when she arrived. *Id.* at 43.

6. Rosemond then took some pictures of the hanging rope, took the rope down, put it in a plastic bag and put the bag in his desk. *Id*. at 45. He then spoke with two of the cashiers who arrived at 7:00 a.m. One of the cashiers, Irene, told Rosemond that she was upset because

---

[1] Rosemond first saw the rope when he had opened an internal mail pouch two days prior. He left the rope in a box on the desk between his and Marcy Wutka's. Bidwell Dep. at 21.

-3-

the rope reminded her of her brother-in-law who had hung himself in a closet. *Id*. at 47-49. After that, Rosemond went about his normal management duties. *Id*. at 55-56.

7. Rosemond intended to call Kathleen Collins ("Collins"), the District Manager and Director of Operations, to report the incident, but had still not done so when Whalen arrived at the store an hour or so later. Rosemond Dep. at 50-51, 61. Whalen came in on his day off to work on budgets. Whalen Dep. at 10.

8. When Rosemond showed the rope to Whalen and told him where he found it, Whalen responded that he would have security review the videotapes. Rosemond Dep. at 62. With that, Whalen returned to his work on the computer. *Id*.

9. Rosemond was upset by Whalen's response because he expected Whalen to show a little more concern about what had occurred and stop doing his work on the computer. *Id*. at 63.

10. According to Rosemond, Whalen was not very personable and communications between him and store employees were not as good as they had been with the prior Store Manager. *Id*. at 31-33. Chicopee was Whalen's first position as Store Manager. *Id*. at 33-34.

11. In any event, Rosemond concedes that Whalen had never done or said anything that would make him believe that Whalen harbored any kind of racial animus or hatred. *Id*. at 70-71, 75-76.

12. Whalen's initial thought when Rosemond told him what had occurred was that the night crew was playing a joke. He thought Rosemond was concerned that someone on the night crew was going to hang himself. Whalen Dep. at 11. He did not understand what Rosemond's

concerns were until a short while later when the store's head of security John Vey ("Vey")[2] told him that Rosemond believed the rope was meant for him. *Id*. at 12.

      13.      Within a half hour of Rosemond's first conversation with Whalen, Whalen spoke with Rosemond again and apologized twice for not understanding the significance of the situation to Rosemond. Whalen told him that "it didn't click" with him what the rope meant to Rosemond. Rosemond Dep. at 64, 74.

      14.      Whalen then directed Vey to review the videotapes of the area around the time clock and advised Collins, about what had occurred. *Id* at 64, 71; Whalen Dep. at 13-14; Deposition of Collins at 12.

      15.      According to Rosemond, Whalen's half-hour failure to appreciate the significance of what occurred and apparent lack of concern made Stop & Shop's investigation lacking. Rosemond Dep. at 122-23.

      16.      Rosemond concedes that Whalen's actions thereafter were appropriate, *id.* at 76, and that every other Stop & Shop employee with whom he spoke appropriately expressed their concern. *Id*. at 122-23.

      17.      After speaking with Whalen, Rosemond put the rope back in the bag with the pictures and put the bag in his car. Rosemond Dep. at 62.

      18.      Brenda Broad, Director of Human Resources, dispatched Jerry Bidwell, Human Resources Manager from the Company's North Haven, Connecticut District Headquarters, to Chicopee to assist with investigation. Bidwell Dep. at 13.

      19.      When Bidwell arrived at the Chicopee store on December 11, he asked Rosemond to turn over the rope. Rosemond responded that he would have to check and see if he could give

---

[2] The security department is also called the loss prevention department.

the rope back. When asked, Rosemond did not want to divulge with whom he had to check. Bidwell testified that he told Rosemond:

> I said. Well, Joe, I'm concerned. You're a member of management, you have company property, which is this rope. We're trying to conduct an investigation, you're telling me this rope was hanging over Marcy's desk. I'm concerned for Marcy as well here, so I would expect you to have that back here tomorrow, . . .

Bidwell Dep. at 15, 23. Bidwell Dep. Ex. 2, attached as Appendix "Ex. B." Rosemond eventually turned the rope over to Stop & Shop. Barsolou Dep. Ex. 1, attached as Appendix "Ex. C."

      20.     Vey, his boss, Mary Downing, the Loss Prevention Manager for Market 14, and Scott Ziter, Loss Prevention Manager for the Connecticut Division, reviewed the tapes into Wednesday night and Thursday, December 10 and 11, and put together a list of the associates who worked the night shift on December 9. Ex. C. Vey also contacted Chicopee police. *Id*.

      21.     On December 12, Downing, Vey and Cindy Flannery, another Human Resources Manager at the Company's North Haven headquarters, interviewed a number of employees, including the two employees who, during their interviews, admitted they had hung the noose – Charles Ingalls, Head Meat Cutter, and Jeramie Rankin, Seafood Clerk. Flannery Dep. Ex. 1, attached as Appendix "Ex. D"; Flannery Dep. at 17-31.

      22.     During the course of the investigation, Flannery contacted other Managers for whom Ingalls and Rankin had worked to determine their work history. Ex. D; Flannery Dep. at 51-52.

      23.     Ingalls and Rankin told investigators and testified at deposition that the store crew often pulled pranks and that hanging the noose was simply a joke and was not aimed at Rosemond, Wutka or anyone. Flannery Dep. at 31-32, 37; Ex. D; Ingalls Dep. at 11, 21, 23-24; Rankin Dep. at 20-27; 30; 40-41; Kaleta Dep. at 16; Collins Dep. at 24-25, Whalen Dep. at 11.

24. According to Rankin, a group of employees, including Ingalls, Rankin and Stan Kaleta, Meat "Manager",[3] would meet in the parking lot and walk in to work together. On December 10, Kaleta stopped to get his paper, while Ingalls, Rankin and others continued upstairs to the mezzanine area to punch in on the time clock. Ingalls and Rankin found a rope tied in a noose on Wutka's desk. Rankin helped Ingalls hang the rope in the ceiling. After the rope was hung, Kaleta went upstairs, saw it and said something like, "who's the wise guy." Everybody punched in and went to work. Rankin Dep. at 18-19, 31; Ingalls Dep. at 10-11; Kaleta Dep. at 13-14; 22.

25. As Kaleta testified, when he entered the mezzanine, everyone waiting to punch in was giggling, and he thought a joke was being played on him. Kaleta Dep. at 13-14, 17, 21-23. Someone put a hand up, Kaleta looked up, saw the rope and said 'who's the joker.' *Id*. at 22. Kaleta did not see who had hung the rope; it was done before he got upstairs. *Id.*

26. Both Ingalls and Rankin got along well with Rosemond and expressed surprise and remorse that Rosemond or anyone else would be offended by the prank. They did not intend to hurt anyone. Ingalls Dep. at 17, 21, 23-24; Rankin Dep. at 30, 35, 40-43. 47; Russello Dep. at 22-23; Flannery Dep. 31-32

27. Rosemond felt that he had a good relationship with both Ingalls and Rankin, and had seen no evidence of animosity from them towards him. Rosemond Dep. at 81-85, 105.

28. Rosemond believed the noose was racially motivated not because of the people involved, but only because it involved a noose:

> Q. Did you have any ideas or thoughts about why these guys might have done this?
> A. I have no idea why they would do that.
> Q. Did you think it was racially motivated?

---

[3] Kaleta was the meat department's lead clerk and a member of the union, as are all department heads. Department heads have no authority to hire or fire. Rosemond Dep. at 84-85, 128.

>     A.   Yes; I did.
>     Q.   Why?
>     A.   That's the only way that I can relate to a rope.
>
>                              * * * *
>
>     Q.   Because as I understand what we've talked about this morning,
>          there wasn't anything that happened in the store and nothing that
>          had happened with the people in the store that made you think they
>          were racist?
>     A.   No.
>     Q.   It was the rope, itself?
>     A.   Yes.

Rosemond Dep. at 85, 105.

    29.    Moreover, Rosemond understood that the noose was not self-evidently a racist symbol. Rosemond Dep. at 127. When asked whether is was possible based on somebody's ethnic or cultural background that they might have looked at that rope and not have considered it to be racist, Rosemond responded:

> I don't – how do I know that? I don't know that. That rope means different things to different people.

Rosemond Dep. at 127.

    30.    Immediately after Ingalls and Rankin admitted on December 12 that they had hung the noose, Stop & Shop suspended them without pay pending further investigation. Flannery Dep. Ex. 4, attached as Appendix "Ex. E"; Ingalls Dep. at 20; Rankin Dep. at 32. That same day, Stop & Shop gave Kaleta a written warning for failing to address the situation and report it to management. Flannery Dep. at 39; Ex. A, Answer Nos. 1 and 3.

    31.    That same day, Ziter and Flannery also met with Rosemond and Wutka to update them on the investigation. They told Rosemond the rope was meant as a joke with no intent to harm anyone. Rosemond said he was relieved that it was not directed at him and thanked them for following through. Wutka told them she did not take the rope personally and thought it was a

joke.[4] Ex. D; Flannery Dep. at 39. Flannery believed that Rankin and Ingalls had behaved inappropriately, but that neither had intended to intimidate or threaten anyone or act with racial animosity. Flannery Dep. at 33-34, 54.

32. To get an outside perspective on the incident, Allan Cave, Vice President of Human Resources, asked Kathy Russello ("Russello"), Human Resource Director for the New York division, investigate the incident. Russello Dep. at 9; Collins Dep. at 26; Flannery Dep. Ex. 4, attached as Appendix "Ex. E".

33. On December 18, Russello conducted a further round of interviews, meeting with Rosemond, Whalen, Wutka, Ingalls, Rankin, Kaleta and others. Russello Dep. Ex. 1, attached as Appendix "Ex. G". Russello concluded, as the prior investigators had, that while the conduct was insensitive, Ingalls and Rankin had not acted with racial animosity, malice or intent to harm or hurt anyone in any way. Russello Dep. at 23; Collins Dep. at 22.

34. It was clear that the episode was personally mortifying to Ingalls and Rankin, and that they were remorseful and understood how seriously the Company took the matter. Ingalls Dep. at 23-24, 31; Rankin Dep. at 34-35, 46-47; Kaleta Dep. at 31-32; Flannery Dep. at 37; Russello Dep. at 18-19; Ex. G; Collins Dep. at 24-25.

35. In total, Stop & Shop interviewed 14 employees and contacted eight former managers and supervisors to obtain information on Ingalls' and Rankin's past performance. Fourteen members of Stop & Shop management were involved in the investigation, reviewed the findings and took part in the disciplinary decision-making process. Ex. D; Ex. C; Ex. G; Ex. A, Answer No. 7.

---

[4] Investigators initially believed that the noose might have been directed as a joke towards Wutka, who had had issues with some associates. Rosemond Dep. at 34, 95-96. Rosemond was skeptical of this because Wutka was on vacation. *Id*. Ingalls was unaware that Wutka was on vacation because he had been out of work due to a bad leg. Ingalls Dep. at 30.

36.     Considering the nature of the offense, their work history and remorse for their conduct, Stop & Shop determined that the two and a half week period that Ingalls and Rankin were suspended without pay was appropriate discipline.[5]  Stop & Shop also issued each a final written warning, transferred them to other locations, and provided them and all Store 36 employees with sensitivity training.  Ex. G; Russello Dep. at 29; Barsolou Dep. at 16-18; Ex. A, Answer No. 3; Flannery Dep. at 49-50.

37.     Although he had (1) never experienced any racially harassing conduct at the store; (2) never had any problems with Ingalls, Rankin or Kaleta; and (3) never spoke with any of them about the incident, Rosemond believes that Stop & Shop should have terminated the employment of Ingalls, Rankin or Kaleta.  Rosemond Dep. at 94-97.

38.     According to Rosemond, Stop & Shop "dropped the ball" by not terminating them.  Rosemond also felt Whalen did not show sufficient concern when Rosemond first informed him of the noose, and the Company did not provide sensitivity classes prior to the incident.[6]  Rosemond Dep. at 63, 122-125.

39.     After the incident, Rosemond went on medical leave for approximately seven months.  In July 2004, he informed the Company he was returning to work.  Although Stop & Shop had reassigned Ingalls and Rankin to different stores, Rosemond did not want to go back to the Chicopee store.  Instead, he became the CSM at the company's West Springfield Store.  Rosemond Dep. 114, 119-120.

---

[5] The suspensions were all the more significant because they occurred during the Christmas holiday season when Ingalls and Rankin would have undoubtedly earned significant overtime pay.

[6] Stop & Shop requires all associates, supervisors and managers to attend anti-harassment training.  The Company trains all new employees as part of its orientation program.  In addition, the Company distributes its anti-harassment policy to all employees each year.  Ex. A, Answer No. 1; Barsolou Dep. at 39.

40.     In addition to the noose incident, Rosemond relies on two comments made by David Terranova ("Terranova"), the Bake Shop lead clerk, whom he supervised. Rosemond Dep. at 22. Sometime in 2003, Rosemond arrived for a meeting with then store manager Mike Leach with two coffees, not expecting Terranova to be present. Terranova asked, "Where is my coffee? What am I, black?" Deposition of David Terranova at 9.

41.     After the meeting, Rosemond went downstairs and told Terranova that he did not appreciate the comment and never to say anything like that again. Terranova apologized, and Rosemond testified that he considered the issue closed. Rosemond Dep. at 25. He did not write up Terranova for disciplinary action. *Id.* at 24-25.

42.     The second incident occurred sometime before Thanksgiving in 2003. Rosemond Dep. at 27. According to Rosemond, during a discussion about shortage of help, Terranova allegedly said that if Stop & Shop would stop putting minorities in management positions, it would not have this problem. *Id.* at 25-26. Rosemond alleges that he was angry over the incident but admits that although he was a senior manager of the store with the authority and ability to discipline Terranova, he did not. Additionally, Rosemond never reported it to Stop & Shop management even though he understood that it was a violation of Stop & Shop policy. *Id.* at 11-12, 24, 28.

43.     Terranova confirmed his comment over the coffee and his apology, stating that it was intended as a joke. Terranova Dep. at 9-10. Terranova, however, denies the comment concerning "minorities" in management altogether. Instead, Terranova testified that Rosemond was complaining to him about women who had been promoted above him. It was Rosemond's opinion, Terranova testified, that there were certain people who were incompetent, specifically referring to Manager Marcy Wutka. Terranova testified that he said something to the effect of,

-10-

"that's what happens when they put women that don't know what to do in these jobs," but denies that he ever mentioned minorities. Terranova Dep. at 11-12. For the purpose of this summary judgment motion, Rosemond's version of this conversation is credited.

44.     Rosemond had no problems at the Northampton or West Springfield facilities, and no issues with his management co-workers in Chicopee. Rosemond Dep. at 20. Except for the isolated incidents in 2003 alleged in his complaint, Rosemond testified that he got along with everyone at the Chicopee store, did not believe there was anyone in the store who harbored any racial animosity towards him and did not experience any other racially harassing conduct at that store.[7] *Id*. at 52, 58. Moreover, he testified that he never experienced any other alleged racially harassing incidents in his career with Stop & Shop nor heard of any other incidents happening at the Company. *Id*. at 52-53. Specifically, Rosemond testified:

> Q. Did you get along pretty well with everybody in the store?
> A. Yes.
> Q. As far as you know, they were all your friends?
> A. As far as I know.
> Q. Do you have any reason to believe that there was somebody in the store who would have done this?
> A. I didn't have any reason to believe that.
> Q. That it was done in a way that was racially harassing?
> A. Did I think it was racially harassing?
> Q. No; did you have reason to believe that there was someone in the store who had racial animosity to do this?
> A. No; I didn't believe that.
> Q. Did you have any other racially harassing incidents in the store other than what you described with Mr. Taranova [sic]?
> A. No.
> Q. In your career at Stop & Shop, had you ever experienced anything like this, which was in your view racially harassing?
> A. No.
> Q. Had you ever seen anything like this?
> A. No.
> Q. Had you ever heard of anything like this happening at Stop & Shop?

---

[7] Indeed, as Flannery testified, it was apparent that everyone in the Chicopee store thought highly of Rosemond because he was a "people person." Flannery Dep. at 21-22, 26, 28.

      A.     No.

* * * *

      Q.     As far as you knew, there was nobody who was angry or mad or hostile or discriminatory or out to get you in any way at the store?
      A.     Not to my knowledge.
      Q.     You got along with everybody?
      A.     Yes.

45. Stop & Shop maintains strict policies regarding equal employment opportunity and harassment in the workplace. It communicates these policies to its employees through postings in work locations, direct distribution at time of hire and then once each year, and through training. Ex. A, Answer No. 1; Barsolou Dep. at 39-40.

46. In the Chicopee store, newly hired union associates complete a centralized orientation and training process which includes an anti-harassment component. During the training, participants receive a new hire package which includes a copy of the company's Anti-Harassment policy. Ex. A, Answer No. 1. The participants also view a videotape entitled "Respect is More Than a Right - Preventing Harassment in the Workplace." This training generally occurs prior to the first day of work. *Id*.

47. Stop & Shop conducts mandatory diversity training for all exempt employees in the Company, including the store management team. *Id*. Stop & Shop also conducts new hire orientation for all store management new hires. *Id*. As a part of the new hire program, participants view the "Respect is More Than a Right - Preventing Harassment in the Workplace" videotape and receive a copy of the Company's Anti-Harassment policy. *Id*. Store management trainees must also attend a two-week training program which includes a five to six hour training class on employment laws. *Id;* Rosemond Dep. at 123-24.

48. Rosemond understood that the Company's anti-harassment policy was important:

> Q. Do you understand from people like Mark Smith, Mike Leach and people you've worked with, how important that policy is to them and to the company?
> A. I'm sure it's important; yes.

Rosemond Dep. at 54.

49. Rosemond continues to be employed by Stop & Shop and has had no problems or issues at the West Springfield store. Rosemond Dep. at 120.

Dated: July 8, 2005

The Stop & Shop Supermarket Company LLC

By their attorneys,

/s/ Yvette Politis
Lisa J. Damon (BBO # 558843)
Yvette Politis (BBO # 644986)
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
(617) 946-4800 (telephone)
(617) 946-4801 (fax)