**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

**Civil Action No. 04-30072-MAP**

| | |
|---|---|
| **JOSEPH ROSEMOND,**<br>       **Plaintiff** | )<br>)<br>) |
| **v.** | )<br>) |
| **STOP AND SHOP SUPERMARKET<br>COMPANY,**<br>        **Defendant** | )<br>)<br>)<br>) |

**PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.    SUMMARY OF THE FACTS[1]**

On the morning of December 10, 2003, Mr. Rosemond, an African American, arrived at the Defendant's Chicopee Store and discovered a noose hanging from the ceiling of his office. See Complaint, paragraph 21; Answer and Additional Defenses, paragraph 21; photograph of hanging noose; Rosemond Dep., p. 37, 39-42.[2]

"[T]he crime of lynching succeeded slavery as the ultimate expression of racism in the United States following Reconstruction." See A Resolution Apologizing to the Victims of Lynching and the Descendants of Those Victims for the Failure of the Senate to Enact Anti-Lynching Legislation, S. Res. 39, 109th Cong. (2005). Lynching often

---

[1] For a complete recitation of relevant facts, Mr. Rosemond incorporates Plaintiff's Statement of Facts in Dispute.

[2] Mr. Rosemond and Marcy Wutka, the Perishables Manager of the Chicopee Store, shared an office. See Rosemond Dep., p. 37; see also Deposition of Charles Ingalls, hereinafter "Ingalls Dep.," p. 12, Ex. 1. The desks of Mr. Rosemond and Ms. Wutka were placed next to each other. See Rosemond Dep., pp. 40, Ex. 2. At the time Mr. Rosemond found the noose, Marcy Wutka was on vacation. See Rosemond Dep., p. 41-42; Rankin Dep., p. 23. Two of the employees involved in hanging the noose were aware that Ms. Wutka was not working on December 10th and Mr. Rosemond was scheduled to work. See Rankin Dep., pp. 23-24; Ingalls Dep., p. 30. Additionally, Gerald Bidwell, whose testimony is the sole support cited by Defendant regarding the placement of the noose, did not see the noose when it was hanging from the ceiling in Mr. Rosemond's office. See Bidwell Dep., pp. 13-14.

1

involved the use of a noose to brutally torture and kill African Americans. See 151 CONG. REC. S6365-S6378 (daily ed. June 13, 2005)(statements of Sen. Mary Landrieu [D-LA], Sen. Mark Pryor [D-AR], Sen. Richard Durbin [D-IL]). Because a noose is a symbol and instrument of racially motivated violence against African Americans, the noose made Mr. Rosemond feel offended, threatened, and intimidated. See Rosemond Psychiatric Evaluation, bates stamped 002-004, attached hereto as Exhibit 13; Rosemond Dep., pp. 50, 51-52, 98, 105. Mr. Rosemond explained, "I'm from South Carolina, when I was a kid, everyday you could turn on the TV and hear about a black man hanging from a tree. It brings back painful memories." See Russello Dep., Ex. 1.

Mr. Rosemond complained to Brian Whelan, the Store Manager, about the noose. See Complaint, paragraph 26; Answer and Additional Defenses, paragraph 26. Mr. Rosemond attempted to give the noose to Mr. Whalen and explained that the noose was hanging in his office when he arrived in the morning. See Rosemond Dep., pp. 61-62. In response to Mr. Rosemond's complaint, Mr. Whalen said, "Wow, I wonder who did that? Well, we'll get Security to pull the tapes and see what we can find." See Rosemond Dep., p. 62. Without taking additional action, making any other comments or asking any questions, Mr. Whalen turned away from Mr. Rosemond and resumed the work in which he had previously been engaged. See Rosemond Dep., p. 62. Mr. Whalen admitted that he did not take any action regarding Mr. Rosemond's complaint until after John Vey the head of security/loss prevention for the Chicopee Store notified him that Mr. Rosemond was upset. See Russello Dep., Ex. 1, bates stamped 26.[3]

Following Mr. Rosemond's complaint, Defendant conducted an investigation into the noose incident. See Barsolou Dep., pp. 11-12. Defendant was aware that Marcy Wutka had been on vacation when the noose was hung in Mr. Rosemond's office. See Defendant's Investigation Note, bates stamped 182,; Russello Dep., p. 15, Ex. 1.

---

[3]Although Mr. Whalen eventually apologized for his callous response, Mr. Rosemond testified that Mr. Whalen's apology seemed insincere. See Rosemond Dep., p. 75. Mr. Whalen later stated that he found "it was difficult for him to see Joe's point of view. He felt the whole thing was being blown out of proportion." See Id.

Nevertheless, the Defendant chose to focus its initial investigatory interviews on whether the incident was a threat to Marcy Wutka. <u>See</u> Flannery Dep., pp. 26-27, ex. 1; Rankin Dep., pp. 29-30.

The Defendant's investigation revealed that three of Defendant's employees were involved in the noose incident. <u>See</u> Barsolou Dep., p. 15; Deposition of Cynthia Flannery, hereinafter "Flannery Dep.," p. 39; 49; Ingalls Dep., p. 13; Rosemond Dep., p. 81. The investigation revealed that Charles Ingalls, the Head Cutter, and Jeramie Rankin, a Seafood Clerk, entered Mr. Rosemond's office and hung the noose. <u>See</u> Ingalls Dep., pp. 10-11, 20; Rankin Dep., pp. 12-13, 18-20, 30. The investigation also showed that Stanley Kaletta, the Manager of the Chicopee Store's Meat Department, later joined Mr. Rankin and Mr. Ingalls in Mr. Rosemond's office, saw the hanging noose, and jokingly commented "oh, who's the comedian?" <u>See</u> Rankin Dep., pp. 31; Ingalls Dep., p. 13. Mr. Kaletta entered approximately two minutes after Mr. Ingalls and Mr. Rankin, stayed in the office for approximately seven minutes, and left the office shortly after Mr. Ingalls and Mr. Rankin. <u>See</u> Videotape Information Sheet, bates stamped 22. At least one of the individuals who admitted to hanging the noose, Mr. Ingalls, testified that Mr. Kaletta was present during the noose hanging. <u>See</u> Ingalls Dep., p. 13. Scott Ziter, Defendant's Director of Security, told Mr. Rosemond that he had reviewed the security tapes, interviewed people, and discovered that Mr. Rankin, Mr. Ingalls and Mr. Kaletta hung the noose. <u>See</u> Rosemond Dep., p. 80-81.

Mr. Kaletta was the supervisor of Mr. Rankin and Mr. Ingalls. <u>See</u> Rankin Dep., p. 12; Ingalls Dep., p. 9. Nevertheless, Mr. Kaletta did not discipline or reprimand Mr. Rankin and Mr. Ingalls, take down the noose, report the incident, or take any other corrective action. <u>See</u> Rankin Dep., p. 35-36; Ingalls Dep., 13; Flannery Dep., p. 55-56, ex. 1, 3; Russello Dep., Ex. 1; Defendant's Investigation Notes, bates stamped 183. If Mr. Kaletta had responded appropriately to the noose, Mr. Rosemond could have been spared the harassment of finding a noose hanging in his office.

On December 12, 2003, after identifying Mr. Ingalls and Mr. Rankin as the individuals who hung the noose, Defendant suspended Mr. Rankin and Mr. Ingalls pending an investigation. <u>See</u> Flannery Dep., Ex. 4, Barsolou Dep., p. 16; Associate

3

Counseling Records, bates stamped 62-63, 65-66. Although Defendant was aware of Mr. Kaletta's involvement, Defendant did not suspend Mr. Kaletta pending the investigation. Defendant merely told Mr. Kaletta that the incident would be documented and placed in his file. See Flannery Dep., pp. 39, 55-56, Ex. 1, 3; Rankin Dep., pp. 31,35-36; Ingalls Dep., p. 13; Russello Dep., Ex. 1, bates stamped 27-28; Defendant's Investigation Notes, bates stamped 183. After the conclusion of its investigation, Defendant did not subject Mr. Kaletta to any disciplinary action, despite his admission that he failed to understand the seriousness of the incident. See Flannery Dep., p. 39; Defendant's Investigation Notes, bates stamped 183.[4]

During the investigation, Mr. Rankin and Mr. Ingalls admitted that they were involved in hanging the noose, but claimed that it was meant as a joke. See Flannery Dep., pp. 31-32, Ex. 1; Russello Dep., Ex. 1. Jeramie Rankin and Charles Ingalls were permitted to frequently make "jokes" based on national origin in the presence of their supervisor, Mr. Kaletta, and Defendant's Perishable Manager, Marcy Wutka. See Russello Dep., Ex. 1. Thus, Defendant had actual knowledge of prior discriminatory conduct by the individuals who hung the noose in Mr. Rosemond's office.

Additionally, during the summer of 2003, the Lead Clerk of the Chicopee Store Bake Shop, David Terranova, was permitted to make a racist "joke" directed at Mr. Rosemond in front of Mike Leach, the then-Store Manager. See Rosemond Dep., p. 21-23, 26; Deposition of David Terranova, dated December 9, 2004. When Mr. Rosemond entered a meeting without a cup of coffee for Mr. Terranova, Mr. Terranova exclaimed, "Where's my coffee? What am I, black?" See Rosemond Dep., p. 23; Terranova Dep., p. 9. Although Mr. Leach was present to hear Mr. Taranova's statement, Mr. Leach did not reprimand Mr. Taranova or indicate in any way that the statement was inappropriate. See Terranova Dep., p. 9-10.

Allan Cave, an African American and Defendant's then-Vice President of Human

---

[4]Mr. Ziter told Mr. Rosemond, "I really don't think it's serious enough for them to lose their job but they will be disciplined." See Rosemond Dep., pp. 93-94. Mr. Rosemond was so upset following this conversation that he left work and went to see his doctor. See Rosemond Dep., p. 98.

Resources, was one of four people involved in making the final decision regarding the disciplinary action for Mr. Ingalls, Mr. Rankin and Mr. Kaletta. See Barsolou Dep., p. 16, 19. Mr. Cave believed that the employees involved in the noose incident should have been terminated. See Barsolou Dep., p. 18. While Mr. Rosemond was out of work, Mr. Cave contacted Mr. Rosemond. Mr. Cave expressed that "as a person of color," he understood how Mr. Rosemond felt. See Rosemond Dep., pp. 89-90. Similarly, Kathleen Russello, Defendant's Human Resources Director for the New York Division who was assigned by Allan Cave to assist in the investigation of the noose incident, testified that she was disturbed by the noose, in part, because Mr. Rosemond was an African American and the noose brought to mind lynchings. See Russello Dep., p. 15.

Defendant's employees have indicated that theft in the amount of a nickle, harassment, threats and violence are all offenses which would result in immediate termination. See Barsolou Dep., p. 33; Collins Dep., pp. 28; Russello Dep., p. 23; Flannery Dep., p. 36. Nevertheless, Defendant decided that the hanging of a noose in an African American's office was not a terminable offense. See Barsolou Dep., p. 17, 33; Russello Dep., pp. 23; Collins Dep., pp. 23-24, 28. On or about December 26, 2003, at the conclusion of Defendant's investigation, Mr. Ingalls and Mr. Rankin were permitted to return to work without any additional disciplinary action. See Ingalls Dep., pp. 22-23; Rankin Dep., pp. 13-14; Barsolou Dep., pp. 16-18; Associate Counseling Records, bates stamped 62-63, 65-66.

Mr. Rosemond was unable to return to work for seven months due to the emotional distress, reoccurring headaches, and insomnia that he suffered as a result of finding a noose hanging in his workspace and Defendant's callous response thereto. See Rosemond Psychiatric Evaluation, bates stamped 002-004; Rosemond Dep., pp. 106-112.

Resources, was one of four people involved in making the final decision regarding the disciplinary action for Mr. Ingalls, Mr. Rankin and Mr. Kaletta. <u>See</u> Barsolou Dep., p. 16, 19. Mr. Cave believed that the employees involved in the noose incident should have been terminated. <u>See</u> Barsolou Dep., p. 18. While Mr. Rosemond was out of work, Mr. Cave contacted Mr. Rosemond. Mr. Cave expressed that "as a person of color," he understood how Mr. Rosemond felt. <u>See</u> Rosemond Dep., pp. 89-90. Similarly, Kathleen Russello, Defendant's Human Resources Director for the New York Division who was assigned by Allan Cave to assist in the investigation of the noose incident, testified that she was disturbed by the noose, in part, because Mr. Rosemond was an African American and the noose brought to mind lynchings. <u>See</u> Russello Dep., p. 15.

Defendant's employees have indicated that theft in the amount of a nickle, harassment, threats and violence are all offenses which would result in immediate termination. <u>See</u> Barsolou Dep., p. 33; Collins Dep., pp. 28; Russello Dep., p. 23; Flannery Dep., p. 36. Nevertheless, Defendant decided that the hanging of a noose in an African American's office was not a terminable offense. <u>See</u> Barsolou Dep., p. 17, 33; Russello Dep., pp. 23; Collins Dep., pp. 23-24, 28. On or about December 26, 2003, at the conclusion of Defendant's investigation, Mr. Ingalls and Mr. Rankin were permitted to return to work without any additional disciplinary action. <u>See</u> Ingalls Dep., pp. 22-23; Rankin Dep., pp. 13-14; Barsolou Dep., pp. 16-18; Associate Counseling Records, bates stamped 62-63, 65-66.

Mr. Rosemond was unable to return to work for seven months due to the emotional distress, reoccurring headaches, and insomnia that he suffered as a result of finding a noose hanging in his workspace and Defendant's callous response thereto. <u>See</u> Rosemond Psychiatric Evaluation, bates stamped 002-004; Rosemond Dep., pp. 106-112.

## LEGAL ARGUMENT

## II.    SUMMARY JUDGMENT SHOULD NOT BE ALLOWED BECAUSE THERE IS SUFFICIENT EVIDENCE TO ALLOW A FAIR-MINDED JURY TO RETURN A VERDICT FOR THE PLAINTIFF.

Rule 56(c) of the Federal Rules of Civil Procedure provides that a party moving for summary judgment has the burden of demonstrating that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "It is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the Plaintiff has no evidence to prove his case." Celotex Corporation v. Catrett, 477 U.S. 317, 328 (1986) (White, J., concurring).

In deciding a motion for summary judgment, the Court should view the facts in the light most favorable to the non-moving party and "indulge all reasonable inferences in that party's favor." Flanagan-Uusitalo v. D.T. Industries, Inc., et.al., 2001 U.S. Dist. LEXIS 23034 at 10 (D. Mass. Dec. 20, 2001); see also O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993). "[A]part from that which may be inherently incredible, the non-moving party is entitled to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in [the evidence] resolved favorably to him. . . ." Greenburg v. Puerto Rico Maritime Shipping Auth., 835 F.2d 932, 934 (1st Cir. 1987), quoting Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979)). Based on the evidence viewed in the light most favorable to the non-moving party, the Court must consider "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

The Massachusetts Supreme Judicial Court has held that summary judgment is a disfavored remedy in discrimination cases because issues of discriminatory intent are factual questions, which are more appropriately decided by the "finder of fact after weighing the circumstantial evidence and assessing the credibility of the witnesses." Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 440-446, 646 N.E.2d 111 (1995).

6

As will be shown below, a fair-minded jury could reasonably return a verdict in Mr. Rosemond's favor.  Therefore, Defendant's motion for summary judgment should be denied.

## III.    LEGAL FRAMEWORK OF RACIAL HARASSMENT CASES

To demonstrate that he has been subjected to unlawful harassment under Massachusetts General Laws Chapter 151B ("Chapter 151B") and 42 U.S.C. § 2000e et seq ("Title VII"), Mr. Rosemond must demonstrate the following:

1.    Mr. Rosemond was subjected to harassment because of his race;
2.    Mr. Rosemond subjectively felt that the harassment altered his working environment and created a barrier to full participation in the workplace; and
3.    A reasonable African American in Mr. Rosemond's position would find that the harassment altered his working environment and  created a barrier to full participation in the workplace.

Under Chapter 151B, an employer is unconditionally liable for unlawful harassment by its supervisors.  See College-Town, Div. of Interco, Inc. v. Mass. Comm'n Against Discrimination, 400 Mass. 156, 165 (1987).

Under Title VII, an employer is liable for unlawful harassment by a supervisor unless the employer can demonstrate that the employer exercised reasonable care to prevent and correct promptly any harassing behavior and the plaintiff/employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm.  See Faragher v. Boca Raton, 524 U.S. 775, 807 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998).

Under both Title VII and Chapter 151B, an employer will be liable for unlawful harassment perpetrated by a non-supervisory employee if it knew about the harassment, and failed to take prompt, appropriate and effective remedial action.  See Crowley v. L.L. Bean, Inc., 303 F.3d 387, 401 (1st Cir. 2002); College-Town, 400 Mass.

7

156, 508 N.E.2d 587 (1987);  Massachusetts Commission Against Discrimination
Guidelines on Sexual Harassment, Section V(F).  (A copy of which is attached hereto
for the convenience of the Court.)

### IV.    THE NOOSE WAS DIRECTED AT PLAINTIFF BECAUSE OF HIS RACE

Indeed, the noose is among the most repugnant of all racist symbols,
because it is itself an instrument of violence.  It is impossible to appreciate
the impact of the display of a noose without understanding this nation's
opprobrious legacy of violence against African-Americans.  One study
notes that from 1882, the earliest date for reliable statistics, to 1968,
3,446 African-Americans died at the hands of lynch mobs.  See Robert L.
Zangrado, The NAACP Crusade Against Lynching, 1909-1950, 4 (1980).
Obviously, these figures underestimate the actual number of blacks who
were victims of lynchings because such atrocities were underreported,
and southern whites frequently attempted to suppress evidence of mob
violence for fear of the enactment of a federal anti-lynching law.  See id.

Williams v. New York City Hous. Auth., 154 F. Supp. 2d 820, 824 (S.D.N.Y.
2001)

Lynching had a powerful terroristic effect on the target population.  Some black
southerners witnessed the violence firsthand, but even those who did not could
hardly escape awareness of the practice.  The use of violence was aimed not
just at the individual victim but at the black community generally . . . .  As a
result, southern blacks lived with the knowledge that any one of them could be a
victim at any time. Lu-in Wang, The Complexities of "Hate," 60 Ohio St. L. J.
799, 835-36 (1999).  See also Leon F. Litwack, Trouble in Mind:  Black
Southerners in the Age of Jim Crow 290 (1998) ("Once having settled on lynch
justice, mobs were not overly scrupulous about determining the guilt of the black
victim.   The idea, after all, as one black observer noted, was to make an
example, 'knowing full well that one Negro swinging from a tree will serve as well
as another to terrorize a community.' ")

Id., at 824, n.2.

The lynchings in this nation's past cannot be relegated to the history books.  As

8

one essayist noted: "That is [the] rite of colored male passage: having to drag all those lynchings around with them, around their necks: those are their ancestors."  Hilton Als, GWTW in Without Sanctuary: Lynching Photography in America 38, 41 (2000) (examining Henry Dumas's short story, "Ark of Bones"). The hangman's noose remains a potent and threatening symbol for African-Americans, in part because the grim specter of racially motivated violence continues to manifest itself in present day hate crimes.

Id., at 824-825.

Of the many cases involving nooses from all over the United States which were cited by Defendant, there was not a single case where the Court held that the hanging of a noose was not a racially motivated action. See Ford v. West, 222 F.3d 767 (10th Cir. 2000); Glenn v. Hogan Bros., Inc., Civil Action No. 03-6578, slip op. (E.D. PA June 24, 2005); Robinson v. Valmont Industries, 238 F.3d 1045, 1047 (8th Cir. 2001); Pedigo v. National Cart Co., Inc., 2004 U.S. App. LEXIS 8230 (8th Cir. 2004); Vance v. Southern Bell Telephone & Telegraph Co., 863 F.2d 1503 (11th Cir.1989); Hardy v. USF Reddaway, Inc., 2004 U.S. Dist. LEXIS 10179 (D. Or. 2004); Wilson v. Dana Corp., 210 F. Supp. 2d 867 (W.D. KY 2002); Miller v. Rowan Cos., Inc., 55 F. Supp. 2d 568 (S.D. Miss. 1998); Lewis v. Snow, 2003 U.S. Dist. LEXIS 15700 (S.D.N.Y. 2003); Settle v. Baltimore County, 34 F. Supp. 2d 969 (D. MD 1999); Snell v. Suffolk County, 782 F.2d 1094 (2d Cir. 1986); Henderson v. International Union, 263 F. Supp. 2d 1245 (D. Kan. 2003).  See also Williams, 154 F. Supp. 2d 820.[5]

---

[5]The majority of the cases cited by the Defendant are distinguishable from the present case.  In Ford, the noose was not hung in or near the plaintiff's workspace or directed at the plaintiff in any way.  Additionally, the perpetrator who hung the noose was terminated and sent back to prison.

In Robinson, the Court stated that the plaintiff had suffered unwelcome, racially motivated harassment.  Summary judgment was granted because the plaintiffs did not dispute the promptness or adequacy of the remedial action taken by the defendant.

In Miller, the plaintiff described the incident as a joke prior to speaking to an attorney.  This fact alone would indicate that the plaintiff did not find the noose subjectively harassing.  Additionally, upon learning of the noose, the plaintiff's supervisor destroyed the noose and expressed disapproval.  Nevertheless, the supervisor was subjected to formal counseling for failing to punish the employees who were involved in leaving the noose for the plaintiff.

In Lewis, an African American co-worker of the plaintiff sent the plaintiff an email stating that the co-worker had seen a figurine of Michael Jordan hanging from a noose in a Caucasian co-worker's office.  The plaintiff never saw the noose at issue.  Additionally, the plaintiff's action was untimely.

In Settle, the noose was a loop of bungee cord that had been taped to a broom handle.  The plaintiff saw a co-worker carrying the item he described as a noose on only one occasion.   The noose was not in or near the

9

In <u>Vance v. Southern Bell Telephone & Telegraph Co.</u>, 863 F.2d 1503, 1511 (11th Cir.1989), the Court noted "It is hard to imagine an incident of this sort taking place in 1984.  The grossness of hanging an object resembling a noose at the work station of a black female is self-evident."  <u>Id.</u>

Contrary to Defendant's assertions, this case does not merely involve the hanging of a noose in isolation, with no other circumstances.  Rather, it involves the hanging of a noose in the office of Mr. Rosemond, an African American man.  <u>See</u> Rosemond Dep., p. 37, 39-42.  The noose was hung in Mr. Rosemond's office, when he was scheduled to be the only employee who was working there.  <u>See</u> Rosemond Dep., p. 41-42; Rankin Dep., p. 23.  Two of the three individuals involved in hanging the noose admitted that they were aware that Mr. Rosemond's Caucasian officemate was not working on the day they hung the noose.  <u>See</u> Ingalls Dep., p. 30; Rankin Dep., pp. 23-24.  Additionally, two of the individuals involved, who claimed that hanging the noose was merely a joke,[6] were known to engage in jokes regarding national origin while at

---

plaintiff's workspace or directed at the plaintiff or any other African American. Other African American employees indicated that they had seen the item that the plaintiff described as a noose and were not offended by it.

Wilson is a case under the Kentucky Civil Rights Act and has absolutely no relevance to the present action. Additionally, the plaintiffs did not allege that the defendant should have taken stronger action against perpetrators.

In Glen, an unpublished slip opinion from Pennsylvania, there was no supervisor who saw the noose before the plaintiff saw it and had an opportunity to remove the noose. Additionally, the Glen Court held that as long as the employer takes a remedial step, it cannot be held liable for harassment. However, Massachusetts case law indicates that remedial action must be prompt, appropriate and effective. See Saad v. Stanley Street Treatment and Resources, Inc., 1994 U.S. Dist. LEXIS 20728 at *25-26, 1994 WL 846911 at *10 (D. Mass. May 20, 1994)("answer to that inquiry is properly shaped by the specific tenor of the situation they were called upon to address"), citing Ellison v. Brady, 924 F.2d 872, 881 (9th Cir. 1991)(remedy should be reasonably calculated to end harassment and persuade potential harassers to refrain from unlawful conduct); MCAD Fact Sheet, Sexual Harassment in Employment ("Generally, the corrective action should reflect the severity of the conduct."); Massachusetts Commission Against Discrimination Guidelines on Sexual Harassment, Section V(F).

[6]In an apparent attempt to diminish the severity of a noose hanging in an African American employee's office, Defendant suggests that the noose was just a joke. Defendant seems to argue that because the individuals involved in hanging the noose allegedly perceived their action to be a joke, the noose should not be considered to be a racial incident. The Defendant has not cited to any case law in support of this position. In fact, individuals engaging in unlawful harassment often think that their harassing actions are amusing or funny. See e.g. Danco, Inc. v. Wal-Mart Stores, Inc., 178 F.3d 8 (1st Cir.1999). "As a result, instances of racial violence or threatened violence which might appear to white observers as mere "pranks" are, to black observers, evidence of threatening, pervasive attitudes closely associated with racial jokes, comments or nonviolent conduct which white observers are also more likely to dismiss as non-threatening isolated incidents." Harris v. Int'l Paper Co., 765 F. Supp. 1509, 1516 (D. Me. 1991), citing to Matsuda, Public Response to Racist Speech:  Considering the Victim's Story, 87 Mich.L.Rev. 2320, 2326-35 (1989). As a result, the Massachusetts Commission Against Discrimination ("MCAD") guidelines on

10

work. See Russello Dep., Ex. 1.

In this case, Mr. Rosemond told Defendant that he was extremely upset about the noose because it represented a lynching to him. Mr. Rosemond explained, "I'm from South Carolina, when I was a kid, everyday you could turn on the TV and hear about a black man hanging from a tree. It brings back painful memories." See Russello Dep., Ex. 1. Additionally, it was not merely Mr. Rosemond who perceived a noose to have racial implications. Several of the individuals involved in Defendant's investigation expressed serious concern about the racial implications of a noose hanging in Mr. Rosemond's workspace. See Russello Dep., pp. 14-15, 25, Ex. 1; Barsolou Dep., pp. 12, 20-21; Bidwell Dep., pp. 28-29.

For instance, Mr. Isaac Kibodya, another African American employee at the Chicopee Store, expressed his concern about the situation and told Defendant that a noose "cannot have a second meaning to any African American." See Russello Dep., p. 25, Ex. 1. Similarly, Kathleen Russello, Defendant's Human Resources Director for the New York Division, testified that she was disturbed by the noose, in part, because Mr. Rosemond was an African American. She testified that "It was disturbing to me because in my mind it absolutely brought to mind lynchings, it brought to mind people hurting themselves or killing themselves, absolutely." See Russello Dep., p. 15. Furthermore, Allan Cave, Defendant's then-Vice President of Human Resources[7] and the only African American involved in Defendant's disciplinary decisions related to this incident, believed that the employees involved in the noose incident should have been terminated. See Barsolou Dep., p. 18. In a discussion regarding whether the individuals should be terminated, Mr. Cave expressed his viewpoint and explained the meaning and significance of a noose to African Americans to Donald Barsolou, Defendant's Vice President of Operations. See Barsolou Dep., p.20, 21. Additionally,

---

sexual harassment specifically include "jokes" as a form of unlawful harassment. See MCAD Guidelines, Section II (C)(1). Furthermore, such issues of discriminatory intent are factual questions, which are more appropriately decided by the "finder of fact after weighing the circumstantial evidence and assessing the credibility of the witnesses." Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 440-446, 646 N.E.2d 111 (1995).

[7]Mr. Cave has left the Defendant's employ.

while Mr. Rosemond was out of work, Mr. Cave contacted Mr. Rosemond.  Mr. Cave
expressed that "as a person of color," he understood how Mr. Rosemond felt.  See
Rosemond Dep., pp. 89-90.

Two of the three individuals involved in hanging the noose in Mr. Rosemond's
office, Mr. Ingalls and Mr. Rankin, acknowledged their awareness of the fact that
nooses had been used to hang African Americans.  See Ingalls Dep, pp. 15-16; Rankin
Dep., p. 24.[8]

When asked about the significance of a noose, Gerald Bidwell, one of
Defendant's investigators, stated that a noose reminded him of World War II stories,
"not to mention the things that Joe mentioned.  I mean, it was pretty obvious.
Obviously, I'm old enough to remember Martin Luther King and some of the various
things that happened down through the ages, so yes, it had significance."  See Bidwell
Dep., p. 31.

Donald Barsolou testified that he understood that the phrase "the significance of
the noose" meant "Based on Joe being African-American and the significance of a
noose to someone of African-American descent -- people of that culture and in the
south that a noose had a significance that was negative."  See Deposition of Donald
Barsolou.

Cynthia Flannery, a Human Resources Manager for Defendant, reluctantly
admitted that she was aware that a noose could be a racial symbol because black
people were hung with them.  See Flannery Dep., p. 62.

While it may have been "possible"[9] for a noose to have another meaning in

---

[8]Additionally, Mr. Kaletta stated that he felt that Mr. Rosemond was "offended very easily" but that he
understood that Mr. Rosemond was upset about the noose because, "back in the civil rights days, there were a lot of
lynchings going on."  See Kaletta Dep., p. 26.

[9]During Mr. Rosemond's deposition, Defendant's counsel asked Mr. Rosemond a hypothetical question
about whether it was possible for a person of another ethnic or cultural background to not have seen the noose as
racist.  See Rosemond Dep., p. 127.  Because Mr. Rosemond responded that it was possible, Defendant argues that
Mr. Rosemond did not think the noose in this particular situation was necessarily a racist symbol.  However, this
argument does not make sense in the context of this particular noose (i.e., one that was left in the office of an African
American).  For example, while the Nazis in World War II targeted many different groups of individuals, it would be
an untenable position to argue that a swastika left in a Jewish employee's office was not necessarily a symbol of anti-
Semitism.

another place and time and under a different set of circumstances, this particular noose was hung, allegedly as a joke, in the office of an African American man by individuals who had a history of making "jokes" about employees' national origins.  See Rosemond Dep., p. 37, 39-42; See Russello Dep., Ex. 1.  Under these circumstances, most African Americans would consider the noose to be a racist symbol.  See Bracey Dep., pp. 51, 79, 80-81, 88, 98-101.

## V.    HANGING A NOOSE IN THE OFFICE OF AN AFRICAN AMERICAN IS SEVERE AND PERVASIVE HARASSMENT

The First Circuit has indicated that "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.  These may include the frequency of the discriminatory conduct;  its severity;  whether it is physically threatening or humiliating, or a mere offensive utterance;  and whether it unreasonably interferes with an employee's work performance." Landrau-Romero v. Banco Popular De Puerto Rico, 212 F.3d 607, 613 (1st Cir. 2000).  Similarly, the Supreme Judicial Court has stated that, to prevail on a hostile work environment claim, a plaintiff must demonstrate that the environment was "pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization, [and poses] a formidable barrier to full participation of an individual in the workplace."  Cuddyer v. Stop & Shop Supermarket Co., 434 Mass. 521, 532 (2001) (internal citations omitted).

Both Massachusetts and Federal courts have indicated that one or more characteristics of a victim may be incorporated into the reasonable person standard if relevant to the claims and the characteristics do not reduce it to a subjective standard. See also Muzzy v. Cahillane Motors, Inc., 434 Mass. 409 (2001); Harris v. Int'l Paper Co., 765 F. Supp. 1509, 1515-1516 (D. Me. 1991); McGinest v. GTE Sercvice Corp., 360 F.3d 1103 (9th Cir. 2004) ("By considering both the existence and the severity of discrimination from the perspective of a reasonable person of the plaintiff's race, we recognize forms of discrimination that are real and hurtful, and yet may be overlooked if considered solely from the perspective of an adjudicator belonging to a different group than the plaintiff.").  See also Oncale v. Sundower Offshore Servs., Inc., 523 U.S. 75,

13

80 (1998) ("Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the Plaintiff's position would find severely hostile and abusive."). As a result, the appropriate standard in this case is that of a reasonable African American.[10]

State and Federal courts in Massachusetts have recognized that "a single act of harassment may, if egregious enough, suffice to evince a hostile work environment." Noviello v. City of Boston, 398 F.3d 76, 84 (1st Cir. 2005); citing Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (Title VII); Gnerre v. Mass. Comm'n Against Discrimination, 402 Mass. 502, 524 N.E.2d 84, 88-89 (1988) (chapter 151B - Landlord/Tenant). In Gnerre, the Court recognized that "the more offensive the comments the fewer incidents of harassment may be required to demonstrate the objective reasonableness of the claim. . . ." Gnerre, 402 Mass. at 508. Additionally, the Court recognized that "Very threatening behavior . . . , for instance, might render a tenancy less desirable after even one incident. . . ." Id.

In this case, two Caucasian employees hung a noose in an African American employee's office with the approval of their Caucasian supervisor. The Caucasian supervisor observed the noose, joked about the noose, and left the noose for the African American employee to find when he arrived at work.[11] As noted above, "the noose is among the most repugnant of all racist symbols, because it is itself an instrument of violence." See Williams, 154 F. Supp. 2d at 824. One Federal District Court has noted that a "Defendant's contention, however that the display of a noose by a white supervisor in his office could not, as a matter of law, sufficiently 'alter the conditions of employment' for an African-American employee is naive and untenable."

---

[10]Defendant does not appear to dispute that Mr. Rosemond subjectively felt the harassment to be sufficiently offensive to alter his working environment. There is more than sufficient evidence for a jury to conclude that Mr. Rosemond found the conduct to be subjectively offensive. Mr. Rosemond was unable to return to work for seven months due to the emotional distress, reoccurring headaches, and insomnia that he suffered as a result of finding a noose hanging in his workspace and Defendant's callous response thereto. See Rosemond Psychiatric Evaluation, bates stamped 002-004; Rosemond Dep., pp. 106-112.

[11]Within months before this incident, another Caucasian employee was permitted to direct a racist "joke" at the African American employee in front of their Causcasian supervisor.

Id. at 826.[12]   Another Federal District Court noted that "[t]he omnipresence of race-based attitudes and experiences in the lives of black Americans [may cause] even nonviolent events to be interpreted as degrading, threatening, and offensive. Even an inadvertent racial slight unnoticed either by its white speaker or white bystanders will reverberate in the memory of its black victim." Harris, 765 F. Supp. 1509, 1516 (D. Me. 1991) (internal citations omitted)(noting that 'instances of racial violence or threatened violence which might appear to white observers as mere 'pranks' are, to black observers, evidence of threatening, pervasive attitudes'), vacated in part on other grounds, 765 F. Supp. 1529 (D. Me. 1991).

       Similarly, in Vance v. Southern Bell Telephone & Telegraph Co., 863 F.2d 1503, 1511 (11th Cir.1989), a noose was hung on two occasions in the light fixture over the work station of the plaintiff, an African American female.  Although the plaintiff did not complain about the noose incidents at the time, she brought the incidents up to the employer several months later during a grievance hearing.  In addition to the noose incidents, the plaintiff provided evidence that she was arguably treated more harshly than white employees on at least two occasions. The district court judge granted the defendant's motion for judgment not withstanding the verdict, holding that two incidents of harassment were insufficient as a matter of law to establish a hostile work environment claim.  The Eleventh Circuit disagreed with the trial judge and held that "the totality of the circumstances necessarily includes the severity, as well as the number, of incidents of harassment."  Id.  Additionally, the Court noted "It is hard to imagine an incident of this sort taking place in 1984.   The grossness of hanging an object resembling a noose at the work station of a black female is self-evident." Id.

---

[12]Plaintiff has been unable to locate any cases in Massachusetts cases that involve the hanging of a noose in the workplace of an African American. In Landrau-Romero v. Banco Popular De Puerto Rico, 212 F.3d 607, 613 (1st Cir. 2000), the First Circuit did consider a claim of racial harassment involving racist comments. The plaintiff claimed that he was mistreated by his supervisor over a period of several years. However, the only directly race-related mistreatment involved a comment about his "kinky hair" and a complaint made by a supervisor about the plaintiff meeting with other black workers about a discrimination complaint. The Court held that, while the plaintiff's evidence was not overwhelming, there was sufficient evidence to survive summary judgment. A reasonable jury could conclude that the harassment suffered by Mr. Rosemond, which involved the use of a symbol of racist violence against African Americans, was at least as severe as one comment about "kinky hair" and one remark regarding a discrimination complaint.

Because a noose is a symbol and instrument of racially motivated violence against African Americans, the noose made Mr. Rosemond feel offended, threatened, and intimidated. See Rosemond Psychiatric Evaluation, bates stamped 002-004, attached hereto as Exhibit 13; Rosemond Dep., pp. 50, 51-52, 98, 105. The average African-American would be likely to view a noose in his or her workspace as an act of racial aggression and hostility. See Bracey Dep., p. 80-81.

As noted above, both of the two other African American employees who were involved in Defendant's investigation of this incident, indicated that they were seriously disturbed by the noose and understood Mr. Rosemond's response. See Russello Dep., p. 25, Ex. 1; Barsolou Dep., pp. 18, 20, 21; Rosemond Dep., pp. 89-90. A jury could conclude that a reasonable African American in Mr. Rosemond's position would have felt that finding a noose hung in his office was sufficiently severe and pervasive to alter his working environment and create a barrier to full participation in the workplace. Therefore, summary judgment should be denied.

## VI.    SUPERVISORY EMPLOYEE ENGAGED IN HARASSING BEHAVIOR

### A.    Under 151B, Defendant Is Strictly Liable for Harassment by Supervisors

Under Chapter 151B, an employer is unconditionally liable for unlawful harassment by its supervisors. College-Town, Div. of Interco, Inc. v. Mass. Comm'n Against Discrimination, 400 Mass. 156, 165 (1987).[13] In College-Town, the Supreme Judicial Court held that "It is clear that the Legislature intended that an employer be liable for discrimination committed by those on whom it confers authority." Id. The Court explained that harassment committed by a supervisor appears to convey the employer's approval of the harassment and "carries an implied threat that the supervisor will punish resistance through exercising supervisory powers, which may

---

[13]Defendant argues, without citation to any case law, that this strict liability standard is not actually unconditional. Defendant suggests that Mr. Rosemond must demonstrate that Kaletta was on notice of a complaint by Mr. Rosemond. However, the Massachusetts Supreme Judicial Court explicitly stated in College-Town, that if a supervisor is involved in perpetrating the harassment, no complaint by the plaintiff is necessary. See College-Town, 400 Mass. at 167.

16

range from discharge to assignment of work, particularly exacting scrutiny, or refusal to protect the employee from coworker harassment." Id. at 165-166.

The MCAD[14] has indicated that "[i]n some circumstances, an employer may be liable for the actions of a supervisor, even if that supervisor does not have direct supervisory authority over the Complainant." See MCAD Guidelines on Sexual Harassment, Section III(B).

The MCAD has stated that types of factors which are considered as indications of supervisory authority include, but are not limited to the following:

- Undertaking or recommending tangible employment decisions affecting an employee;
- Directing activities, assigning work and controlling work flow;
- Hiring, firing, promoting, demoting or disciplining;
- Altering or affecting an employee's compensation or benefits;
- Evaluating an employee's work load;
- Distributing necessary supplies and tools;
- Giving directions and verifying and fixing mistakes;
- Assisting employees in assigning tasks; and
- Monitoring and evaluating work performance.

See Id. Additionally, the MCAD has specifically noted that an "employer may be vicariously liable for sexual harassment even if the alleged harasser is not formally designated as a supervisor and even if a supervisor lacks actual authority, under the doctrine of apparent authority. See Id.; see also Belanger v. Saint-Gobain Industrial Ceramics, Inc., 9 Mass. L. Rep. 581, 1999 Mass. Super. LEXIS 89, *17 (Mass. Super. Ct. Feb. 18, 1999) ("To date, the Massachusetts appellate courts have not ruled that a company is not vicariously responsible for harassment committed by a low-level supervisor, and this Court also declines to so rule.").  Thus, the ability to hire and fire employees is not essential to the determination that an employee is a supervisor under

---

[14]"We note that an administrative interpretation of a statute is accorded deference particularly where, as here, an agency must interpret a legislative policy which is only broadly set out in the governing statute." College-Town, 400 Mass. at 165 (citations omitted).

Chapter 151B.[15]

Stanley Kaletta fell within this definition of a supervisory employee. Stanley Kaletta, Defendant's Meat Department Manager, testified that his duties and responsibilities as the Meat Department Manager included "oversee[ing] the meat and Seafood Department, ordering, scheduling, just delegation of work for the employees that are there." See Kaletta Dep., p. 7. Defendant has noted that, as a department manager, Mr. Kaletta was expected to pass on any information about unlawful harassment. See Kaletta Report of Change, bates stamped 61 (Defendant's Exhibit F). Additionally, the Defendant stated that "he needs to understand as a Department Manager he cannot condone this kind of behavior." See Id. As the Meat Department Manager, Mr. Kaletta supervised the employees in the Meat and Seafood Department, including Mr. Ingalls and Mr. Rankin. See Rosemond Dep., p. 127; Ingalls Dep., 9; Rankin Dep., pp. 12, 14; Kaletta Dep., pp. 7-8. Therefore, a jury could reasonably conclude that Mr. Kaletta was a supervisor under Chapter 151B.

On December 10, 2003, Mr. Kaletta joined Mr. Ingalls and Mr. Rankin in Mr. Rosemond's office,[16] saw them hanging the noose in Mr. Rosemond's office, and commented "Oh, who's the comedian?" See Rosemond Dep., p. 80-81; Rankin Dep., p. 12, 31; Ingalls Dep., p. 9, 13; Russello Dep., Ex. 1, bates stamped 27-28; Defendant's Investigation Notes, bates stamped 183. Mr. Kaletta spent approximately seven minutes in Mr. Rosemond's office with Mr. Ingalls and Mr. Rankin and made a joke about the noose. See Videotape Information Sheet, bates stamped 22; Rankin Dep., pp. 31; Ingalls Dep., p. 13. As a Meat Department Manager, Mr. Kaletta was expected to communicate any information about unlawful harassment. See

---

[15]Defendant cites to Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005) for the proposition that Kaletta was not a supervisor because he did not have the authority to hire or fire employees. However, the Court in Noviello was following the standard propounded in a Seventh Circuit case. As noted above, Massachusetts courts and agencies have defined the term "supervisor" far more broadly than the standard described in Noviello.

[16]Defendant misleadingly suggests that Mr. Kaletta thought the noose was a joke which was directed at himself. However, Mr. Kaletta actually testified that he heard people giggling before he saw the noose and thought someone was playing a joke on him. He did not indicate that he thought the noose was a joke which was directed at himself. See Kaletta Dep., pp. 13-14, 21-22.

Defendant's Exhibit F. Although Mr. Kaletta was a supervisory employee and expected to pass on any information about unlawful harassment, Mr. Kaletta did not reprimand his subordinates or express disapproval, take down the noose, report the incident, or take any other preventive or corrective action. See Rankin Dep., p. 12, 35-36; Ingalls Dep., 9, 13; Flannery Dep., p. 55-56, ex. 1, 3; Russello Dep., Ex. 1, bates stamped 27-28; Defendant's Investigation Notes, bates stamped 183. If Mr. Kaletta had responded appropriately to the noose, Mr. Rosemond would have been spared the trauma of finding a noose hanging in his office.   As a result of Mr. Kaletta's inaction and complicit approval of the noose of his subordinates' behavior, Mr. Rosemond, an African American, arrived at work to find a noose hanging in his office. See Complaint, paragraph 21; Answer and Additional Defenses, paragraph 21; photograph of hanging noose; Rosemond Dep., p. 37, 39-42.

Defendant admits that if a supervisor condoned the harassing behavior, an employer may be held liable for the harassment. See Defendant's Brief, p. 14. From the  evidence on record, a jury could reasonably conclude that Mr. Kaletta, an employee upon whom the Defendant conferred supervisory authority, participated in and condoned unlawful harassing behavior. Therefore, summary judgment should be denied.

**B.**     **Under Title VII, Defendant Is Liable for Harassment by Supervisors Because It Cannot Establish An Affirmative Defense**

The United States Supreme Court has held that an employer is vicariously liable for sexual harassment conducted by an employee's immediate supervisor or supervisory employee. See Faragher v. Boca Raton, 524 U.S. 775, 807 (1998) and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998).   An affirmative defense is available to the employer if there has been no tangible employment action and the employer exercised reasonable care to prevent and correct promptly any harassing behavior and the plaintiff/employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm. Both elements are necessary to provide the employer with the opportunity to assert the affirmative defense. Faragher, 524 U.S. at 807.   Therefore, if the harassed

employee takes advantage of the preventive and corrective opportunities, an employer may cite to its prompt action only for the purpose of limiting its damages, not avoiding liability.

In the present action, it is undisputed that Mr. Rosemond took advantage of corrective opportunities, by making a complaint to his supervisor, Brian Whelan and participating in the Defendant's investigation. See Complaint, paragraph 26; Answer and Additional Defenses, paragraph 26; Rosemond Dep., pp. 61-62. Additionally, as will be discussed more fully below, a reasonable juror could conclude that Defendant did not exercise reasonable care to prevent and correct promptly the harassing behavior.

## VII. DEFENDANT KNEW OR SHOULD HAVE KNOWN ABOUT HARASSMENT AND FAILED TO TAKE PROMPT, APPROPRIATE AND EFFECTIVE PREVENTATIVE AND CORRECTIVE MEASURES

Even if this Court finds that the harassing behavior was not perpetrated by a supervisory employee, summary judgment should not be granted because there is sufficient evidence for a jury to conclude that Defendant knew about the harassment, and failed to take prompt, appropriate and effective remedial action. See Crowley v. L.L. Bean, Inc., 303 F.3d 387, 401 (1st Cir. 2002); College-Town, 400 Mass. 156, 508 N.E.2d 587 (1987); MCAD Guidelines on Sexual Harassment, Section V(F).

### A.    Defendant Knew or Should Have Known About Harassment

The Massachusetts Supreme Judicial Court has held that once a supervisor is made aware of harassment, the employer is notified and has an affirmative obligation to remedy the situation. See College-Town, 400 Mass. at 167, 508 N.E.2d 587. Similarly, the First Circuit has noted that employer liability may attach "if information of the harassment had come to the attention of someone who is reasonably believed to have a duty to pass on the information." See Crowley, 303 F.3d at 402-403, citing Sims v. Health Midwest Physician Servs. Corp., 196 F.3d 915, 920-921 (8th Cir.1999) ("Notification of sexual harassment to an employer need not come solely from the victim of the harassment for knowledge to be imputed to the employer.").

20