There is evidence from which a jury could conclude that prior to the noose incident, Jeramie Rankin and Charles Ingalls were permitted to frequently make "jokes" based on national origin in the presence of their supervisor, Mr. Kaletta, and Defendant's Perishable Manager, Marcy Wutka.[17]  See Russello Dep., Ex. 1.  Thus, Defendant had actual knowledge of prior discriminatory conduct by the individuals who hung the noose in Mr. Rosemond's office.

Similarly, before Mr. Rosemond was subjected to the noose hanging in his office, Stanley Kaletta, Defendant's Meat Department Manager, saw his subordinates, Mr. Ingalls and Mr. Rankin, hanging the noose in Mr. Rosemond's office.  See Rankin Dep., pp. 12, 31; Ingalls Dep., p. 9, 13.  Mr. Kaletta spent approximately seven minutes in Mr. Rosemond's office with Mr. Ingalls and Mr. Rankin and made a joke about the noose.  See Videotape Information Sheet, bates stamped 22; Rankin Dep., pp. 31; Ingalls Dep., p. 13.  As a Meat Department Manager, Mr. Kaletta was expected to pass on any information about unlawful harassment.  See Defendant's Exhibit F.  Although Mr. Kaletta was a supervisory employee and expected to pass on any information about unlawful harassment, Mr. Kaletta did not discipline or reprimand his subordinates, take down the noose, report the incident, or take any other preventive or corrective action.  See Rankin Dep., p. 12, 35-36; Ingalls Dep., 9, 13; Flannery Dep., p. 55-56, ex. 1, 3; Russello Dep., Ex. 1, bates stamped 27-28; Defendant's Investigation Notes, bates stamped 183.  If Mr. Kaletta had responded appropriately to the noose, Mr. Rosemond would have been spared the harassment of finding a noose hanging in his office.  As a result of Mr. Kaletta's inaction and complicit approval of the noose of his subordinates' behavior, Mr. Rosemond, an African American, arrived at work to find a noose hanging in his office.  See Complaint, paragraph 21; Answer and Additional Defenses, paragraph 21; photograph of hanging noose; Rosemond Dep., p. 37, 39-42.

"[C]ombined knowledge and inaction may be seen as demonstrable negligence, or as the employer's adoption of the offending conduct and its results, quite as if they had been authorized affirmatively as the employer's policy."  Faragher v. City of Boca

---

[17]There was evidence that Marcy Wutka, as the Perishable Manager, was immediately above Mr. Rosemond in the chain of command.  See Kaletta Dep., pp. 39.

Raton, 524 U.S. 775, 789 (1998) citing Katz v. Dole, 709 F.2d 251, 256 (4th Cir.1983) (upholding employer liability because the "employer's supervisory personnel manifested unmistakable acquiescence in or approval of the harassment") and Hall v. Gus Constr. Co., 842 F.2d 1010, 1016 (8th Cir. 1988) (holding employer liable for harassment by co-workers because supervisor knew of the harassment but did nothing).[18]

Furthermore, it is undisputed that Mr. Rosemond complained to his supervisor, Brian Whelan about finding a noose in his office. See Complaint, paragraph 26; Answer and Additional Defenses, paragraph 26; Rosemond Dep., pp. 61-62. As a result, Defendant had an affirmative obligation to remedy the situation. See College-Town, 400 Mass. at 167, 508 N.E.2d 587.

### B. Defendant Failed to Take Prompt, Appropriate and Effective Preventive and Corrective Action

Under both Massachusetts and Federal law, preventative and remedial action must not only be reasonably calculated to end the harassment, but also proportionate to the offense. See Saad v. Stanley Street Treatment and Resources, Inc., 1994 U.S. Dist. LEXIS 20728 at *25-26, 1994 WL 846911 at *10 (D. Mass. May 20, 1994)("answer to that inquiry is properly shaped by the specific tenor of the situation they were called upon to address"), citing Ellison v. Brady, 924 F.2d 872, 881 (9th Cir. 1991)(remedy should be reasonably calculated to end harassment and persuade potential harassers to refrain from unlawful conduct); MCAD Fact Sheet, Sexual Harassment in Employment ("Generally, the corrective action should reflect the severity of the conduct."); MCAD Guidelines on Sexual Harassment, Section V(F). Similarly, remedial action should also be reasonably calculated to deter future harassment. See Yamaguchi v. United States Dep't of the Air Force, 109 F.3d F.3d 1475, 1482 (9th Cir. 1997).

---

[18] Defendant, citing to a Tenth Circuit case, argues that Mr. Rosemond cannot demonstrate that Defendant had "constructive knowledge" of the harassment he suffered. However, discussions of constructive knowledge are irrelevant and superfluous where the harassing employees' supervisors had actual knowledge of the harassing behavior, but failed to take any action to correct it.

22

Additionally, an employer is liable for unlawful harassment if it fails to take any remedial action after receiving notice of the harassment. "In such instances, the combined knowledge and inaction may be seen as demonstrable negligence, or as the employer's adoption of the offending conduct and its results, quite as if they had been authorized affirmatively as the employer's policy." Faragher v. City of Boca Raton, 524 U.S. 775, 789 (1998). "Title VII requires more than a mere request to refrain from discriminatory conduct." Ellison v. Brady, 924 F.2d 872, 882 (9th Cir. 1991). "Employers send the wrong message to potential harassers when they do not discipline employees for [unlawful] harassment." Id.

"The adequacy of [the employer's] remedy is a question of fact which a court may not dispose of at the summary judgment stage if reasonable minds could differ as to whether the remedial action was 'reasonably calculated to end the harassment.'" Paroline v. Unisys Corp., 879 F.2d 100, 106 (4th Cir. 1989), vacated in part on other grounds, 900 F.2d 27.(4th Cir. 1990) (en banc) quoting Katz v. Dole, 709 F.2d 251, 256 (4th Cir.1983).

In this case, the Defendant's preventative and corrective actions were not appropriate or effective. Defendant failed to take reasonable steps to prevent the racial harassment Mr. Rosemond suffered by failing to provide adequate notice and training on its harassment policy. Cynthia Flannery, the Human Resources Manager for the Chicopee Store, testified that Defendant does not provide any training on Defendant's harassment policy to its non-exempt employees after their initial orientation at the time they are hired. See Flannery Dep., p. 49. Kathleen Collins indicated that non-exempt employees are merely given a copy of the policy at orientation, without any training. See Collins Dep., pp. 44. Thus, if Mr. Ingalls, who was hired by Stop & Shop in 1974, was given any training or harassment policy, it would have taken place almost thirty years earlier. See Ingalls Dep., p. 7. Similarly, if Mr. Kaletta, who was hired by Stop & Shop in 1979, was given any training or harassment policy, it would have been almost twenty-five years earlier. See Kaletta Dep., p. 6. Additionally, while exempt supervisory employees are purportedly given a renewed policy and training on a yearly

23

basis,[19] non-exempt supervisory employees, such as Mr. Terranova, Mr. Kaletta, and Mr. Ingalls, were apparently only given a copy of the harassment policy at the time they were hired. See Collins Dep., pp. 44-45; Flannery Dep., p. 49. Massachusetts Law requires employers to maintain a harassment policy and distribute individual written copies of the policy to all employees on a yearly basis. See Massachusetts Commission Against Discrimination Guidelines on Sexual Harassment, Section V.

Defendant also failed to take appropriate preventive and corrective action when it did not take any action against employees, including Mr. Rankin and Mr. Ingalls, who made inappropriate comments and jokes regarding race and national origin. See Rosemond Dep., p. 21-22, 26; Terranova Dep., pp. 9-10; Russello Dep., Ex. 1. By condoning these discriminatory "jokes," Defendant indicated that it did not seriously disapprove of such discriminatory behavior. It is, therefore, not surprising that Mr. Ingalls and Mr. Rankin would feel free to hang the noose in Mr. Rosemond's office as a "joke."

Defendant also failed to prevent the harassment suffered by Mr. Rosemond when Mr. Kaletta, the Chicopee Store Meat Department Manager, saw his subordinates with a noose in Mr. Rosemond's office and failed to take any preventive or corrective action, such as removing the noose, indicating that the behavior was inappropriate, or reporting the incident. See Rankin Dep., p. 35-36; Ingalls Dep., 13; Flannery Dep., p. 55-56, ex. 1, 3; Russello Dep., Ex. 1, bates stamped 27-28; Defendant's Investigation Notes, bates stamped 183. As noted above, employer liability may attach "if information of the harassment had come to the attention of someone who is reasonably believed to have a duty to pass on the information." See Crowley, 303 F.3d at 402-403. Additionally, the Massachusetts Supreme Judicial Court has indicated that employers "would be liable for a supervisor who fails to remedy or report coworker harassment."

---

[19]It is questionable whether Defendant even complied with the requirements of the law for its exempt employees. Mr. Whalen, an exempt employee, testified that he had attended only one sensitivity training in the Chicopee Store, which took place in January or February of 2004. See Whalen Dep., pp. 29-30. Similarly, Mr. Rosemond, another exempt employee, testified that he had not received any training from the Defendant regarding employment laws and sexual harassment since his six-weeks training to become a Customer Service Manager in 2001. p. 9, 13-15.

See College-Town, 400 Mass. at 167, 508 N.E.2d 587. A reasonable jury could conclude that Mr. Kaletta's response to the noose, was not prompt, appropriate or effective.

Defendant also failed to take appropriate action when Brian Whalen, Mr. Rosemond's supervisor, failed to properly pass on information about Mr. Rosemond's complaint. Although Mr. Whalen eventually contacted Kathleen Collins, the District Manager and Director of Operations for Defendant, to inform her about the noose, he told her that a noose was found over the desk of Marcy Wutka, Mr. Rosemond's Caucasian co-worker. See Whalen Dep., p. 13, Collins Dep., p. 12. Defendant continued its inappropriate response to Mr. Rosemond's complaint when, despite knowledge of Mr. Rosemond's concerns about the racist implications of the noose, it explicitly focused its initial investigatory interviews on whether the incident was a threat to Marcy Wutka.[20] See Flannery Dep., pp. 26-27, ex. 1; Rankin Dep., pp. 29-30.

Defendant failed to provide appropriate corrective measures when it acknowledged that Kaletta had engaged in inappropriate behavior, but failed to suspend Mr. Kaletta pending the investigation to protect Mr. Rosemond or issue any disciplinary action to Mr. Kaletta following the conclusion of its investigation. See Flannery Dep., pp. 39, 55-56, Ex. 1, 3; Rankin Dep., pp. 31,35-36; Ingalls Dep., p. 13; Russello Dep., Ex. 1, bates stamped 27-28; Defendant's Investigation Notes, bates stamped 183.

Defendant failed to take appropriate corrective measures when it decided to permit Mr. Ingalls and Mr. Rankin to return to work at the conclusion of its investigation without issuing any additional disciplinary action.[21] See Ingalls Dep., pp. 22-23; Rankin

---

[20] There is no support in the record for Defendant's assertion that it conducted two separate investigations. Rather, the evidence indicates that Defendant conducted one investigation, which was begun by Gerald Bidwell, then handed over to Cynthia Flannery, and concluded by Kathleen Russello. See Flannery Dep., pp. 13-14, 35; Bidwell Dep., pp. 29-20, Ex. 2; Russello Dep., p. 9.

[21] Defendant's Brief incorrectly states that Mr. Rankin and Mr. Ingalls were suspended for two and a half weeks. Additionally, Defendant does not cite to any support in the record for the proposition that Mr. Rankin's and Mr. Ingalls' suspensions were more significant because they occurred during the Christmas holiday. It is equally possible that Mr. Rankin and Mr. Ingalls had previously scheduled vacation to spend time with their families over the Christmas holiday.

25

Dep., pp. 13-14; Barsolou Dep., pp. 16-18; Associate Counseling Records, bates stamped 62-63, 65-66. By doing so, Defendant failed to follow its own policy to terminate the employees who violate Defendant's harassment policy and make threats to other employees. See Flannery Dep., p. 36; Russello Dep., p. 23; Collins Dep., p. 28; Barsolou Dep., p. 33. Defendant, by issuing such negligible disciplining action for hanging a noose in Mr. Rosemond's office, demonstrated that the harassment suffered by Mr. Rosemond was worth less than a nickle to Stop & Shop. See Barsolou Dep., p. 33.

Defendant's Vice President of Operations testified that minor misconduct, such as theft in an amount of a nickle, would result in immediate termination. See Barsolou Dep., p. 33. Additionally, he testified that threatening someone else within the company is a terminable offense. See Id. Kathleen Collins, a District Manager, Director of Operations for Defendant, testified that violations of company policy and violence are offenses which result in termination. See Deposition of Kathleen Collins, attached hereto as Exhibit 16, hereinafter "Collins Dep.," pp. 28. Ms. Russello testified that termination is appropriate "If someone threatens another associate, someone hurts another associate physically, theft, things of that nature." See Russello Dep., p. 23. Cynthia Flannery testified that sexual offenses, harassment, and theft were offenses that would result in termination. See Flannery Dep., p. 36.

"The hangman's noose remains a potent and threatening symbol for African-Americans, in part because the grim specter of racially motivated violence continues to manifest itself in present day hate crimes." Williams, 154 F. Supp. 2d at 825, citing to Frederick M. Lawrence, The Punishment of Hate: Toward a Normative Theory of Bias-motivated Crimes, 93 Mich. L. Rev. 320, 345-46 (1994). "Racially motivated physical threats and assaults are the most egregious form of workplace harassment." Williams, 154 F. Supp. 2d at 825. "The display of a noose would fall within this category of intimidating conduct." Id. Nevertheless, Defendant decided that the hanging of a noose in Mr. Rosemond's office was not a terminable offense. Additionally, Defendant determined that the hanging of the noose in Mr. Rosemond's office did not warrant any additional disciplinary action after the conclusion of its investigation. See Barsolou

26

Dep., p. 17, 33; Russello Dep., pp. 23; Collins Dep., pp. 23-24, 28. A jury would be entitled to conclude that the response taken by Defendant was not proportionate to the offense, and therefore, was not appropriate remedial action. As a result, summary judgment is inappropriate.

### VIII. **CONCLUSION**

WHEREFORE, the Plaintiff, Joseph Rosemond, respectfully requests that the Defendant's Motion for Summary Judgment be denied.

>Respectfully submitted,
>Plaintiff, Joseph Rosemond,
>By His Attorney,
>
>
>*[signature]*
>Tani E. Sapirstein
>BBO #236850
>Carly L. Massy
>BBO #652679
>SAPIRSTEIN & SAPIRSTEIN, P.C.
>1341 Main Street - 3rd Floor
>Springfield, MA 01103
>Tel:  (413) 827-7500
>Fax:  (413) 827-7797

Date:  July 29, 2005

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above document was served upon the following, via first class mail, postage prepaid, to:

>Lisa J. Damon, Esq.
>Yvette Politis, Esq.
>Seyfarth Shaw LLP
>World Trade Center East
>Two Seaport Lane, Suite 300
>Boston, MA 02210-2028

*[signature]*
Tani E. Sapirstein

Date: July 29, 2005
K:\WP61\CASEFILE\ROSEMOND\Opposition to SJ Memo III.wpd

# MCAD Guidelines

# Section II (c) 1.

B.
C. **Hostile Work Environment**[19]

Chapter 151B defines "hostile work environment" harassment as:

sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when . . . such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment.[20]

In a hostile work environment case, the complainant must prove:

1. she was subjected to conduct of a sexual nature;
2. the conduct of a sexual nature was unwelcome;
3. the conduct of a sexual nature had the purpose or effect of creating an intimidating, hostile, humiliating or sexually offensive work environment; and
4. the conduct unreasonably interfered with complainant's work performance or altered the terms and conditions of the complainant's employment.[21]

1. **Conduct of a Sexual Nature**

    Examples of conduct that might create a hostile work environment include: inappropriate touching; sexual epithets, jokes, gossip, sexual conduct or comments; requests for sex; displaying sexually suggestive pictures and objects; and leering, whistling, or sexual gestures.[22] Harassing conduct need not be motivated by sexual desire in order to constitute sexual harassment.[23]

# MCAD Guidelines

# Section III (B)

## III. EMPLOYER LIABILITY
### A. Generally

Sections 4(1) and 4(16A) of chapter 151B provide the statutory basis for employer liability in cases of sexual harassment. Section 4(1) states in relevant part:

It shall be an unlawful practice:

1. For an employer, by himself or his agent, because of the ... sex of any individual to ... discriminate against such individual in compensation or in terms, conditions or privileges of employment.

\*\*\*\*\*\*

Section 4(16A) states:

It shall be an unlawful practice:

16A. For an employer, personally or through its agents, to sexually harass any employee.

\*\*\*\*\*\*

### B. Employers are Liable for Harassment by Persons with Supervisory Authority

An employer is liable for the sexual harassment of employees by managers and persons with supervisory authority, regardless of whether the employer knows of the conduct.[48] Because Massachusetts courts have determined that the Legislature intended that an employer be liable for discrimination committed by those on whom it confers authority, the courts have adopted the theory of vicarious liability in harassment cases. [49]An employer is liable for the actions of its managers and supervisors because they are conferred with substantial authority over subordinates and are thus considered agents of the employer. [50]In some circumstances, an employer may be liable for the actions of a supervisor, even if that supervisor does not have direct supervisory authority over the Complainant. [51]

Factors the Commission will consider as indications of supervisory authority include, but are not limited to

- Undertaking or recommending tangible employment decisions affecting an employee;
- Directing activities, assigning work and controlling work flow;
- Hiring, firing, promoting, demoting or disciplining;
- Altering or affecting an employee's compensation or benefits;
- Evaluating an employee's work load;
- Distributing necessary supplies and tools;
- Giving directions and verifying and fixing mistakes;
- Assisting employees in assigning tasks; and
- Monitoring and evaluating work performance.[52]

The employer may be vicariously liable for sexual harassment even if the alleged harasser is not formally designated as a supervisor and even if a supervisor lacks actual authority, under the doctrine of apparent authority. [53]Liability under these circumstances exists when the harasser holds himself out to the employee as having supervisory authority over the employee.[54] The employee's belief that the harasser has authority over her, to the extent that it is reasonable, may be a significant factor in determining the existence of apparent authority.[55]

# MCAD Guidelines

# Section V (F)

F. **Appropriate Remedial Action**

When an employer concludes that sexual harassment has occurred, the employer must take prompt remedial action designed to end the harassment and prevent future harassment. What constitutes appropriate remedial action depends upon the circumstances. Appropriate remedial action should reflect the nature and severity of the harassment, the existence of any prior incidents, and the effectiveness or lack thereof of any prior remedial steps.

Generally, remedial action consists of the following:

- promptly halting any ongoing harassment;
- taking prompt, appropriate disciplinary action against the harasser;
- taking effective actions to prevent the recurrence of harassment, including conducting a sexual harassment training where appropriate;[99] and
- making the complainant whole by restoring any lost employment benefits or opportunities.[100]

Whether the employer has taken prompt and appropriate remedial action in a given case depends upon many factors, including the timeliness of the actions and whether, given the circumstances, the actions were reasonably likely to stop the conduct and prevent it from recurring. The inquiry into whether the employer took appropriate action is focused primarily on whether the remedial action ultimately succeeded, taking into consideration whether, under the circumstances, the action was reasonably calculated to succeed.[101] The efficacy of the action is not measured by whether the complainant feels that justice has been achieved, but whether the behavior that gave rise to the complaint has ceased and does not threaten to recur.[102]