UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 04-30072-MAP

JOSEPH ROSEMOND, )
    Plaintiff )
)
v. )
)
STOP AND SHOP SUPERMARKET )
COMPANY, )
    Defendant )
_____)

## PLAINTIFF'S STATEMENT OF FACTS IN DISPUTE

The Plaintiff, Joseph Rosemond, hereby disputes the following facts as stated in the Local Rule 56.1 Statement of Material Facts of Defendant, Stop & Shop Supermarket Company, LLC ("Defendant"). As shown below and in Plaintiff's Memorandum of Law, the most fundamental facts in this case are in dispute.

### Statement of Disputed Material Facts[1]

1.     Undisputed

2.     On the morning of December 10, 2003, Mr. Rosemond arrived at the Chicopee Store and discovered a noose hanging from the ceiling of his office. See Complaint, paragraph 21; Answer and Additional Defenses, paragraph 21; photograph of hanging noose; See Deposition of Joseph Rosemond, dated November 4, 2004, attached hereto as Exhibit 1, hereinafter "Rosemond Dep.," p. 37, 39-42. The noose was hanging at approximately Mr. Rosemond's shoulder height. See Deposition of Gerald Bidwell, attached hereto as Exhibit 2, hereinafter "Bidwell Dep.," pp. 27-29, Ex. 2. Mr. Rosemond and Marcy Wutka, the Perishables Manager of the Chicopee Store, shared an office. See Rosemond Dep., p. 37; see also Deposition of Charles Ingalls, attached hereto as Exhibit 3, hereinafter "Ingalls Dep.," p. 12, Ex. 1. Ms. Wutka and Mr.

---

[1] Paragraph numbers coincide with the paragraph numbers used by Defendant in its Statement of Material Facts ("Defendant's Statement").

1

Rosemond were the only employees who had desks in the office. See Rosemond Dep., p. 40-41. Defendant claims that the noose was hung about a foot away from the desk of Marcy Wutka. See Defendant's Statement, paragraph 2. However, the desks of Mr. Rosemond and Ms. Wutka were placed next to each other. See Rosemond Dep., pp. 40, Ex. 2. Additionally, at the time Mr. Rosemond found the noose, Marcy Wutka was on vacation. See Rosemond Dep., p. 41-42; Deposition of Jeramie Rankin, attached hereto as Exhibit 4, hereinafter "Rankin Dep.," p. 23. At least one, and possibly two, of the employees involved in hanging the noose was aware that Ms. Wutka was on vacation and Mr. Rosemond was scheduled to work. See Rankin Dep., pp. 23-24; Ingalls Dep., p. 30. Furthermore, there was evidence that it was the spacing of the ceiling tiles, and not the location of Ms. Wutka's desk, that determined the exact placement of the noose. See Rankin Dep., p. 20, Ex. 1.[2]

3. A water cooler was located in the mezzanine area, just outside of Mr. Rosemond's office and near the hallway to go into the store manager's office. See Rosemond Dep., p. 40, Ex. 2. However, Mr. Rosemond's office was not a common area. Mr. Rosemond and Marcy Wutka were the only employees who had desks in the office where the noose was located. See Rosemond Dep., p. 40-41. These desks were not shared with any other employees. See Id.

4. Mr. Rosemond's desk was placed next to Ms. Wutka's desk. See Rosemond. Dep., p. 40, Ex. 2. There was no significant amount of space between the two desks. See Id. No other employees had desks in Mr. Rosemond's office. See Rosemond Dep., p. 40-41. Mr. Rosemond and Ms. Wutka did not share their desks with any other employees. See Id. See also supra paragraph 3. Additionally, the Cash Office was downstairs from Mr. Rosemond's office in the Chicopee Store. See Rosemond Dep., p. 42.

5. Undisputed.

6. Mr. Rosemond attempted to contact John Vey, the head of security/loss prevention for the Chicopee Store, but found he was not at work yet. See Rosemond Dep., p. 59. Mr. Rosemond also thought about contacting the police, but wanted to speak to Kathleen Collins, Defendant's District Manager and Director of Operations, before he did so. See Rosemond Dep., p. 60. When Isaac Kobodya, the General Merchandise Manager for the Chicopee Store, arrived, Mr. Rosemond informed him about the noose and discussed the

---

[2]Defendant cites to the deposition of Gerald Bidwell for support regarding the placement of the noose. However, it should be noted that Mr. Rosemond removed the noose from the ceiling soon after he found it on December 10, 2003. Rosemond Dep., p. 44. Thus, Mr. Bidwell, who did not arrive at the Chicopee Store until December 11, 2003, did not see the noose when it was hanging from the ceiling in Mr. Rosemond's office. See Bidwell Dep., pp. 13-14.

racial implications of the noose with him. <u>See</u> Rosemond Dep., pp. 36, 57-58. After speaking to Mr. Kobodya, Mr. Rosemond saw the store manager, Brian Whalen. <u>See</u> Rosemond Dep., p. 61.

7. Mr. Rosemond was going to contact Kathleen Collins about the noose, but saw Mr. Whalen before he had a chance. <u>See</u> Rosemond Dep., p. 51, 61. Mr. Rosemond could not recall what time he first saw Mr. Whalen. <u>See</u> <u>Id.</u> However, Mr. Rosemond did recall that when he finished speaking to Isaac Kobodya, he saw Mr. Whalen. <u>See</u> Rosemond Dep., p. 61.

8. When Brian Whalen, the Store Manager, arrived at the Chicopee Store, Mr. Rosemond complained to him about the noose. <u>See</u> Complaint, paragraph 26; Answer and Additional Defenses, paragraph 26. Mr. Rosemond gave the noose to Mr. Whalen and explained that the noose was hanging in his office when he arrived in the morning. <u>See</u> Rosemond Dep., pp. 61-62. In response to Mr. Rosemond's complaint, Mr. Whalen said, "Wow, I wonder who did that? Well, we'll get Security to pull the tapes and see what we can find." <u>See</u> Rosemond Dep., p. 62. Without taking additional action, making any other comments or asking any questions, Mr. Whalen turned away from Mr. Rosemond and resumed the work in which he had previously been engaged. <u>See</u> Rosemond Dep., p. 62. Mr. Whalen admitted that he did not take any action regarding Mr. Rosemond's complaint until after John Vey notified him that Mr. Rosemond was upset. <u>See</u> Deposition of Kathleen Russello, dated February 2, 2005, attached hereto as Exhibit 5, hereinafter "Russello Dep.," Ex. 1. Mr. Whalen also admitted that he found "it was difficult for him to see Joe's point of view. He felt the whole thing was being blown out of proportion." <u>See</u> <u>Id.</u>

9. Undisputed.

10. Undisputed.

11. Mr. Rosemond felt Mr. Whalen's reaction to the noose was a form of racism. <u>See</u> Rosemond Dep., p. 75.

12. At the Summary Judgment stage of litigation, Mr. Rosemond cannot dispute Brian Whalen's deposition testimony regarding Mr. Whalen's state of mind. However, a jury could disbelieve Mr. Whalen's assertion that he did not understand that a noose had racial implication when Mr. Rosemond complained to him about the noose. <u>See</u> Deposition of Brian Whalen, attached hereto as Exhibit 6, hereinafter "Whalen Dep.," pp. 14-15. Additionally, even after Mr. Rosemond explained the racial implications of the noose, Mr. Whalen told one of Stop & Shop's investigators that he found "it was difficult for him to see Joe's point of view. He felt the whole thing was being blown out of proportion." <u>See</u> Russello Dep., Ex. 1; see also Whalen Dep., p. 15.

13. Mr. Whalen apologized and told Mr. Rosemond that "it didn't click," only after Mr. Vey and Mr. Rosemond explained to Mr. Whalen that Mr. Rosemond was upset because he felt that the noose was directed at him.[3] See Rosemond, Dep., pp. 73-75; Whalen Dep., pp. 12-13; Russello Dep., Ex. 1. Mr. Rosemond testified that Mr. Whalen's apology seemed insincere. See Rosemond Dep., p. 75. Mr. Whalen later stated that he felt "it was difficult for him to see Joe's point of view. He felt the whole thing was being blown out of proportion." See Russello Dep., Ex. 1; see also Whalen Dep., p. 15.

14. Mr. Whalen admitted that he did not take any action in response to Mr. Rosemond's initial complaint. See Russello Dep., Ex. 1. When Mr. Rosemond complained about finding the noose, Mr. Whalen testified that he told Mr. Rosemond "why don't you check and see if Security is here and maybe they can see something." See Whalen Dep., p. 12. Although Mr. Whalen may have eventually asked Mr. Vey to review the security tapes, he did not do so until after John Vey contacted Mr. Whalen to express Mr. Rosemond's concerns about the noose. See Id. Additionally, although Mr. Whalen eventually contacted Kathleen Collins about the noose, he told her that a noose was found over the desk of Marcy Wutka, Mr. Rosemond's Caucasian co-worker.[4] See Whalen Dep., p. 13, Deposition of Kathleen Collins, attached hereto as Exhibit 7, hereinafter "Collins Dep.," p. 12. Interestingly, Donald Barsolou, Defendant's Vice President of Operations, told Ms. Collins to "not get totally involved in it because it would take up too much of my time." See Collins Dep., pp. 14-15.

15. Defendant's investigation was lacking for many reasons. For instance, Mr. Whalen not only displayed a callous and apathetic attitude, but also failed to take any active steps toward corrective action after hearing Mr. Rosemond's complaint. See supra paragraph 8. Also, when Mr. Whalen finally reported the incident to Kathy Collins, he told her that the noose was found over the desk of Marcy Wutka, and did not mention Mr. Rosemond. See Collins Dep., p. 12; see also supra paragraph 14. Additionally, Defendant was aware that Marcy Wutka had been on vacation when the noose was hung in Mr. Rosemond's office. See Defendant's Investigation Noted, bates stamped 183, attached hereto as Exhibit 8; Russello Dep., p. 15, Ex. 1. Nevertheless, the Defendant chose to focus its initial investigatory interviews on whether the incident was a threat to Marcy Wutka, rather than investigate whether the noose was a threat to Mr. Rosemond.

---

[3] A review of Mr. Rosemond's deposition demonstrates that Mr. Whalen only apologized once, although Mr. Rosemond described the conversation twice during his deposition. See Rosemond Dep., p. 64, 73-75.

[4] There was no evidence that the noose was hung over Marcy Wutka's desk. Rather, one of the individuals who hung the noose stated, "It wasn't over her desk; it wasn't off – it was just – the tiles and the ceiling were crossed there and that's where it was put." See Rankin Dep., p. 20, Ex. 1. Additionally, at the time Mr. Rosemond found the noose, Marcy Wutka was on vacation. See Rosemond Dep., p. 41-42; Rankin Dep., p. 23. At least one of the employees involved in hanging the noose was aware that Ms. Wutka was on vacation and Mr. Rosemond was scheduled to work. See Rankin Dep., pp. 23-24; see also Ingalls Dep., p. 30.

See Deposition of Cynthia Flannery, attached hereto as Exhibit 9, hereinafter "Flannery Dep.," pp. 26-27, ex. 1; Rankin Dep., pp. 29-30. The Defendant led the individuals who admitted to hanging the noose to believe that they were investigating the incident as a potential threat to Marcy Wutka. See Rankin Dep., pp. 29-30.

16. Mr. Whalen's actions were not appropriate thereafter. Mr. Rosemond believed that Mr. Whalen's apology was insincere. See Rosemond Dep., p. 75. Mr. Whalen later stated that he felt "it was difficult for him to see Joe's point of view. He felt the whole thing was being blown out of proportion." See Russello Dep., Ex. 1; see also Whalen Dep., p. 15. By contrast, Allan Cave, an African American and Defendant's then-Vice President of Human Resources, contacted Mr. Rosemond and expressed that "as a person of color," he understood how Mr. Rosemond felt. See Rosemond Dep., pp. 89-90.

Also, when Mr. Whalen finally reported the incident to Kathy Collins, he told her that the noose was found over the desk of Marcy Wutka, and did not mention Mr. Rosemond. See Collins Dep., p. 12; see also supra paragraph 14.

17. Mr. Rosemond attempted to give the noose to Mr. Whalen when he made his initial complaint. Immediately after Mr. Whalen ignored Mr. Rosemond's initial complaint, Mr. Rosemond put the noose and the pictures in his car. See Rosemond Dep., p. 62; see also supra paragraph 8.

18. Brenda Broad sent Gerald Bidwell to begin the investigation because Cynthia Flannery, the Human Resources Manager for the Chicopee Store, was working on another case. See Flannery Dep., pp. 13-14. After conducting initial interviews with Isaac Kobodya and Mr. Rosemond, Mr. Bidwell was no longer involved in the investigation. See Bidwell Dep., pp. 29-20, Ex. 2.

19. The notes Mr. Bidwell took at the time he conducted his interview with Mr. Rosemond do not contain any suggestion that the noose was hanging over Marcy Wutka's desk. See Bidwell Dep., Ex. 2.

20. Mr. Vey contacted the police at the direction of Allan Cave.[5] See Deposition of Donald Barsolou, dated January 5, 2005, attached hereto as Exhibit 10, hereinafter "Barsolou Dep.," Ex. 1. Later, the Defendant decided that they did not want to notify the police. See Id. However, Mr. Vey had already contacted the police. See Id. The police indicated that the Defendant had two options, i.e.,

---

[5] Allan Cave, an African American and Defendant's then-Vice President of Human Resources, was one of four people involved in making the final decision regarding the disciplinary action for Mr. Ingalls, Mr. Rankin and Mr. Kaletta. See Barsolou Dep., p. 16, 19. Mr. Cave believed that the employees involved in the noose incident should have been terminated. See Barsolou Dep., p. 18.

5

they could conduct an internal investigation or the police would take an initial report. See Id.

21. The Defendant's investigation revealed that three of Defendant's employees were involved in the noose incident. See Barsolou Dep., p. 15; Flannery Dep., p. 39; 49; Ingalls Dep., p. 13; Rosemond Dep., p. 81. The Defendant's investigation revealed that Charles Ingalls, the Head Cutter,[6] and Jeramie Rankin, a Seafood Clerk, entered Mr. Rosemond's office and hung the noose. See Ingalls Dep., pp. 10-11, 20; Rankin Dep., pp. 12-13, 18-20, 30. The investigation also showed that Stanley Kaletta, the Manager of the Chicopee Store's Meat Department, later joined Mr. Rankin and Mr. Ingalls in Mr. Rosemond's office, saw the hanging of the noose, and jokingly commented "oh, who's the comedian?" See Rankin Dep., pp. 31; Ingalls Dep., p. 13. The videotape, which recorded employees entering and leaving Mr. Rosemond's office on December 10, 2003, showed that Mr. Kaletta entered approximately two minutes after Mr. Ingalls and Mr. Rankin, stayed in the office for approximately seven minutes, and left the office shortly after Mr. Ingalls and Mr. Rankin. See Videotape Information Sheet, bates stamped 22, attached hereto as Exhibit 11.

Mr. Kaletta, as the Meat Department Manager, was the supervisor of Mr. Rankin and Mr. Ingalls. See Rankin Dep., p. 12; Ingalls Dep., p. 9. Nevertheless, Mr. Kaletta did not discipline or reprimand Mr. Rankin and Mr. Ingalls, take down the noose, report the incident to Defendant's upper management, or take any other corrective action. See Rankin Dep., p. 35-36; Ingalls Dep., 13; Flannery Dep., p. 55-56, ex. 1, 3; Russello Dep., Ex. 1, bates stamped 27-28; Defendant's Investigation Notes, bates stamped 183.

22. Undisputed.

23. As noted above, the Defendant chose to focus its initial investigatory interviews on whether the incident was a threat to Marcy Wutka, rather than investigate whether the noose was a threat to Mr. Rosemond. See Flannery Dep., pp. 26-27, ex. 1; Rankin Dep., pp. 29-30.

During the investigation, Mr. Rankin and Mr. Ingalls admitted that they were involved in hanging the noose, but claimed that it was meant as a joke. See Flannery Dep., pp. 31-32, Ex. 1; Russello Dep., Ex. 1.

Defendant was aware that Mr. Rankin and Mr. Ingalls had a prior history of

---

[6] Defendant entrusts Mr. Ingalls, as the Head Cutter, with supervisory authority over one other employee. See Ingalls Dep., p. 9.

making "jokes" based on national origin. See Russello Dep., Ex. 1. Marcy Wutka told Defendant's investigator that Mr. Rankin and Mr. Ingalls made "Polish jokes" around her and Mr. Kaletta "because Stan's Polish and they know I was married to a Polish man." See Id.

Similarly, Mr. Rosemond had previously been subjected to such racial "jokes." During the summer of 2003, Mr. Rosemond attended a meeting in the Chicopee store with the then-Store Manager, Mike Leach and the Lead Clerk of the Chicopee Store Bake Shop,[7] David Taranova. See Rosemond Dep., p. 21-22, 26; Deposition of David Terranova, dated December 9, 2004, attached hereto as Exhibit 12, hereinafter "Terranova Dep.," p. 9. When Mr. Rosemond entered to meeting without a cup of coffee for Mr. Taranova, Mr. Taranova exclaimed, "Where's my coffee? What am I, black?" See Rosemond Dep., p. 23; Terranova Dep., p. 9.

Although Mr. Leach heard Mr. Taranova's statement, Mr. Leach did not reprimand Mr. Taranova or indicate in any way that the statement was inappropriate. See Terranova Dep., p. 9-10.

24. The investigation also showed that Stanley Kaletta,[8] the Manager of the Chicopee Store's Meat Department, joined Mr. Rankin and Mr. Ingalls in Mr. Rosemond's office, saw the noose hanging, and commented "Oh, who's the comedian?" See Rankin Dep., p. 31; Ingalls Dep., p. 13; Russello Dep., Ex. 1, bates stamped 27-28; Defendant's Investigation Notes, bates stamped 183. Mr. Kaletta spent approximately seven minutes in Mr. Rosemond's office with Mr. Ingalls and Mr. Rankin and made a joke about the noose. See Videotape Information Sheet, bates stamped 22; Rankin Dep., pp. 31; Ingalls Dep., p. 13. Mr. Kaletta, as the Meat Department Manager, was the supervisor of Mr. Rankin and Mr. Ingalls. See Rankin Dep., p. 12; Ingalls Dep., p. 9. Nevertheless, Mr. Kaletta did not discipline or reprimand Mr. Rankin and Mr. Ingalls, indicate that hanging the noose was inappropriate, take down the noose, report the incident to Defendant's upper management, or take any other corrective action. See Rankin Dep., p. 35-36; Ingalls Dep., 13; Flannery Dep., p. 55-56, ex. 1, 3; Russello Dep., Ex. 1, bates stamped 27-28; Defendant's Investigation Notes, bates stamped 183.

25. At least one of the individuals who admitted to hanging the noose, Mr. Ingalls, testified that Mr. Kaletta was present during the noose hanging. See Ingalls Dep., p. 13. Scott Ziter, Defendant's Director of Security, told Mr. Rosemond

---

[7] Defendant entrusts its Lead Clerk of the Bake Shop with supervisor duties. See Terranova Dep., pp. 6-7; Rosemond Dep., pp. 22.

[8] Mr. Kaletta was the Manager of the Chicopee Store's Meat Deparatment, and supervised the employees in the Meat and Seafood Department. See Rosemond Dep., p. 127; Ingalls Dep., 9; Rankin Dep., pp. 12, 14; Deposition of Stanley Kaletta, attached hereto as Exhibit 13, hereinafter "Kaletta Dep.," pp. 7-8.

that he had reviewed the security tapes, interviewed people, and discovered that Mr. Rankin, Mr. Ingalls and Mr. Kaletta hung the noose. See Rosemond Dep., p. 80-81.

26. Mr. Ingalls stated that his "life was aggravated for two weeks," that he was upset because he used to be able to joke around at work, and because Mr. Rosemond should have known that the noose hanging in his office was a "joke." See Ingalls Dep., pp. 21, 23-24. Mr. Rankin also mentioned that he was upset because he used to be able to joke around at work and that his relationships with Mr. Ingalls and Mr. Kaletta changed. See Rankin Dep., pp. 39-40. Mr. Rankin was also worried about being transferred because people would pre-judge him and "think that I am a Third Reich racist." See Rankin Dep., p. 47. The investigation notes indicate that Mr. Kaletta "still didn't really understand the severity of this." Defendant's Investigation Notes, bates stamped 183.

27. Prior to this incident, Mr. Rosemond thought he had a good relationship with Mr. Ingalls and Mr. Rankin. See Rosemond Dep., pp. 81-85. However, Mr. Rosemond has not talked to any of the individuals since they hung the noose in his office. See Rosemond Dep., p. 85; Ingalls Dep., p. 24; Rankin Dep., p. 43; Kaletta Dep., p. 38.

28. This case does not merely involve the hanging of a noose. Rather, it involves the hanging of a noose in the office of Mr. Rosemond, an African American man. See Rosemond Dep., p. 37, 39-42. Additionally, the noose was hung by individuals who were known to make "jokes" about other employees' national origins. See Russello Dep., Ex. 1.

Mr. Rosemond told Defendant that he was extremely upset about the noose because it represented a lynching to him. Mr. Rosemond explained, "I'm from South Carolina, when I was a kid, everyday you could turn on the TV and hear about a black man hanging from a tree. It brings back painful memories." See Russello Dep., Ex. 1.

However, it was not merely Mr. Rosemond who felt the circumstances of a noose hanging in the office of an African American indicated that race was a factor. Several of the individuals involved in Defendant's investigation expressed serious concern about the racist implications of a noose hanging in Mr. Rosemond's workspace. See Russello Dep., pp. 14-15, 25, Ex. 1; Barsolou Dep., pp. 12, 20-21; Bidwell Dep., pp. 28-29.

Mr. Isaac Kibodya, another African American employee at the Chicopee Store, expressed his concern about the situation and told Defendant that a noose "cannot have a second meaning to any African American." See Russello Dep., p. 25, Ex. 1.

8

Similarly, Kathleen Russello, Defendant's Human Resources Director for the New York Division who was asked to give a second opinion regarding the noose incident, testified that she was disturbed by the noose, in part, because Mr. Rosemond was an African American. She testified that "It was disturbing to me because in my mind it absolutely brought to mind lynchings, it brought to mind people hurting themselves or killing themselves, absolutely." See Russello Dep., p. 15. Ms. Russello also testified that she told Mr. Ingalls "I don't understand how you could do this and not think it would affect someone, that your actions, you need to be accountable for them and you need to understand that this isn't something we do in the workplace or anywhere else and it is a very hurtful thing that you've done." See Rusello Dep., p. 20. Ms. Russello "didn't understand how he [Mr. Ingalls] would think anything like that would be a joke or funny, there are many people that would take it as something very hurtful, whether it be someone killing themselves or someone being lynched." See Rusello Dep., p. 20. Ms. Russello felt that "under any circumstance a noose hanging from a ceiling is extremely disturbing. It is not something that can be taken any other way than destructive and hurtful." See Russello Dep, Ex. 1.

Allan Cave believed that the employees involved in the noose incident should have been terminated. See Barsolou Dep., p. 18. In a discussion regarding whether the individuals should be terminated, Mr. Cave expressed his viewpoint and explained the meaning and significance of a noose to African Americans to Mr. Barsolou, Defendant's Vice President of Operations. See Barsolou Dep., p.20, 21. While Mr. Rosemond was out of work, Mr. Cave contacted Mr. Rosemond. Mr. Cave expressed that "as a person of color," he understood how Mr. Rosemond felt. See Rosemond Dep., pp. 89-90.

29. "[T]he crime of lynching succeeded slavery as the ultimate expression of racism in the United States following Reconstruction." See A Resolution Apologizing to the Victims of Lynching and the Descendants of Those Victims for the Failure of the Senate to Enact Anti-Lynching Legislation, S. Res. 39, 109th Cong. (2005), attached hereto as Exhibit 14. "[A]t least 4,742 people, predominantly African-Americans, were reported lynched in the United States between 1882 and 1968." See A Resolution Apologizing to the Victims of Lynching and the Descendants of Those Victims for the Failure of the Senate to Enact Anti-Lynching Legislation, S. Res. 39, 109th Cong. (2005). Lynching often involved the use of a noose to brutally torture and kill African Americans. See 151 CONG. REC. S6365-S6378 (daily ed. June 13, 2005)(statements of Sen. Mary Landrieu [D-LA], Sen. Mark Pryor [D-AR], Sen. Richard Durbin [D-IL]), excepts of which are attached hereto at Exhibit 14.

While it may have been "possible" for a noose to have another meaning in another place and time and under a different set of circumstances, this particular noose was hung, allegedly as a joke, in the office of an African American man in

9

the United States by individuals who had in the past made other "jokes" about employees' national origin. See Rosemond Dep., p. 37, 39-42; See Russello Dep., Ex. 1. Under these circumstances, most African Americans would consider the noose to be a racist symbol. See Deposition of John H. Bracey, Jr., attached hereto as Exhibit 15, hereinafter "Bracey Dep.," pp. 51, 79, 80-81, 88, 98-101.

Both of the individuals who admitted to hanging the noose in Mr. Rosemond's office acknowledged their awareness of the fact that nooses had been used to hang African Americans. See Ingalls Dep, pp. 15-16; Rankin Dep., p. 24.

When asked about the significance of a noose, Gerald Bidwell, one of Defendant's investigators, stated that a noose reminded him of World War II stories, "not to mention the things that Joe mentioned. I mean, it was pretty obvious. Obviously, I'm old enough to remember Martin Luther King and some of the various things that happened down through the ages, so yes, it had significance." See Bidwell Dep., p. 31.

Donald Barsolou, Defendant's Vice President of Operations, testified that he understood that the phrase "the significance of the noose" meant "Based on Joe being African-American and the significance of a noose to someone of African-American descent -- people of that culture and in the south that a noose had a significance that was negative." See Barsolou Dep., p. 12.

Kathleen Russello testified that she was disturbed by the noose, in part, because Mr. Rosemond was an African American. She testified "It was disturbing to me because in my mind it absolutely brought to mind lynchings, it brought to mind people hurting themselves or killing themselves, absolutely." See Russello Dep., p. 15.

Cynthia Flannery, a Human Resources Manager for Defendant who was assigned to investigate the noose incident, testified that she was aware that a noose could be a racial symbol because black people were hung with them. See Flannery Dep., p. 62.

30. Although Defendant was aware that Mr. Kaletta had seen the noose, laughed about the noose, and left the noose hanging in Mr. Rosemond's office, Defendant did not suspend Mr. Kaletta pending the investigation. Defendant merely told Mr. Kaletta that the incident would be documented and placed in his file. See Flannery Dep., pp. 39, 55-56, Ex. 1, 3; Rankin Dep., pp. 31,35-36; Ingalls Dep., p. 13; Russello Dep., Ex. 1, bates stamped 27-28; Defendant's Investigation Notes, bates stamped 183.

31. Mr. Rosemond met with Scott Ziter and Ms. Flannery separately on Friday, December 12, 2003. See Rosemond Dep., pp. 86-87, 93. The two

conversations were essentially the same. See Rosemond Dep., pp. 86, 100-101. Mr. Ziter told Mr. Rosemond that they found the three individuals who hung the noose. See Rosemond Dep., p. 81. Mr. Ziter told Mr. Rosemond that "it was Charles Ingalls, Jeramie Rankin, and Stan Kaletta. He said he interviewed those three people. Charlie Ingalls and Jeramie Rankin admitted to doing it." See Id. Mr. Ziter also told Mr. Rosemond, "I really don't think it's serious enough for them to lose their job but they will be disciplined." See Rosemond Dep., pp. 93-94. Mr. Rosemond told Mr. Ziter, "if that's what you want to do, then you do what you have to do, but I told him that I've seen a seventy-five-year-old man fired for stealing a donut -- because they thought he stole a donut. If this isn't grounds for termination, then what is." See Rosemond Dep., p. 94. Mr. Ziter told Mr. Rosemond that "they put the rope up as a joke, playing a joke on Marcy, but at the time Marcy was on vacation so how was it going to be a joke on Marcy." See Rosemond Dep., pp. 95-96. Mr. Ziter also told Mr. Rosemond that the disciplinary decision was not his to make. See Rosemond Dep., p. 96. Mr. Rosemond was so upset following this conversation that he left work and went to see his doctor. See Rosemond Dep., p. 98. There is no indication from Mr. Rosemond's recital of these conversations that Mr. Rosemond told Mr. Ziter or Ms. Flannery that he was relieved that the noose was not directed at him or thanked them for following through. In fact, Mr. Rosemond indicates that he was very upset at the conclusion of these conversations. See Rosemond Dep., p. 98.

Defendant suggests that they initially believed that the noose was a joke directed at Ms. Wutka. However, Mr. Rankin was aware that Ms. Wutka was on vacation and Mr. Rosemond was scheduled to work. See Rankin Dep., pp. 23-24. Although Mr. Ingalls had been out with a bad leg, Mr. Ingalls testified that he was aware that Ms. Wutka was not at work on Tuesday, December 9, or Wednesday, December 10, 2003. See Ingalls Dep., p. 30.

When Ms. Flannery conducted her investigation, she Ms. Flannery stated that "if it was meant as a sick joke, it was inappropriate." See Flannery Dep., p. 40. Nevertheless, Ms. Flannery claimed that she did not conclude that hanging the noose in Mr. Rosemond's office was "racially inappropriate." See Id. Ms. Flannery stated that the basis of this conclusion was that the people she interviewed at the Chicopee Store spoke well of Mr. Rosemond. See Id. Additionally, Ms. Flannery chose to focus her investigatory questions specifically on whether the incident was a threat to Marcy Wutka, rather than on whether the noose was a threat to Mr. Rosemond. See Flannery Dep., pp. 26-27, ex. 1; Rankin Dep., pp. 29-30.

32. Undisputed.

33. Ms. Russello testified that she was disturbed by the noose, in part, because Mr.

11

Rosemond was an African American. She testified that "It was disturbing to me because in my mind it absolutely brought to mind lynchings, it brought to mind people hurting themselves or killing themselves, absolutely." See Russello Dep., p. 15. Ms. Russello also testified that she told Mr. Ingalls "I don't understand how you could do this and not think it would affect someone, that your actions, you need to be accountable for them and you need to understand that this isn't something we do in the workplace or anywhere else and it is a very hurtful thing that you've done." See Russello Dep., p. 20. Ms. Russello "didn't understand how he would think anything like that would be a joke or funny, there are many people that would take it as something very hurtful, whether it be someone killing themselves or someone being lynched." See Rusello Dep., p. 20. Ms. Russello felt that "under any circumstance a noose hanging from a ceiling is extremely disturbing. It is not something that can be taken any other way than destructive and hurtful." See Russello Dep, Ex. 1.

34. Mr. Ingalls stated that his "life was aggravated for two weeks," that he was upset because he used to be able to joke around at work, and because Mr. Rosemond should have known that the noose hanging in his office was a "joke." See Ingalls Dep., pp. 21, 23-24. Mr. Rankin also mentioned that he was upset because he used to be able to joke around at work and that his relationships with Mr. Ingalls and Mr. Kaletta changed. See Rankin Dep., pp. 39-40. Mr. Rankin was also worried about being transferred because people would pre-judge him and "think that I am a Third Reich racist." See Rankin Dep., p. 47. The investigation notes indicate that Mr. Kaletta "still didn't really understand the severity of this." Defendant's Investigation Notes, bates stamped 183.

35. Only four individuals, Donald Barsolou, Brenda Broad, William Cummings, and Allan Cave, were involved in making the final disciplinary decision. See Barsolou Dep., p. 16, 19. As noted above, Mr. Cave, an African American, believed that the employees involved in the noose incident should have been terminated. See Barsolou Dep., p. 18. In the discussion regarding whether the individuals should be terminated, Mr. Cave expressed his viewpoint and explained the meaning and significance of a noose to African Americans to Mr. Barsolou, Defendant's Vice President of Operations. See Barsolou Dep., p.20, 21.

36. As a result, on or about December 26, 2003, at the conclusion of Defendant's investigation, Mr. Ingalls and Mr. Rankin were permitted to return to work without any additional disciplinary action. See Ingalls Dep., pp. 22-23; Rankin Dep., pp. 13-14; Barsolou Dep., pp. 16-18; Associate Counseling Records, attached hereto as Exhibit 16, bates stamped 62-63, 65-66. Thus, Mr. Ingalls and Mr.

Rankin were suspended pending the investigation for a total of two weeks.[9] Defendant asserted that the two weeks of suspension pending the investigation was sufficient punishment for Mr. Ingalls and Mr. Rankin. See Barsolou Dep., pp. 16-18.

Defendant transferred Mr. Ingalls and Mr. Rankin to different stores upon their return. See Ingalls Dep., pp. 22-23; Rankin Dep., pp. 13-14; Associate Counseling Records, bates stamped 62-63, 65-66.

After the conclusion of its investigation, Defendant did not subject Mr. Kaletta to any disciplinary action, despite his failure to understand the seriousness of the incident. See Flannery Dep., p. 39; Defendant's Investigation Notes, bates stamped 183.

Defendant's Vice President of Operations testified that minor misconduct, such as theft in an amount of a nickle, would result in immediate termination. See Barsolou Dep., p. 33. Additionally, he testified that threatening someone else within the company is a terminable offense. See Id.

Kathleen Collins, a District Manager, Director of Operations for Defendant, testified that violations of company policy and violence are offenses which result in termination. See Collins Dep., pp. 28.

Ms. Russello testified that termination is appropriate "If someone threatens another associate, someone hurts another associate physically, theft, things of that nature." See Russello Dep., p. 23.

Ms. Flannery testified that sexual offenses, harassment, and theft were offenses that would result in termination. See Flannery Dep., p. 36.

Defendant has an anti-harassment policy which prohibits harassment on the basis of race that has the intent or effect of offending. See Equal Employment Opportunity Policy, bates stamped 9, Anti-Harassment Policy, bates stamped 6-7, attached hereto as Exhibit 17.

Defendant's policies also require managers and supervisors to cooperate in implementing and upholding the anti-harassment policies. See Anti-Harassment Policy, bates stamped 6-7; Harrsment Prevention and Sensitivity Training, Bates stamped 42, attached hereto as Exhibit 18.

---

[9] Defendant's Brief incorrectly states that Mr. Rankin and Mr. Ingalls were suspended for two and a half weeks. Additionally, Defendant does not cite to any support in the record for the proposition that Mr. Rankin and Mr. Ingalls suspensions were more significant because they occurred during the Christmas holiday. It is entirely possible that Mr. Rankin and Mr. Ingalls had scheduled vacation to spend time with their families over the Christmas holiday.

13

Nevertheless, Defendant decided that the hanging of a noose in Mr. Rosemond's office was not a terminable offense. See Barsolou Dep., p. 17, 33; Russello Dep., pp. 23; Collins Dep., pp. 23-24, 28.

Defendant does not cite to any evidence that the three individuals at issue, much less all Store 36 employees, attended the training. Mr. Ingalls testified that only fifteen people attended the sensitivity training. See Ingalls Dep., pp. 29.

37. Mr. Rosemond had experienced racially harassing conduct at the store. For instance, David Terranova made at least two racist statements to Mr. Rosemond. See supra paragraphs 23, 40-43; Rosemond Dep., p. 23; Terranova Dep., p. 9. Additionally, Mr. Rosemond, an African American, found a noose hanging in his office. See Complaint, paragraph 21; Answer and Additional Defendant, paragraph 21; photograph of hanging noose; Rosemond Dep., p. 37, 39-42. While Mr. Rosmond never previously had any problems with Mr. Ingalls, Mr. Rankin or Mr. Kaletta, they hung a noose, allegedly as a joke, in the office of an African American man. See Rosemond Dep., p. 37, 39-42. Additionally, Defendant was aware that Mr. Ingalls and Mr. Rankin made "jokes" about employees' national origin. See Russello Dep., Ex. 1. See also Paragraph 36.

38. Defendant failed to prevent the racial harassment Mr. Rosemond suffered by failing to provide adequate harassment and discrimination training. Cynthia Flannery, the Human Resources Manager for the Chicopee Store, testified that Defendant does not provide any training on Defendant's harassment policy to its non-exempt employees after their initial orientation at the time they are hired. See Flannery Dep., p. 49. Thus, if Mr. Ingalls, who was hired by Stop & Shop in 1974, was given any training, it would have taken place almost thirty years earlier. See Ingalls Dep., p. 7. Similarly, if Mr. Kaletta, who was hired by Stop & Shop in 1979, was given any training, it would have been almost twenty-five years earlier. See Kaletta Dep., p. 6.

Defendant failed to take appropriate preventive and corrective action when it did not take any action against employees who made inappropriate comments and jokes regarding race and national origin. See Rosemond Dep., p. 21-22, 26; Terranova Dep., pp. 9-10; Russello Dep., Ex. 1.

Defendant also failed to prevent the harassment suffered by Mr. Rosemond when Mr. Kaletta, the Chicopee Store Meat Department Manager, saw his subordinates with a noose in Mr. Rosemond's office and failed to take any preventive or corrective action, such as removing the noose and notifying upper Management. See Rankin Dep., p. 35-36; Ingalls Dep., 13; Flannery Dep., p. 55-56, ex. 1, 3; Russello Dep., Ex. 1, bates stamped 27-28; Defendant's Investigation Notes, bates stamped 183.

14

Defendant also failed to take appropriate action when Mr. Whalen, Mr. Rosemond's supervisor, essentially ignored Mr. Rosemond's complaint that he found a noose in his office. See Rosemond Dep., pp. 61-62; Russello Dep., Ex. 1, bates stamped 26.

Defendant failed to take appropriate corrective action when it focused its initial investigatory interviews on whether the incident was a threat to Marcy Wutka, rather than on whether the noose was a threat to Mr. Rosemond. See Flannery Dep., pp. 26-27, ex. 1; Rankin Dep., pp. 29-30.

Defendant failed to provide appropriate corrective measures when it acknowledged that Kaletta had engaged in inappropriate behavior, but failed to suspend Mr. Kaletta pending the investigation or issue any disciplinary action following the conclusion of its investigation. See Flannery Dep., pp. 39, 55-56, Ex. 1, 3; Rankin Dep., pp. 31,35-36; Ingalls Dep., p. 13; Russello Dep., Ex. 1, bates stamped 27-28; Defendant's Investigation Notes, bates stamped 183.

Defendant failed to take appropriate corrective measures when it decided to permit Mr. Ingalls and Mr. Rankin to return to work at the conclusion of its investigation without issuing any additional disciplinary action. See Ingalls Dep., pp. 22-23; Rankin Dep., pp. 13-14; Barsolou Dep., pp. 16-18; Associate Counseling Records, bates stamped 62-63, 65-66.

Defendant failed to take appropriate action by failing to follow its own policy to terminate the employees who violate Defendant's harassment policy and make threats to other employees. See Flannery Dep., p. 36; Russello Dep., p. 23; Collins Dep., p. 28; Barsolou Dep., p. 33.

Defendant failed to take appropriate corrective action by responding to the hanging of a noose in Mr. Rosemond's office with less severe punishment than it would have responded for the theft of a nickle. See Barsolou Dep., p. 33.

39. Mr. Rosemond was unable to return to work for seven months due to the emotional distress, reoccurring headaches, and insomnia that he suffered as a result of finding a noose hanging in his workspace and Defendant's callous response thereto. See Rosemond Psychiatirc Evaluation, attached hereto as Exhibit 19, bates stamped 002-004; Rosemond Dep., pp. 106-112. When Mr. Rosemond notified Brenda Broad of his intention to return to work, she asked him for a doctor's note and informed him that he would be assigned to the West Springfield Store. See Rosemond Dep., pp. 118-119. Although Mr. Rosemond did not request to be transferred to another store, he was not unhappy with about the reassignment. See Id.

40. During the summer of 2003, Mr. Rosemond attended a meeting in the Chicopee

store with the then-Store Manager, Mike Leach.  See Rosemond Dep., p. 21-22, 26; Deposition of David Terranova, dated December 9, 2004, attached hereto as Exhibit 3, hereinafter "Terranova Dep.," p. 9.  When Mr. Rosemond arrived at the meeting, Mr. Leach and the Lead Clerk of the Chicopee Store Bake Shop,[10] David Taranova were in attendance.  See Rosemond Dep., p. 21-23; Terranova Dep., pp.6, 9.  Upon realizing that Mr. Rosemond did not have coffee for him, Mr. Taranova exclaimed, "Where's my coffee?  What am I, black?"  See Rosemond Dep., p. 23; Terranova Dep., p. 9.

41.  Although Mr. Leach was present during the meeting and heard Mr. Taranova's statement, Mr. Leach did not reprimand Mr. Taranova or indicate in any way that the statement was inappropriate.  See Terranova Dep., p. 9-10.

42.  Mr. Rosemond was very angry about the comment and concerned he not would be able to respond in an appropriate manner.  As a result, Mr. Rosemond just tried to avoid Mr. Terranova after the second racist comment.  See Rosemond Dep., pp. 27-29.

43.  During the second incident, Mr. Rosemond and Mr. Terranova were "talking about shortage of help, cutting hours and he [Mr. Terranova] made a comment to me [Mr. Rosemond] if Stop & Shop would stop putting minorities in management positions, we wouldn't have this problem."  See Rosemond Dep., pp. 25-26.

44.  Mr. Rosemond did have issues with Charles Ingalls, David Terranova and Stanley Kaletta.  See Paragraphs 21, 23, 24, 37, 40-43.  Defendant entrusted Mr. Ingalls, Mr. Terranova and Mr. Kaletta with supervisory authority over employees.  See Terranova Dep., pp. 6-7; Rosemond Dep., pp. 22, 127; Ingalls Dep., 9; Rankin Dep., pp. 12, 14; Kaletta Dep., pp. 7-8.  Additionally, Mr. Rosemond's direct supervisor ignored Mr. Rosemond's complaint about the noose and stated that he "felt the whole thing was being blown out of proportion." See Rosemond Dep., pp. 61-62; Russello Dep., Ex. 1.

45.  There is no dispute that Defendant maintained strict policies regarding equal employment opportunity and harassment in the workplace.  However Defendant did not adequately distribute these policies to its employees.  For instance, Cynthia Flannery, the Human Resources Manager for the Chicopee Store, testified that Defendant does not provide any training on Defendant's harassment policy to its non-exempt employees after their initial orientation at the time they are hired.  See Flannery Dep., p. 49.  Kathleen Collins indicated that non-exempt employees are merely given a copy of the policy at orientation, rather than any training.  See Collins Dep., pp. 44.  While exempt employees are

---

[10] Defendant entrusts its Lead Clerk of the Bake Shop with supervisor duties.  See Terranova Dep., pp. 6-7; Rosemond Dep., pp. 22.

16

purportedly given a renewed policy and training on a yearly basis, non-exempt employees, such as Mr. Terranova, Mr. Kaletta, Mr. Ingalls and Mr. Rankin, were apparently only given a copy of the harassment policy at the time they were hired. See Collins Dep., pp. 44-45; Flannery Dep., p. 49. Thus, if Mr. Ingalls, who was hired by Stop & Shop in 1974, was given a copy of the policy or any training, it would have taken place almost thirty years earlier. See Ingalls Dep., p. 7. Similarly, if Mr. Kaletta, who was hired by Stop & Shop in 1979, was given a copy of the policy or any training, it would have been almost twenty-five years earlier. See Kaletta Dep., p. 6. Likewise, if Mr. Terranova, who was hired in 1993, was given a copy of the policy or any training, it would have been approximately ten years earlier. See Terranova Dep., p. 6.

Additionally, Mr. Whalen testified that he had attended only one sensitivity training in the Chicopee Store, which took place in January or February of 2004. See Whalen Dep., pp. 29-30. Similarly, Mr. Rosemond testified that he had not received any training from the Defendant regarding employment laws and sexual harassment since his six-week training to become a Customer Service Manager in 2001. See Rosemond Dep., p. 9, 13-15.

46. As noted above, if Mr. Ingalls, who was hired by Stop & Shop in 1974, was given a copy of the policy or any training, it would have taken place almost thirty years earlier. See Ingalls Dep., p. 7. Similarly, if Mr. Kaletta, who was hired by Stop & Shop in 1979, was given a copy of the policy or any training, it would have been almost twenty-five years earlier. See Kaletta Dep., p. 6. Likewise, if Mr. Terranova, who was hired in 1993, was given a copy of the policy or any training, it would have been approximately ten years earlier. See Terranova Dep., p. 6.

47. Although Defendant entrusted Mr. Terranova, Mr. Kaletta, Mr. Ingalls with supervisory authority, they were members of the union, who were considered to be "non-exempt" employees. See Terranova Dep., pp. 6-7; Rosemond Dep., pp. 22, 84-85, 127-128; Ingalls Dep., pp. 9, 16; Rankin Dep., pp. 12, 14; Kaletta Dep., pp. 7-8, 29. Because Defendant provided only exempt employees with regular diversity training, Mr. Ingalls, Mr. Rankin, Mr. Terranova and Mr. Kaletta would not have been provided with the diversity training described by Defendant in Paragraph 47. See Collins Dep., pp. 44-45; Flannery Dep., p. 49; Defendant's Statement, Paragraphs 46 and 47. Additionally, Mr. Whalen testified that he had attended only one sensitivity training in the Chicopee Store, which took place in January or February of 2004. See Whalen Dep., pp. 29-30.

48. It is undisputed that Mr. Rosemond believed that the Defendant's anti-harassment policy was important. However, Defendant, by its response to the hanging of a noose in Mr. Rosemond's office, demonstrated that the harassment

17

suffered by Mr. Rosemond was worth less than a nickle to Stop & Shop. Barsolou Dep., p. 33.

49. Undisputed.

>Respectfully submitted,
>Plaintiff, Joseph Rosemond,
>By His Attorney,
>
>*Tani E. Sapirstein* (signature)
>Tani E. Sapirstein
>BBO #236850
>Carly L. Massy
>BBO #652679
>SAPIRSTEIN & SAPIRSTEIN, P.C.
>1341 Main Street - 3rd Floor
>Springfield, MA 01103
>Tel:   (413) 827-7500
>Fax:  (413) 827-7797

Date: July 29, 2005

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above document was served upon the following, via first class mail, postage prepaid, to:

>Lisa J. Damon, Esq.
>Yvette Politis, Esq.
>Seyfarth Shaw LLP
>World Trade Center East
>Two Seaport Lane, Suite 300
>Boston, MA 02210-2028

>*Tani E.S.* (signature)
>Tani E. Sapirstein

Date: July 29, 2005

K:\WP61\CASEFILE\ROSEMOND\Oppo Facts.wpd