UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOSEPH ROSEMOND,<br>Plaintiff<br><br>v.<br><br>STOP AND SHOP SUPERMARKET<br>COMPANY,<br><br>Defendant. | C.A. No. 04-30072- KPN |

## REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### Introduction

Plaintiff Joseph Rosemond's ("Rosemond") opposition to the motion for summary judgment filed by defendant, The Stop & Shop Supermarket Company LLC ("Stop & Shop" or the "Company"), is based entirely on misinterpretations of law and misstatements of facts. Even if the facts as portrayed by Rosemond were true, the federal and state standards for assessing whether conduct constitutes actionable racial harassment, and whether Stop & Shop may even be held liable for its employees' conduct in this instance, dictate that Rosemond's discrimination claim be dismissed.

In his opposition, Plaintiff sets forth four equally flawed arguments: (1) that hanging the rope in this instance constituted actionable racial harassment, (2) that Stop & Shop is strictly liable under Mass. Gen. Laws c. 151B for this conduct because Stanley Kaleta, an hourly union employee, is a "supervisor" and failed to remove the rope, (3) that Stop & Shop is liable under Title VII because it cannot establish the *Ellerth/Faragher* affirmative defense, and (4) that, in any event, Stop & Shop is liable for co-worker harassment because it knew or should have

known about the conduct, and failed to take both preventive measures and prompt and effective remedial action.

Each of Rosemond's arguments fails. First, the conduct at issue was not sufficiently severe or pervasive to be actionable. Second, strict liability for supervisor harassment does not apply because Kaleta, a non-exempt union associate, is a lower level employee than Rosemond, and had no authority over him. Third, because Kaleta was not Rosemond's supervisor, Stop & Shop need not establish the *Ellerth/Faragher* affirmative defense to avoid liability under Title VII. Finally, Stop & Shop's preventive measures are irrelevant in analyzing this co-worker harassment claim. The undisputed facts establish that Stop & Shop did not know or have any reason to know that this conduct would occur and took prompt and effective remedial action once it learned of it. In the end, even accepting Rosemond's distorted version of the facts, the application of the <u>correct</u> legal analysis leads inexorably to the dismissal of Rosemond's claim.

## Legal Argument

### I.   The Conduct in This Case Was Not Sufficiently Severe or Pervasive To Be Actionable.

Clearly appreciating the difficulty he faces in pursuing a racial harassment claim based on a single incident, Rosemond contorts the facts and relies on cases that simply do not support his theory that the incident at issue, though a disturbing exhibition of poor judgment, is sufficient to constitute actionable racial harassment.

Some of Rosemond's most glaring overstatements can be found in his description of where Jeremy Rankin and Charles Ingalls hung the rope, the layout of his "office" area, the individuals involved and their knowledge of who might see the rope hanging from the ceiling. Rosemond portrays Rankin and Ingalls as hanging the rope next to his desk in a private office. The undisputed facts, including Rosemond's own drawing of his work area, establish that he and

Marcy Wutka worked in an open mezzanine area where a public water fountain and one of the store's time clocks were located, not in a private office closed off by a door. (Plaintiff's Exhibit 1; Defendant's Exhibit A, Interrogatory Answer Nos. 3 and 8; Defendant's Exhibit B; Rosemond Dep., 37, 40-42, 45; Rankin Dep., 20, 23.) Indeed, it was necessary to walk through their common work area to reach the office of the store manager. (Rosemond Dep., 40-41.) Similarly, Rosemond's drawing reveals that Rankin and Ingalls hung the rope, not next to Rosemond's desk, but on the far side of Wutka's desk, away from his desk. (Plaintiff's Exhibit 1.) Finally, Ingalls's testimony that he was not aware that Wutka was on vacation rebuts Rosemond's claim that Ingalls knew Wutka would not be at work on December 10. (Ingalls Dep., 30.)

As set forth in Stop & Shop's memorandum in support of summary judgment, to prevail on his claim, Rosemond must establish racially harassing conduct that is sufficiently severe or pervasive to create a hostile work environment. While under both state and federal law, a single incident of harassment, if sufficiently egregious, may meet this standard, Rosemond fails to cite any case where a claim involving comparable conduct survived summary judgment. In fact, in the racial harassment cases plaintiff relies on, the conduct was <u>substantially</u> more than a single incident on a single day. *See Harris v. Int'l Paper Co.*, 765 F. Supp. 1509 (D. Me. 1991) (harassment involved multiple instances of discriminatory conduct over period of time); *Vance v. Southern Bell Telephone & Telegraph Co.*, 863 F.2d 1503 (11th Cir. 1989) (claim based on noose hung on two occasions and other allegations of disparate treatment); *Landrau-Romero v. Banco Popular De Puerto Rico*, 212 F.3d 607 (1st Cir. 2000) (multiple instances of conduct over almost a year). There is no federal or state case law that supports the idea that this incident, which did

not involve violence or even threats of violence toward Rosemond, is sufficient to satisfy the severe or pervasive standard and for this reason summary judgment is warranted.[1]

## II. Kaleta Is Not a Supervisor for Whose Conduct Stop & Shop Is Strictly Liable.

Central to Rosemond's claim is the premise that Kaleta, an hourly union employee, was allegedly directly involved in hanging the rope and is a supervisor for whose conduct Stop & Shop is strictly liable under c. 151B.[2] Even assuming Kaleta is a supervisor for purposes of c. 151B, a fact Stop & Shop does not concede, this argument is meritless. While, an employer is strictly liable under c. 151B for harassment committed by a supervisor toward his subordinate employee, no case law suggests that an employer is strictly liable for a supervisor's harassment of a <u>higher</u> level manager. Indeed, cases decided under c. 151B and the Massachusetts Commission Against Discrimination's ("MCAD") Harassment in the Workplace Guidelines ("Guidelines") reveal that the factors that support imposing strict liability are simply absent when a lower level supervisor harasses a higher level manager.

In *College Town, Div. of Interco, Inc. v. Massachusetts Comm'n Against Discrimination*, 400 Mass. 156 (1987), a case involving a supervisor's harassment of a subordinate employee, the Supreme Judicial Court explained its reasoning for establishing a strict liability standard:

---

[1] In an effort to portray this incident in a more inflammatory light, Rosemond frequently makes factual assertions that are irrelevant and often inaccurate or simply false. For instance, Rosemond asserts that Rankin and Ingalls were "known to engage in jokes regarding national origin while at work." *Plaintiff's Opposition to Summary Judgment* ("Plaintiff's Opp."), at 10-11. There is no allegation, much less evidence, that Rosemond experienced such jokes, and this allegation, therefore, has no bearing on the issue of whether the atmosphere he experienced was severe or pervasive.

[2] Again, in describing Kaleta's involvement in this incident, Rosemond misstates the facts, asserting that Kaleta spent seven minutes in the mezzanine with Ingalls and Rankin. The document Rosemond relies on reveals that Kaleta was in the mezzanine for less than four minutes. (Plaintiff's Exhibit 11.) Nonetheless, even accepting Rosemond description of the facts, Rosemond cannot establish a basis for imposing strict liability for the reasons set forth herein.

"[H]arassment by a supervisor carries an implied threat that the supervisor will punish resistance through exercising supervisory powers, which may range from discharge to assignment of work, particularly exacting scrutiny, or refusal to protect the employee from coworker harassment." (Emphasis added.) *Id.*, at 166. The reasoning of *College-Town* simply does not apply where a lower level supervisor harasses a higher level manager because the alleged harasser has no authority, let alone ability, to abuse his supervisory powers or punish the alleged victim. Indeed, interpreting *College-Town*, another Court found that a fellow manager's sexual harassment of the plaintiff could not support imposing strict liability under c. 151B:

> I reject the argument that an employer is per se liable for the acts of supervisory employees who are not acting in their supervisory role when dealing with another employee. I conclude that the mere fact that Duarte may have been the supervisor of some employees is insufficient to hold the defendants strictly liable for the hostile environment he allegedly created in harassing a non-subordinate co-worker.

*Saad v. Stanley Street Treatment and Resources, Inc.*, 1994 U.S. Dist. LEXIS 20728, *23 (D. Mass. 1994, Woodlock, J.); *see also Johnson v. Boston Edison Co.*, 19 MDLR 162, 1997 Mass. Comm. Discrim. LEXIS 42, at *31-32 (1997) (MCAD finds employer may not be held strictly liable for supervisor harassment for conduct that occurred when alleged harasser had no supervisory authority over complainant).

The limited application of strict liability is further borne out by the MCAD's Guidelines which provide that, "[i]n some circumstances, an employer may be liable for the actions of a supervisor, even if that supervisor does not have direct supervisory authority of the Complainant." (Emphasis added.) Guidelines, Section III(B). Further, the Guidelines establish that an employer may only be strictly liable for the harassment of a non-supervisory employee under a theory of apparent authority if "the harasser holds himself out to the employee as having supervisory authority over the employee." (Emphasis added.) *Id.* Finally, no cases cited in the

Guidelines impose strict liability in circumstances where the alleged harasser was a lower level employee than, and had no authority over, the complainant.[3]

In short, Rosemond's efforts to hold Stop & Shop strictly liable because Kaleta did not remove the rope fail because Kaleta had no actual or apparent authority over Rosemond. Kaleta, the Meat Manager and a non-exempt union employee without authority to hire, fire, set compensation and benefits, or discipline employees, had limited supervisory authority and no power to exercise that authority in a manner that could intimidate or punish Rosemond, one of the store's most senior managers. (Affidavit of Ronald Petronella, Defendant's Exhibit H attached hereto; Rosemond Dep., 12.) Because the very purpose of imposing strict liability for supervisor harassment – to protect lower level employees from an abuse of power by more powerful supervisory employees – is utterly absent in this case, Plaintiff's argument fails.

### III. Stop & Shop Need Not Establish the Affirmative Defense Because Kaleta Was Not Rosemond's Supervisor.

Rosemond next argues that Stop & Shop is liable under Title VII because Kaleta is a "supervisor," unless the Company can establish the *Ellerth/Faragher* affirmative defense by showing that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior and, . . . that [Rosemond] unreasonably failed to take advantage of any preventive or corrective opportunities provided by [Stop & Shop] or to avoid harm otherwise." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 2293 (1998). Rosemond's

---

[3] Notably, Rosemond cites no cases that support his overly broad application of strict liability. Rosemond relies on *Belanger v. Saint-Gobain Industrial Ceramics, Inc.*, 9 Mass. L. Rep. 581, 1999 Mass. Super. LEXIS 89, at *17 (Mass. Super. Ct. Feb. 18, 1999), for the proposition that an alleged harasser need not be formally designated as a supervisor for strict liability to attach. Plaintiff's reliance on *Belanger* is misplaced because its facts are inapposite. In that case, the low level supervisor who engaged in the harassing conduct was the plaintiff's supervisor, and the Court declined to find that the employer could not be held strictly liable for his conduct.

efforts to impose the burden of proving this affirmative defense on Stop & Shop to avoid liability fails because Kaleta was not Rosemond's supervisor.

Rosemond incorrectly argues that *Faragher* and *Ellerth* impose liability on an employer, subject to the employer's ability to prove the affirmative defense, for <u>all</u> supervisor harassment. *See Plaintiff's Opp.*, at 19. Both decisions, however, clearly articulate that vicarious liability – and the corresponding affirmative defense – applies in limited circumstances: "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment <u>created by a supervisor with immediate (or successively higher) authority over the employee</u>." (Emphasis added.) *Burlington Ind., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S. Ct. 2257, 2270 (1998); *see also Faragher*, 524 U. S. at 807, 118 S. Ct. at 2292-93 (setting forth identical standard). There is no dispute that Kaleta, a non-exempt union employee, did not have any supervisory authority over Rosemond, an exempt management employee who was in charge of the store on December 10. Accordingly, Stop & Shop is not vicariously liable for Kaleta's alleged conduct and need not rely on the affirmative defense to avoid liability. Further, because Rosemond cannot establish supervisor harassment under either Title VII or c. 151B, Stop & Shop may only be liable for the conduct of Rankin, Ingalls and Kaleta if the Company knew or should have known about harassing conduct and failed to take prompt and effective remedial action. *Noviello v. City of Boston*, 398 F.3d 76, 95, 96-97 (1st Cir. 2005).

### IV. Stop & Shop Had No Reason to Know of the Conduct and Took Prompt and Effective Remedial Action When It Learned of It.

Rosemond's final argument – that Stop & Shop knew or should have known "about the harassment" and failed to prevent it or to take prompt, and effective remedial action – fails. The undisputed facts do not support that conclusion and he again applies the wrong analysis to the facts.

### A.  Stop & Shop Had No Reason To Know About the Alleged Harassment.

Rosemond makes two equally untenable arguments supporting his contention that Stop & Shop knew or should have known that Rankin and Ingalls would engage in racially harassing conduct. First, he incorrectly asserts that Stop & Shop "permitted [them] to frequently make 'jokes' based on national origin" in front of Wutka and Kaleta. According to Rosemond, this alleged "discriminatory" conduct put Stop & Shop on notice that they would engage in racial harassment. Second, Rosemond argues that Kaleta's knowledge that the rope was hanging from the ceiling put Stop & Shop on notice of racial harassment. *Plaintiff's Opp.*, at 21.

Rosemond's first argument is premised on his distortion of a single sentence in a report concerning this incident. In the course of investigating Rosemond's complaint, Kathy Russello interviewed Wutka, the Perishable Manager to whom Rankin and Ingalls reported. In her report, Russello recounted Wutka's description of their relationship:

> They [Rankin and Ingalls] alluded to the fact that it was a joke about me, I think because the noose was over my desk. I'm a manager first, very direct, I do my job, but they also know they can joke with me. …[S]ince they apologized to me, it made it sound like it was directed at me. They will tell jokes in the back even if I'm present. I can't think of anything specific. They can say how they feel in front of me without me taking it disrespectful. Sometimes they will do Polish jokes because Stan's Polish and they know I was married to a Polish man.

(Defendant's Exhibit G.) Nothing about Wutka's comment, particularly given its context, supports Rosemond's allegation that Rankin and Ingalls "frequently" made national origin jokes, much less his conclusion that Stop & Shop was on notice that they would engage in racially harassing behavior toward him.[4]

---

[4] Importantly, Wutka did not state or even suggest that she found their jokes offensive, much less harassing. While it may be poor judgment to tell such jokes, this conduct is insufficient to establish a history of harassment, much less racial harassment, by Rankin or Ingalls.

Rosemond's second argument is based on even more tortured reasoning. Rosemond contends, inaccurately, that Kaleta spent seven minutes with Ingalls and Rankin in the office when they hung the rope and made a joke about it.[5] According to Rosemond, once Kaleta saw the rope hanging from the ceiling, by virtue of his status as Meat Manager, Stop & Shop was aware of racially harassing conduct and failed to take prompt and effective remedial action. Plaintiff quotes *Faragher*, and notes the cases it cites, for the proposition that Kaleta's brief observation of the rope was sufficient to impute knowledge and inaction to Stop & Shop. In fact, as a more complete quote reveals, *Faragher* does not support this conclusion because the cited cases involved direct knowledge by higher level officials:

> There have, for example, been myriad cases in which District Courts and Courts of Appeals have held employers liable on account of actual knowledge by the employer, or high-echelon officials of an employer organization, of sufficiently harassing action by subordinates, which the employer or its informed officers have done nothing to stop. [Citations omitted.] In such instances, the combined knowledge and inaction may be seen as demonstrable negligence, or as the employer's adoption of the offending conduct and it results, quite as if they had been authorized affirmatively as the employer's policy.

*Faragher*, 524 U.S. at 789, 118 S. Ct. at 2284. In this instance, Kaleta's limited observation, when placed in context, is insufficient to impute knowledge to Stop & Shop. Unlike other cases in which a supervisor's knowledge of harassment was imputed to the employer, Kaleta observed no conduct that was obviously directed at Rosemond and no one, including Rosemond, had yet complained about the rope. While Kaleta exhibited poor judgment in failing to remove the rope, his brief observation, in isolation, is insufficient to infer knowledge of racially harassing conduct.

Even if Kaleta's knowledge is imputed to Stop & Shop, a fact that the Company does not concede, there is no dispute that Stop & Shop took prompt remedial action, starting its

---

[5] As previously noted, Kaleta was in the office for less than four minutes. *See* Plaintiff's Exhibit 11. Moreover, he did not make a joke about the noose, but asked "who is the joker." (Kaleta Dep., 14, 16.)

investigation on the day the rope was hung and suspending Rankin and Ingalls within two days. Given Stop & Shop's swift response, any argument by Rosemond that Stop & Shop was aware of the conduct and ignored it is rebutted by the undisputed facts.

### B. Stop & Shop Took Prompt and Effective Remedial Action.

Rosemond next seeks to heighten the standard for assessing Stop & Shop's response to the incident, arguing that Stop & Shop failed to take appropriate "preventive and remedial" action. (Emphasis added.) *See Plaintiff's Opp.*, at 23. Contrary to Rosemond's assertion, Stop & Shop is only liable for co-worker harassment that it was unaware of if it failed to take prompt and effective remedial action once it learned of the incident. *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 401 (1st Cir. 2002) ("a plaintiff must demonstrate that the employer knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate action" (quotation marks omitted)). No case law requires Stop & Shop to have taken particular steps to prevent harassment in order to avoid liability for co-worker harassment. Accordingly, Stop & Shop's efforts in that regard are not relevant to this analysis.[6]

Focusing on the appropriate standard – Stop & Shop's response to Rosemond's complaint – Plaintiff argues that the Company's response was not effective because: (1) when Store Manager Brian Whalen reported the incident to District Manager and Director of Operations, he

---

[6] Rosemond's focus on this issue is misplaced in any event. Rosemond falsely asserts that Stop & Shop failed to take reasonable steps to prevent harassment and failed to comply with the Massachusetts law requiring the yearly distribution of its policy prohibiting sexual harassment. In fact, the undisputed facts establish that Stop & Shop distributes its policy prohibiting harassment to all employees every year. *See* Defendant's Exhibit A, Interrogatory Answer No. 1. (Stop & Shop policies regarding equal employment opportunity and harassment in the workplace "are communicated to Stop & Shop employees through postings in work locations, distributions directly to employees at time of hire and then once a year, and through training" (emphasis added)). Rosemond's assertion that Ingalls and Kaleta likely had not received the relevant policy in 25 years is false. The deposition testimony which Rosemond cites in support of this assertion addresses training, not the distribution of this policy. (Collins Dep., 44; Flannery Dep., 49.)

told her the rope was hung over Wutka's desk and Stop & Shop's investigation focused on whether it was directed at Wutka; (2) Stop & Shop failed to suspend or impose discipline on Kaleta; (3) Stop & Shop permitted Ingalls and Rankin to return to work after their suspensions without further discipline; and (4) Stop & Shop failed to follow its policy of terminating employees who violate the harassment policy or threaten other employees.

Rosemond's arguments are factually inaccurate and completely ignore the correct standard for assessing whether remedial action is prompt and effective. Rosemond's assertion that Stop & Shop improperly focused on Wutka as the target of the rope misses the point. When faced with this disturbing incident, Stop & Shop promptly began its investigation to determine who was responsible. Given the fact that the rope was hung to one side of Wutka's desk, on the opposite side from Rosemond's desk, it was hardly surprising that Stop & Shop questioned who the intended target was.[7]

Moreover, Rosemond's contention that Stop & Shop ignored his complaint and focused on Wutka is controverted by the evidence. Rosemond was the second person, after Isaac Kobodya,[8] interviewed in connection with the investigation. (Defendant's Exhibit B.) Cindy Flannery's investigation report reflects that she and Scott Ziter met with Rosemond after they conducted interviews of store employees to apprise him of the status of their investigation, a clear acknowledgment that he had complained about the rope. (Defendant's Exhibit D; Flannery Dep., 9, 39.) Finally, Kathy Rusello's investigation case report clearly focuses on Rosemond's

---

[7] Rosemond emphasizes his dissatisfaction with Whalen's response when Rosemond told him about the rope. Given the location of the rope, it was hardly surprising that Whalen did not view the rope as being targeted at Rosemond.

[8] Kobodya was the manager in charge the night before Rosemond found the rope. (Defendant's Exhibit B.)

complaint. (Defendant's Exhibit G.) She notes his complaint in her summary of allegations and, in her report, recounts her interview with him first. Id.

Rosemond's argument that Stop & Shop failed to take adequate disciplinary measures against Kaleta, Rankin and Ingalls is equally unavailing. Rosemond incorrectly contends that Kaleta experienced no discipline. In fact, Stop & Shop counseled and warned him about his failure to bring the incident to the attention of management. (Defendant's Exhibit D and F; Kaleta Dep., 27.) Similarly, Rosemond's assertion that Stop & Shop returned Rankin and Ingalls to work after their suspensions without further discipline is false. Each received a final warning upon their return to work and each was transferred to a different store. (Plaintiff's Exhibit 16 (Associate Counseling Records state "Final Warning given"); Rankin Dep., 13-14, 32; Ingalls Dep., 21.)

Finally, Rosemond's assertion that Stop & Shop deviated from its own disciplinary policy is not supported by the evidence. None of the testimony that Rosemond cites supports the contention that harassing conduct automatically leads to termination.[9] It <u>may</u> lead to termination depending on all the circumstances. Further, Rosemond's reliance on the testimony that violence

---

[9] The individuals whose testimony Rosemond relies on never testified that discriminatory harassment would automatically lead to termination. The only conduct that anyone testified would automatically lead to termination was theft. In particular, Don Barsolou testified as follows:

    A:    One where there is absolutely no flexibility is if they steal from the company, they're gone.
    Q:    No matter how much they steal?
    A:    A nickel to a million dollars. Anything other than that is up for discussion based on the situation and the parties involved and what happens, the severity of it. One other one I would have very little room for is if somebody threatened somebody else within the company and it's over an overt actual threat, which has happened, terminated offense – a direct threat.

(Barsolou Dep., 33.)

or threats of violence could lead to termination does not support his position because Stop & Shop ultimately concluded that Rankin and Ingalls had not intended to threaten or hurt anyone, and the conduct was not an overt threat.

By any measure, Stop & Shop's response meets the prompt and effective remedial action standard as a matter of law.[10] *See Memorandum of Law in Support of Defendant's Motion for Summary Judgment*, 11-12. In assessing whether an employer's response is effective, both the EEOC and the MCAD consider whether: (1) ongoing harassment is halted, (2) disciplinary action is prompt and appropriate, (3) effective action – such as training – is taken to prevent recurrence, and (4) whether the complainant was made whole by restoring lost benefits or opportunities. *See* MCAD's Guidelines, Section VI(F); EEOC's Policy Guidance on Current Issues of Sexual Harassment, Section E. In this case, Stop & Shop conducted a thorough and expeditious investigation. The Company gave considerable thought to the appropriate disciplinary response, taking into account the reason for and nature of the conduct and the disciplinary history of the employees involved. Stop & Shop took steps to ensure that this conduct would not recur. The Company conducted sensitivity training for Kaleta, Rankin and Ingalls and the other store employees and transferred Rankin and Ingalls to other stores. Most importantly, Rosemond admits that no other conduct of this nature has occurred. In short,

---

[10] *Paroline v. Unisys Corp.*, 879 F.2d 100 (4th Cir. 1989), which Rosemond cites for the proposition that this issue is a fact question for the jury, does not support his argument. In that case, the Court left this issue to the jury because the evidence showed that the employer's response to the complaint of harassment actually increased the likelihood that the alleged harasser would encounter the plaintiff. Moreover, there was evidence that the employer's past reprimands of the harasser had not deterred his harassing conduct. *Id.*, at 106-107. In this instance, Stop & Shop ensured that Rankin, Ingalls and Kaleta would not work at the same store as Rosemond and there is no evidence that any of them was a serial harasser who had previously been warned but continued to engage in the same type of conduct.

BO1 15730979.1

Rosemond's personal dissatisfaction with the investigation and its outcome cannot outweigh the evidence that Stop & Shop's response was prompt, appropriate and effective.

## Conclusion

For the reasons set forth herein, Stop & Shop is entitled to summary judgment on all of Rosemond's claims, and the complaint must be dismissed with costs and attorneys' fees awarded.

        Respectfully submitted,

        **THE STOP & SHOP SUPERMARKET COMPANY LLC**

        By its Attorneys,

        /s/ Brigitte M. Duffy
        Lisa J. Damon (BBO # 558843)
        Brigitte M. Duffy (BBO # 567724)
        Yvette Politis (BBO # 644986)
        SEYFARTH SHAW LLP
        World Trade Center East
        Two Seaport Lane, Suite 300
        Boston, MA 02210-2028
DATED:  August 19, 2005        (617) 946-4800

EXHIBIT H

AFFIDAVIT OF RONALD PETRONELLA

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOSEPH ROSEMOND,  )
    Plaintiff,  )
                       )    C.A. No. 04-30072-KPN
v.  )
                       )
STOP AND SHOP SUPERMARKET  )
COMPANY, LLC  )
    Defendant.  )

STATE OF CONNECTICUT  )
                           :ss
COUNTY OF FAIRFIELD  )

## AFFIDAVIT OF RONALD PETRONELLA

I, Ronald Petronella, being duly sworn, do hereby depose and state as follows:

1. I am over the age of 18 and understand the obligations of an oath. I make this affidavit based on my own personal knowledge.

2. I am employed by United Food and Commercial Workers Union, Local 371 ("Local 371" or the "Union") and am the Vice President for Local 371. I have held this position within the Union for the past 5 years and have been employed by the Union for a total of 19 years.

3. Local 371 is the collective bargaining representative for employees that are employed by Stop & Shop Supermarket Company ("Stop & Shop") in various locations in the State of Connecticut and Massachusetts. In my capacity as Vice-President, I have responsibility for the administration of the collective bargaining agreement and am familiar with the both the union and non-union positions within the Company and the

respective duties and responsibilities of those positions.

4. The position of department managers, including Meat Managers, are employment classifications covered by the collective bargaining agreement. I am aware that Stanley Kaleta is employed by Stop & Shop as a Meat Manager and he is a member of Local 371.

5. As a Meat Manager, Mr. Kaleta cannot hire or fire employees. He may schedule employees for work subject to the approval of store management. In addition, Mr. Kaleta cannot conduct performance reviews or impose discipline on the associates in his department. Mr. Kaleta does not set compensation or benefits. He also lacks authority to approve associate's vacation schedules.

_____
Ronald Petronella

Sworn to before me this 19th day
of August, 2005

_____
Notary Public

**BARBARA A. LAVALETTE**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES AUG. 31 2007

2

BO1 15731819.1