UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOSEPH ROSEMOND, | ) | |
| Plaintiff | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-30072-MAP |
| | ) | |
| | ) | |
| STOP & SHOP SUPERMARKET CO., | ) | |
| Defendant | ) | |

REPORT AND RECOMMENDATION WITH REGARD TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (Document No. 31)
March 22, 2006

NEIMAN, C.M.J.

Joseph Rosemond ("Plaintiff"), who is African-American, brings this action

against his employer, Stop & Shop Supermarket Company ("Defendant"), after

discovering a noose hanging from the ceiling in his work area at Defendant's Chicopee

store on December 10, 2003.  Plaintiff's complaint alleges that he suffered a racially-

hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e *et seq.* ("Title VII"), and Mass. Gen. L. ch. 151B ("chapter 151B").  He

asserts that Defendant, as his employer, is liable for the racially-hostile work

environment regardless of whether the harassment was conducted by one of its

supervisors or by his co-workers.

Defendant has filed a motion for summary judgment, which motion has been

referred to this court for a report and recommendation.  *See* 28 U.S.C. § 636(b)(1)(B).

For the following reasons, the court will recommend that Defendant's motion be denied,

with the caveat that the action may proceed only as a co-worker harassment case.

## I. BACKGROUND

The following background is derived from Defendant's Local Rule 56.1 Statement of Material Facts (Document No. 33, hereinafter "Def.'s Facts") and Plaintiff's Statement of Facts in Dispute (Document No. 40, hereinafter "Pl.'s Facts"). The facts are stated in a light most favorable to Plaintiff, the party opposing summary judgment. *Douglas v. York County*, 433 F.3d 143, 149 (1st Cir. 2005). As necessary, further facts are addressed in the court's discussion below.

Plaintiff has been a manager with Defendant since 1994. He is currently the customer service manager ("CSM") at Defendant's West Springfield store. When initially hired, Plaintiff worked in Defendant's Northampton distribution center. In 2001, he was offered and accepted the position of CSM at Defendant's Chicopee store. In that position, Plaintiff managed between 80 and 110 "front end" employees and reported directly to the store manager, Brian Whalen ("Whalen"). (Def.'s Facts ¶¶ 1, 2.)

### A. The Incident

On the morning of December 10, 2003, Plaintiff was the store manager-in-charge since Whalen was not on duty. After arriving at around 7:15 a.m., Plaintiff went to his work area in the upstairs mezzanine. There, he found a rope, cinched in a noose, hanging from the ceiling. Plaintiff was quite upset. Following an investigation, Charles Ingalls ("Ingalls"), the head meat cutter, and Jeramie Rankin ("Rankin"), a seafood clerk, admitted that they had hung the noose in the mezzanine. (Def.'s Facts

¶¶ 2, 21; Pl.'s Facts ¶ 21.)

The mezzanine overlooks the retail shopping floor and contains the store's time clock.  For summary judgment purposes, the parties rely on a diagram of the mezzanine created by Plaintiff at his deposition.  It shows a stairway leading up to an open area.  At the top of the stairway is a water cooler, behind which is a hallway leading to Whalen's office.  To the right of the water cooler is the desk of Marcy Wutka ("Wutka"), the store's perishables manager.  Plaintiff's desk, the only other desk pictured in the diagram, is positioned next to Wutka's and closer to the stairway.  According to the diagram, the noose was hung between the water cooler and Wutka's desk.  At the time, Wutka was on vacation.  (Def.'s Facts ¶ 3; Pl.'s Facts ¶ 14 n.4; Document No. 41, Appendix to Pl.'s Ex. 1 (Rosemond Depo.).)

Upon seeing the noose, Plaintiff immediately called Jen Gatto ("Gatto") in the downstairs cash office.  Gatto, who would have been among the first to have arrived that morning, told Plaintiff that she had not noticed a rope when she began work at 6:00 a.m.  Plaintiff then took some pictures of the hanging noose, took it down, put it in a plastic bag and put the bag in his desk.  (Def.'s Facts ¶¶ 5, 6.)

Plaintiff next spoke about the noose with two of the cashiers who had arrived at 7:00 a.m., one of whom told Plaintiff that she was upset because it reminded her of her brother-in-law who had hung himself in a closet.  When Isaac Kobodya ("Kobodya"), the general merchandise manager, arrived, Plaintiff informed him about the noose and discussed its racial implications.  Kobodya is African-American.  Plaintiff also attempted to contact John Vey ("Vey"), the head of store security, but he was not yet at work.

Plaintiff also thought about contacting the police, but wanted to first speak with

Kathleen Collins ("Collins"), Defendant's district manager and director of operations.

(Def.'s Facts ¶ 6; Pl.'s Facts ¶¶ 6, 28.)

B.  Whalen's Response

    Before Plaintiff could contact Collins -- and about an "hour or so" after the

incident -- Plaintiff saw Whalen, the store manager.  As it turned out, Whalen had come

in on his day off to work on budgets.  Plaintiff gave the noose to Whalen and explained

that it had been hanging in his work area when he arrived that morning.  According to

Plaintiff, Whalen said: "Wow, I wonder who did that?  Well, we'll get Security to pull the

tapes and see what we can find."  Then Whalen turned away and resumed working.

Plaintiff, who viewed Whalen as impersonal and a poor communicator, was particularly

upset by Whalen's low-key response to the incident.  Plaintiff felt at the time that

Whalen's reaction to the incident was itself a form of racism.  Plaintiff later testified at

his deposition, however, that Whalen never did or said anything else that would make

him believe that Whalen harbored any kind of racial animus.  (Def.'s Facts ¶¶ 7-11;

Pl.'s Facts ¶¶ 7-11.)

    For his part, Whalen testified that he initially thought that the night crew was

playing a joke and that Plaintiff was concerned that someone on that crew was going to

hang himself.  Whalen did not understand Plaintiff's actual concerns until a short while

later when the store's head of security, Vey, told him that Plaintiff believed the rope was

meant for him.  (Def.'s Facts ¶ 12; Pl.'s Facts ¶ 12.)

    Following his conversation with Vey -- and within a half-hour of his initial

4

encounter with Plaintiff -- Whalen apologized to Plaintiff for not initially understanding the significance of the situation.  Whalen told Plaintiff that "it didn't click" with him immediately what the rope meant to Plaintiff.  Plaintiff viewed Whalen's apology as insincere.  Plaintiff also points to Whalen's later statement that "it was difficult for him to see [Plaintiff's] point of view" and that he felt that "the whole thing was being blown out of proportion."  (Def.'s Facts ¶ 13; Pl.'s Facts ¶ 13.)

C.  The Investigation

There is no dispute that Whalen directed Vey to review the videotapes of the area around the time clock.  Nor is there any dispute that, around the same time, Plaintiff put the rope and the pictures he had taken into his car and that Whalen advised Collins, the district manager, about what had occurred.  Plaintiff notes, however, that Whalen initially, and incorrectly, told Collins that the noose was over Wutka's desk and did not mention Plaintiff.  (Def.'s Facts ¶¶ 14, 17; Pl.'s Facts ¶ 14 and n.4.)

Thereafter, Brenda Broad ("Broad"), Defendant's director of human resources, dispatched Jerry Bidwell ("Bidwell"), the human resources manager at Defendant's North Haven, Connecticut, district headquarters, to Chicopee to assist with the investigation.  (Apparently, Cynthia Flannery ("Flannery"), the human resources manager of the Chicopee store, was working on another case.)  On December 11th, Bidwell traveled to the Chicopee store where he interviewed Kobodya and Plaintiff. (Def.'s Facts ¶ 18; Pl.'s Facts ¶ 18.)

Meanwhile, during the night of December 10th and into December 11th, Vey and

his bosses -- Mary Downing ("Downing"), a loss prevention manager, and Scott Ziter ("Ziter"), loss prevention manager for the Connecticut division -- reviewed the tapes and put together a list of associates who had worked the night shift on December 9th. Vey also contacted the Chicopee police, although Plaintiff contends that he did so at the direction of Allan Cave ("Cave"), an African-American and Defendant's vice-president of human resources. The police indicated that Defendant could either provide an initial report or conduct its own internal investigation. Defendant chose the latter. (Def.'s Facts ¶ 20; Plaintiff's Facts ¶ 20.)

On December 12th, Downing, Vey and Flannery interviewed a number of employees, including Ingalls and Rankin who admitted they had hung the noose. Ingalls and Rankin told the investigators, and later testified at their depositions, that their crew often pulled pranks and that hanging the noose was simply a "joke" not aimed at Plaintiff, Wutka or anyone else. Rankin, however, also testified that he knew Wutka was on vacation at the time and that Plaintiff was scheduled to work. The investigators then contacted managers for whom Ingalls and Rankin had worked to determine their work history. (Def.'s Facts ¶¶ 21-23; Pl.'s Facts ¶ 14 n.4. See also Pl.'s Ex. 4 (Rankin Depo.) at 23-24.)

The investigation also included a review of a security videotape which showed Ingalls and Rankin entering the mezzanine on December 10th. The videotape then showed their supervisor, meat department manager Stanley Kaletta ("Kaletta")[1],

---

[1] Although Defendant spells Kaletta's name with only one "t" (*i.e.*, "Kaleta"), at his deposition he spelled it "K-A-L-E-T-T-A." (Pl.'s Ex. 13 at 5.) The court employs his spelling throughout this report and recommendation.

6

entering the area approximately two minutes later, staying for about seven minutes, and then leaving the area shortly after Ingalls and Rankin themselves left.  (Pl.'s Facts ¶ 21.)

According to deposition testimony by Rankin, Ingalls and Kaletta, a group of employees from their shift would typically meet in the parking lot and walk in to work together.  On the day in question, Kaletta stopped to get his paper, while Ingalls, Rankin and others continued upstairs to the mezzanine to punch in on the time clock. Ingalls and Rankin found a rope -- already tied in a noose on Wutka's desk -- and they hung it from the ceiling.  After the noose was hung, Kaletta heard giggling, saw the noose hanging and, believing a joke was being played on him, said something like, "who's the wise guy" or "who's the joker."  (Def.'s Facts ¶¶ 24, 25; Pl.'s Facts ¶ 24.)

Ingalls later testified that Kaletta was present in the mezzanine at the time the noose was actually hung.  According to other testimony, Kaletta may have even played a more active role.[2]  Regardless, there is no dispute that Kaletta did not discipline or

---

[2]  At his deposition, Plaintiff testified that on December 12th, Ziter implicated Kaletta along with Rankin and Ingalls:

> A.  . . . [T]hat morning [December 12th] when I spoke with [Ziter], he told me that they found the *three individuals* that [sic] did that and he told me who they were.
>
> Q.  Who did he tell you?
>
> A.  He said it was Charles Ingalls, Jeramie Rankin, *and Stan Kaletta*.  He said he interviewed those *three people*.  Charlie Ingalls and Jeramie Rankin admitted to doing it.

(Pl.'s Ex. 1 at 81 (emphasis added).)

reprimand Rankin or Ingalls, indicate that hanging the noose was inappropriate, take down the noose, or report the incident to upper management.  Rather, everyone just "punched in and went to work."  (Def.'s Facts ¶ 24; Pl.'s Facts ¶¶ 24, 25.)

Immediately after Ingalls and Rankin admitted on December 12th that they had hung the noose, Defendant suspended them without pay pending further investigation. That same day, Defendant gave Kaletta a written warning for failing to address the situation and report it to upper management.  (Def.'s Facts ¶ 30.)

Also on December 12th, Ziter and Flannery met with Plaintiff and Wutka -- who had by then returned from vacation -- to update them on the investigation and the discipline that was being imposed.  Although Ziter and Flannery concluded that the rope was meant as a joke with no intent to harm anyone, Flannery stated that "if it was meant as a sick joke, it was inappropriate."  For her part, Wutka told the investigators that she did not take the rope personally and also thought it was a joke.  Plaintiff, however, was so upset that Defendant had not fired the perpetrators that he left work and went to see his doctor.  Before he left, Plaintiff told Ziter: "If that's what you want to do [not fire them], then you do what you have to do, but . . . I've seen a seventy-five year-old man fired for stealing a donut -- because they thought he stole a donut.  If this isn't grounds for termination, then what is."  (Def.'s Facts ¶ 31; Pl.'s Facts ¶ 31.)

To get an outside perspective, Cave then asked Kathy Russello ("Russello"), the human resource director for Defendant's New York division, to engage in a second investigation of the incident.  On December 18th, Russello re-interviewed a number of store employees, including Plaintiff, Whalen, Wutka, Ingalls, Rankin and Kaletta.  At

the end of her investigation, Russello concluded that Ingalls and Rankin had not acted

with racial animosity, malice or intent to harm anyone.  She was, however, deeply

disturbed by the incident and felt that it was "not something that can be taken any way

other than destructive and hurtful."  (Def.'s Facts ¶¶ 32, 33; Pl.'s Facts ¶ 33.)

    In total, Defendant interviewed fourteen employees and contacted eight former

managers and supervisors.   In addition, fourteen members of Defendant's

management were involved in the investigation, reviewed the findings and/or took part

in the disciplinary process.  In the end, considering the nature of the offense, as well as

the employees' work history and remorse for their conduct, Defendant determined that

they had been given appropriate discipline.  Defendant also issued Rankin and Ingalls

a final written warning, transferred them to other locations, and provided them and all

store employees with sensitivity training.  According to Plaintiff, however, only fifteen

employees actually attended the training and there is no evidence that Rankin, Ingalls

or Kaletta were among them.  (Def.'s Facts ¶¶ 35, 36; Pl.'s Facts ¶¶ 35, 36.)

D.  <u>Prior Incidents</u>

    Plaintiff points to what he describes as three "prior incidents."  First, during the

summer preceding the noose incident, Plaintiff attended a meeting with Whalen's

predecessor, Mike Leach.  When Plaintiff arrived, Leach and David Terranova, the lead

clerk of the bake shop, were already there.  Upon realizing Plaintiff did not have coffee

for him, Terranova exclaimed, "Where's my coffee?  What am I, black?"  Leach did not

reprimand Terranova or indicate in any way that the statement was inappropriate.  After

the meeting, however, Plaintiff told Terranova, who he supervised, that he did not

9

appreciate the comment and never to say anything like that again.  Terranova
apologized and Plaintiff considered the matter closed.  (Def.'s Facts ¶¶ 40, 41; Pl.'s
Facts ¶¶ 40, 41.)

The second incident, also involving Terranova, occurred sometime before
Thanksgiving in 2003.  During a discussion about a shortage of help and cutting hours,
Terranova said that Defendant "wouldn't have this problem" if it "would stop putting
minorities in management positions."  Plaintiff was very angry about the comment, but
again did not discipline Terranova, even though he had the authority and ability to do
so.  Nor did he report the incident to upper management.  According to Plaintiff, he
simply "didn't want anything else to do with the man."  (Def.'s Facts ¶ 42; Pl.'s Facts ¶¶
42, 43.  See also Pl.'s Ex. 1 (Rosemond Depo.) at 25-29.)

Finally, Plaintiff notes that Rankin and Ingalls had a history of making "national
origin jokes."  Specifically, Plaintiff points out that Wutka told Defendant's investigators
that Rankin and Ingalls made "Polish jokes" around her and Kaletta "because Stan's
Polish and they know I was married to a Polish man."  (Pl.'s Facts ¶ 23.)

E.  <u>After the Incident</u>

Following the December 2003 events, Plaintiff went on an extended medical
leave in order to deal with his "emotional distress, reoccurring headaches, and
insomnia."  It was not until July of 2004 that he notified Broad of his intention to return
to work.  She asked for a doctor's note and informed him that he would be transferred
to the West Springfield store.  Although Plaintiff did not request the transfer, he was not
unhappy about the assignment and has since remained as CSM of that store without

any problems or issues.  (Def.'s Facts ¶¶ 39, 49; Pl.'s Facts ¶¶ 39, 49.)

In the meantime, Plaintiff filed this action in April of 2004.  Although the complaint lists four causes of action, Plaintiff has confirmed that this is a race-based hostile work environment case arising under Title VII (Counts I and II) and chapter 151B (Counts III and IV).  As so framed, Defendant moved for summary judgment and, in due course, the court heard oral argument.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  For this purpose, an issue is "genuine" when the evidence is such that a reasonable fact-finder could resolve the point in favor of the nonmoving party, and a fact is "material" when it might affect the outcome of the suit under the applicable law. *Morris v. Gov't. Dev. Bank*, 27 F.3d 746, 748 (1st Cir. 1994).  The nonmoving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact.  *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (discussing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate."  *Papadopoulos v. Hartford Life Ins. Co.*, 379 F. Supp. 2d 117, 123-24 (D. Mass. 2005).

## III.  DISCUSSION

Defendant makes two primary arguments in support of its motion for summary

judgment.  One, Defendant argues that there is no basis for employer liability.  Two,

Defendant argues that Plaintiff cannot establish -- *i.e.*, no reasonable jury could

determine -- that he was subjected to a racially-hostile work environment.  Plaintiff, of

course, disagrees in all respects.  For its part, the court, addressing Defendant's

arguments in reverse order, believes that a reasonable jury could determine that

Plaintiff was subjected to a racially-hostile work environment.  The court also believes

that there may be a basis to hold Defendant liable as Plaintiff's employer, but only to

the extent the harassment may have been perpetrated by co-workers, not supervisors.

With that caveat, the court will recommend that Defendant's motion for summary

judgment be denied.

A.  Whether Plaintiff was Subjected to a Racially-Hostile Work Environment

      Defendant's work environment argument can be dealt with in relatively short

order.  The parties agree on the basic "harassment" standards to be applied in race-

based hostile work environment cases and jointly cite the First Circuit's recent decision

in *Noviello v. City of Boston*, 398 F.3d 76 (1st Cir. 2005) as controlling.  *Noviello*

summarizes the Supreme Court's Title VII jurisprudence as follows:

> In order to prove a hostile work environment, a plaintiff must
> show that [he] was subjected to severe or pervasive
> harassment that materially altered the conditions of [his]
> employment.  *Faragher* [*v. City of Boca Raton*], 524 U.S.
> [775,] 786 [(1998)].  The harassment must be "objectively
> and subjectively offensive, one that a reasonable person
> would find hostile or abusive, and one that the victim in fact
> did perceive to be so."  *Id.* at 787.  In determining whether a
> reasonable person would find particular conduct hostile or
> abusive, a court must mull the totality of the circumstances,
> including factors such as the "frequency of the

12

> discriminatory conduct; its severity; whether it is physically
> threatening or humiliating, or a mere offensive utterance;
> and whether it unreasonably interferes with an employee's
> work performance." *Id.* at 787-88 (quoting *Harris* [*v. Forklift
> Sys., Inc.*], 510 U.S. [17,] 23 [(1993)]).  The thrust of this
> inquiry is to distinguish between the ordinary, if occasionally
> unpleasant, vicissitudes of the workplace and actual
> harassment.  *Id.* at 788.

*Id.* at 92.  *See also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).  The parties

also agree that this basic framework applies to chapter 151B hostile environment

claims, *see, e.g.*, *Muzzy v. Cahillane Motors, Inc.*, 749 N.E.2d 691, 694-95 (Mass.

2001), although, as indicated below, there is a divergence between the federal and

state standards with regard to employer liability.[3]

Defendant's work environment argument has two parts.  First, Defendant argues

that Plaintiff must, but cannot, show that he was subjected to conduct tainted by racial

animus.  *See Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) ("General

harassment if not racial . . . is not actionable.").  Second, Defendant asserts that

Plaintiff cannot show that he "was subjected to severe or pervasive harassment that

materially altered the conditions of [his] employment."  *Noviello*, 398 F.3d at 92.  In the

court's view, both issues favor Plaintiff, at least for summary judgment purposes.

As an initial matter, the court believes that sufficient evidence exists for a

reasonable jury to determine that the noose incident was tainted by racial animus.  In

this respect, the court will assume that the Tenth Circuit requirement in *Bolden* applies

---

[3] While *Noviello* and many of the other cases cited concerned sex-based hostile
work environment allegations, the parties agree that the analysis is the same with
regard to race.  *See Lattimore v. Polaroid Corp.*, 99 F.3d 456, 463 (1st Cir. 1996).

here as well.  Granted, it is quite conceivable that Rankin and Ingalls (and Kaletta, too)
were simply engaged, as Defendant explains it, in "a thoughtless, rash, and
inappropriate act, intended as a joke."  (Defendant's Memorandum of Law (Document
No. 32) at 17.)  But racially-motivated explanations are possible as well.

It practically goes without saying, regrettably, that nooses are known to have
been used historically to kill African-Americans.  There are, in fact, numerous judicial
decisions, including several cited by Defendant itself, which comment on the overt
racial implications of a hanging noose.  *See, e.g.*, *Robinson v. Valmont Indus.*, 238
F.3d 1045, 1046-47 (8th Cir. 2001) (no dispute that "clothesline tied in the shape of a
noose" was one of "several instances of unwelcome, racially-motivated harassment");
*Vance v. S. Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1511 n.4 (11th Cir. 1989) ("The
grossness of hanging an object resembling a noose at the work station of a black
female is self-evident.").  As one judge observed:

> [T]he noose is among the most repugnant of all racist
> symbols, because it is itself an instrument of violence.  It is
> impossible to appreciate the impact of the display of a noose
> without understanding this nation's opprobrious legacy of
> violence against African-Americans.  One study notes that
> from 1882, the earliest date for reliable statistics, to 1968,
> 3,446 African-Americans died at the hands of lynch mobs.
> *See* Robert L. Zangrando, *The NAACP Crusade Against
> Lynching, 1909-1950* 4 (1980).  Obviously, these figures
> underestimate the actual number of blacks who were the
> victims of lynchings because such atrocities were
> underreported, and southern whites frequently attempted to
> suppress evidence of mob violence for fear of the enactment
> of a federal anti-lynching law.  *See id.*

*Williams v. New York City Hous. Auth.*, 154 F. Supp. 2d 820, 824 (S.D.N.Y. 2001).  And

14

here, the trio of Rankin, Ingalls and Kaletta obviously knew that Plaintiff was black and that he worked in the area where the noose was hung. Rankin also knew that Wutka, the only other manager with a desk in the mezzanine, was on vacation, suggesting that he, at least, directed the act at Plaintiff. Accordingly, in the court's view, a reasonable jury could determine that the conduct at issue in this case was tainted by racial animus.

The court also believes that a reasonable jury could determine that Plaintiff was subjected to severe or pervasive harassment that materially altered the conditions of his employment. First, for essentially the same reasons described, the court believes that a reasonable jury could determine that the noose incident, standing alone, was *objectively* hostile or abusive. As noted by the First Circuit in *Noviello*, "a single act of harassment may, if egregious enough, suffice to evince a hostile work environment." *Id.*, 398 F.3d at 84 (citations omitted). *See also Gnerre v. Mass. Comm'n Against Discrimination*, 524 N.E.2d 84, 89 (Mass. 1988) (recognizing that "the more offensive the [action] the fewer instances of harassment may be required to demonstrate" liability under chapter 151B). The noose incident may well pass that test.

Second, the court believes that a reasonable jury could determine that Plaintiff *subjectively* believed the noose to be hostile and abusive. According to Plaintiff: "I'm from South Carolina[.] [W]hen I was a kid, every day you could turn on the TV and hear about a black man hanging from a tree. It brings back painful memories." The incident also caused Plaintiff to experience "emotional distress, reoccurring headaches, and insomnia," causing him to stay out of work for over half a year. (Def.'s Appendix (Document No. 35), Ex. G; Pl.'s Facts ¶ 39.)

15

The court, it should be noted, reaches these conclusions without considering the prior comments made by Terranova, who was not involved in the noose incident, or the alleged "national origin jokes" comments expressed by Ingalls and Rankin to Wutka and/or Kaletta.  In short, the court believes that a reasonable jury could determine that the noose incident, in and of itself, demonstrated that Plaintiff was subjected to a racially-hostile work environment.

B.  <u>Employer Liability</u>

Defendant's second argument, involving its potential liability as Plaintiff's employer, is more tricky.  As explained below, both Title VII and chapter 151B distinguish between "co-worker" and "supervisory" harassment.  As a result, Defendant expends a lot of energy arguing that the harassment was performed only by "co-workers," *e.g.*, Rankin and Ingalls, not by a supervisor.  As for Kaletta -- the only conceivable "supervisory" harasser -- Defendant claims that he neither engaged in nor condoned the harassment and, in any event, had no control over Plaintiff.

Plaintiff, in contrast, argues that Kaletta was indeed a supervisor -- albeit of Rankin and Ingalls -- and, accordingly, that Defendant is strictly liable for his harassment under chapter 151B and, with regard to Title VII, subject to an exacting affirmative defense.  Plaintiff also argues that, even assuming the harassment was conducted only by co-workers, Defendant could still be held liable.

For its part, the court believes that Kaletta is not the type of "supervisor" for whom Title VII and/or chapter 151B employer liability might attach.  As a "co-worker" harassment case, however, the court believes that genuine issues of material fact exist.

16

With that caveat, therefore, the court will recommend that Defendant's motion for summary judgment be denied.

1. <u>Supervisory Harassment</u>

Title VII and chapter 151B diverge with respect to an employer's liability for harassment by a supervisor. Accordingly, the court will address each statute separately.

a. *Title VII*

"In two companion cases decided in 1998, the Supreme Court addressed the question of an employer's vicarious liability [under Title VII] for actionable discrimination by a supervisor with immediate or successively higher authority over the plaintiff employee." *Arrieta-Colon v. Wal-Mart P. R., Inc.*, 434 F.3d 75, 85 (1st Cir. 2006) (citing *Ellerth* and *Faragher*). According to the First Circuit, these two cases "articulated some clear lines." *Id.* at 86. First, "'[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.'" *Id.* (quoting *Faragher*, 524 U.S. at 807). Second, "[w]here 'no tangible employment action is taken [against the employee], a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence.'" *Id.* (quoting *Faragher*, 524 U.S. at 808). Third, "'[n]o affirmative defense is available . . . when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.'" *Id.* (quoting *Faragher*, 524 U.S. at 808). And fourth, "[t]he affirmative defense, when available, 'comprises two necessary

17

elements: (a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Id.* (quoting *Faragher*, 524 U.S. at 807).

As it turns out, Plaintiff's claim fails at the first level of inquiry, *i.e.*, whether he was subjected to a hostile environment that was "created by a supervisor with immediate (or successively higher) authority over [him]." Plaintiff cannot make this proof and, in fact, conceded as much at oral argument:

> THE COURT: Is there any dispute with respect to whether or not Mr. Kaletta was Mr. Rosemond's supervisor?
>
> [PLAINTIFF'S COUNSEL]: No, he was not Mr. Rosemond's supervisor. He was Mr. Rankin and Mr. Ingall's [sic] supervisor.

(Oral Argument Tr. (Document No. 51) at 15.) As a result, the court need not determine whether or not a tangible employment action was taken against Plaintiff or whether Defendant will be able to prove both elements of the *Faragher/Ellerth* affirmative defense. Simply put, the court believes that Defendant may not be held liable under Title VII for any harassment which may have been created by Kaletta in his role as a supervisor.[4]

     b. *Chapter 151B*

"As with Title VII, chapter 151B makes employers vicariously liable for hostile

---

[4] The First Circuit's decision in *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387 (1st Cir. 2002), which Plaintiff cites, is not to the contrary. That case involved only "employer liability for a non-supervisory co-employee," *id.* at 401, a scenario addressed below.

work environments created by supervisors." *Noviello*, 398 F.3d at 95 (citing *College-Town, Div. of Interco, Inc. v. Mass. Comm'n Against Discrimination*, 508 N.E.2d 587, 592 (Mass. 1987)). "Unlike Title VII, however, chapter 151B does not afford employers any affirmative defenses to liability." *Id.* "Based upon the legislative mandate that chapter 151B must be construed liberally to effectuate its purposes, *see* Mass. Gen. Laws ch. 151, § 9, the [Massachusetts Supreme Judicial Court ('SJC')] has endorsed a rule that holds employers strictly liable for supervisory harassment." *Id.* (citing *College-Town*, 508 N.E.2d at 591-94; *Blockel v. J.C. Penney Co.*, 337 F.3d 17, 28 n.3 (1st Cir. 2003)). In the instant case, the parties acknowledge this difference between Title VII and chapter 151B.

Plaintiff argues, however, that "supervisory harassment" under chapter 151B is broader than such discrimination under Title VII, *i.e.*, "discrimination by a supervisor with immediate or successively higher authority over the plaintiff employee." Put differently, Plaintiff suggests that even though Kaletta was not *his* supervisor, the fact that Kaletta was *a* supervisor subjects Defendant to *per se* liability under chapter 151B for any harassment Kaletta may have created. The court disagrees. Simply put, there is no Massachusetts decision which even attempts to stretch the language of chapter 151B that far and this court ought not do so on its own volition. *See Federico v. Order of St. Benedict*, 64 F.3d 1, 4 (1st Cir. 1995) ("Plaintiffs who select [a] federal forum in preference to an available state forum may not expect the federal court to steer state law into unprecedented configurations.").

To be sure, the SJC in *College-Town* stated at the end of a lengthy footnote that

19

the Massachusetts Legislature, when enacting chapter 151B, "intended that an

employer be liable for discrimination committed *by those on whom it confers authority*."

*Id.*, 508 N.E.2d at 592 n.5 (emphasis added).  According to Plaintiff, this includes *any*

employee who has *any* supervisory role with regard to *any* other employee.  Plaintiff's

position, however, was explicitly rejected in *Saad v. Stanley Street Treatment &*

*Resources, Inc.*, Civil Action No. 92-11434-DPW, 1994 WL 846911 (D. Mass. May 20,

1994).  According to District Judge Douglas P. Woodlock:

> While it is true that *College-Town* employs some broad
> language arguably susceptible to the interpretation that
> employers are to be held *per se* liable for the abuse wrought
> by their supervisors, a complete reading of the case reveals
> that such language is used a) in the context of the specific
> facts of that case, which involved a supervisor harassing a
> subordinate employee, . . . and b) in reaction to Title VII
> cases that would require notice to employers even where
> supervisors and their subordinates are involved.

*Id.*, at *8*.  This court agrees with this assessment, at least as applied to the situation

here where the alleged harasser had absolutely no supervisory control over the

plaintiff.  *See also Morehouse v. Berkshire Gas Co.*, 989 F. Supp. 54, 64 (D. Mass.

1997) (distinguishing *Saad* where the harassers "were not co-workers of 'equal or

lesser status' than [the plaintiff,] . . . a rank-and-file employee"); *Messina v. Araserve,*

*Inc.*, 906 F. Supp. 34, 37 (D. Mass. 1995) (noting that the touchstone question is

"whether [the harasser] exercised supervisory authority over [the plaintiff]").  In short,

Plaintiff's reading of the *College-Town* footnote stretches chapter 151B beyond what is

reasonable and well beyond what the SJC intended.

Nonetheless, Plaintiff argues that guidelines published by the Massachusetts

20

Commission Against Discrimination ("MCAD") indicate that "[i]n some circumstances, an employer may be liable for the actions of a supervisor, even if that supervisor does not have direct supervisory authority over the Complainant." *Sexual Harassment in the Workplace Guidelines* § III(B), http://www.mass.gov/mcad/shguide.html (July 22, 2005) (attached to Pl.'s Opp'n). That may be so, but in context it is clear that the guidelines are referring to a situation where the harasser, while not the complainant's *actual* supervisor, exhibits "indications of supervisory authority" and thus has "apparent authority" over him. *See id.*[5] That is certainly not the situation here. *See also Newell v. Celadon Security Servs., Inc.*, --- F. Supp. 2d ---, 2006 WL 224196, at **5-8 (D. Mass. Jan. 17, 2006) (recognizing MCAD guidelines, but opining that "[t]he same standard" established by Title VII for determining a supervisor's status vis a vis employer liability "is applicable under Massachusetts state law"). Accordingly, this court is of the opinion that, as with Title VII, Defendant may not be held *per se* liable under chapter 151B for any harassment which may have been created by Kaletta, notwithstanding the fact that he may have possessed some supervisory powers in other contexts.

2. Co-Worker Harassment

In some contrast to the issue of supervisory harassment, Title VII and chapter 151B are aligned with regard to employer liability for harassment by co-workers. Under

---

[5] According to the guidelines, "[l]iability under these circumstances exists when the harasser holds himself out *to the employee* as having supervisory authority *over the employee*." *Id.* (emphasis added). "The employee's [reasonable] belief that the harasser has authority over [him]," the guidelines continue, "may be a significant factor in determining the existence of apparent authority." *Id.*

both statutes, the underlying question for summary judgment purposes is whether a reasonable jury could determine that the employer "knew or should have known of the charged . . . harassment and failed to implement prompt and appropriate action." *White v. New Hampshire Dep't of Corr.*, 221 F.3d 254, 261 (1st Cir. 2000) (Title VII). *See Brissette v. Franklin County Sheriff's Office*, 235 F. Supp. 2d 63, 90 (D. Mass. 2003) (applying *White* standard to chapter 151B co-worker claim). *See also Newell*, --- F. Supp. 2d ---, 2006 WL 224196, at *5 ("When co-workers, rather than supervisors, are the perpetrators of . . . harassment, both Title VII and Mass. Gen. L. ch. 151B apply the same standard in assessing employer liability.") The burden of proof with respect to this question lies with the plaintiff. *See Noviello*, 398 F.3d at 97.

In this court's estimation, Plaintiff has sustained his burden for summary judgment purposes, albeit by a hair's breadth, of raising genuine issues of material fact as to whether Defendant should be responsible for the alleged co-worker harassment. In coming to this conclusion, the court has considered the totality of the circumstances, Following the parties' lead, however, it has not separately parsed the various elements of co-worker harassment, *i.e.*, whether Defendant "knew . . . of the charged . . . harassment," "should have known of the charged . . . harassment," "failed to implement prompt . . . action," and "failed to implement . . . appropriate action." *See Oakstone v. Postmaster Gen.*, 332 F. Supp. 2d 261, 273-74 (D. Me. 2004) (collapsing co-worker standard into single inquiry). *See also Crowley*, 303 F.3d at 401-04 (analyzing standard as involving only two elements: "knew or should have known" inquiry and "prompt and appropriate action" inquiry).

22

First, Kaletta -- for these purposes a low-level supervisor -- saw the noose before Plaintiff walked in, yet did not take it down, report the incident, pass on any information about unlawful harassment, or take any other corrective action.  This is not to suggest that Kaletta was a high level official for whom Defendant is vicariously liable. As explained *supra*, this court recommends rejecting that possibility.  *See also Noviello*, 398 F.3d at 97 (where there was no evidence that "second-rung shift supervisor . . . had the authority to hire, fire, or otherwise dictate the terms and conditions of employment, vicarious liability is off the table").  But it is at least arguable that Kaletta, by virtue of being Rankin and Ingalls' superior, was uniquely positioned to pass on the information to upper-level management.  He did not.  *See Crowley*, 303 F.3d at 403 ("'[E]mployer liability [for co-worker harassment] could attach if information of the harassment had come to the attention of someone who is reasonably believed to have a duty to pass on the information.'") (parenthetically quoting *Sims v. Health Midwest Physician Servs. Corp.*, 196 F.3d 915, 920 (8th Cir. 1999)).

Second, the fact that Defendant did not fire Rankin or Ingalls (and only gave Kaletta a written warning) has some significance, particularly in view of the deposition testimony of several of Defendant's executives.  For example, Donald Barsolou, Defendant's vice president of operations, testified that minor misconduct such as theft in the amount of "a nickel" would result in immediate termination.  Similarly, Flannery testified that theft would result in immediate termination, as would "sexual offenses" and "harassment."  Collins, Defendant's district manager and director of operations, testified that "violation[s] of company policy" and "violence" are offenses which result in

23

termination. In addition, Russello, the human resource director for Defendant's New York division, testified that termination is appropriate "[i]f someone threatens another associate, someone hurts another associate physically, theft, things of that nature." (Pl.'s Facts ¶ 36.)

In addition, there appears to be a question as to whether Rankin, Ingalls and/or Kaletta actually attended the post-incident sensitivity training made mandatory for all employees. Plaintiff also points to Rankin and Ingalls having previously made "national origin jokes" in the presence of at least one higher-level manager, Wutka. *Compare Noviello*, 398 F.3d at 97 (where there was "no evidence of any prior misconduct" by the harasser). While this latter allegation, in the court's estimation, is not one of Plaintiff's strongest points, it is part of the overall environment Plaintiff is attempting to portray.[6]

---

[6] However, several other factual disputes which Plaintiff raises are, in the court's estimation, immaterial. For example, Plaintiff mentions the summer of 2003 incident involving Terranova who directed a racist "joke" at Plaintiff in the presence of the previous store manager, Leach. This incident, however, is not connected to Rankin, Ingalls or Kaletta in any way. Nor is the comment Terranova made sometime before Thanksgiving of 2003, *i.e.,* that Defendant "wouldn't have this problem" if it "would stop putting minorities in management positions." Indeed, there is no evidence that, other than through Plaintiff himself, Defendant even knew of the Thanksgiving comment. In addition, while Plaintiff nominally questions the promptness of Defendant's response, Defendant appears to have acted swiftly -- indeed, immediately -- after the noose incident.

Finally, the First Circuit has repeatedly held that the issue of employer liability for co-worker harassment is essentially a question of "negligence." *See Reed v. MBNA Mktg. Sys, Inc.*, 333 F.3d 27, 32 n.1 (1st Cir. 2003) (citing *Crowley*, 303 F.3d at 401). *See also Munroe v. Compaq Computer Corp.*, 229 F. Supp. 2d 52, 64 (D.N.H. 2002) ("[The First Circuit] appl[ies] a negligence standard for determining employer liability for co-worker harassment."). At the very least, therefore, the court suggests that the dispute about Defendant's knowledge and the adequacy of its response involves reasonableness assessments not easily amenable to summary judgment. *See O'Connor v. SmithKline Bio-Science Labs, Inc.*, 631 N.E.2d 1018, 1020 (Mass. App. Ct. 1994) (in negligence cases where reasonableness is at issue, "a plaintiff is usually afforded the right to have his claim tried before a jury" insofar as "juries are uniquely qualified to apply the reasonable person standard"). *See also Paroline v. Unisys Corp.*, 879 F.2d 100, 106 (4th Cir. 1989) ("The adequacy of [the employer's] remedy is a question of fact which a court may not dispose of at the summary judgment stage if reasonable minds could differ as to whether the remedial action was reasonably calculated to end the harassment.") (citation and internal quotation marks omitted), *vacated in part on other grounds*, 900 F.2d 27 (4th Cir. 1990).

## IV. CONCLUSION

This case is both legally and factually complex. There are, however, enough threads to Plaintiff's argument to weave a defense to at least part of Defendant's motion. For the reasons stated, the court therefore recommends that Defendant's

25

motion for summary judgment be DENIED as to all counts, but with the caveat that this action proceed only as a co-worker harassment case against Defendant under Title VII and chapter 151B.[7]

DATED: March 22, 2006

　　　　　　　　　　　　　　　　　　　　　  /s/ Kenneth P. Neiman　　　
　　　　　　　　　　　　　　　　　　　　　KENNETH P. NEIMAN
　　　　　　　　　　　　　　　　　　　　　Chief Magistrate Judge

---

[7] The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within ten (10) days** of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services*, 848 F.2d 271, 275 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980). *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.