Westlaw.

2004 WL 1237353 (MCAD)
(Cite as: 2004 WL 1237353 (MCAD))

Massachusetts Commission Against Discrimination
*1 MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION AND JARVIS ALDRIDGE,
COMPLAINANT
v.
THOMAS O'CONNOR CONSTRUCTORS, INC., RESPONDENT
Docket No. 98-BEM-3762
May 7, 2004.

APPEARANCES:

Mitchell Possick, Esq., for Complainant.

James F. Grosso, Esq., for Respondent.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER OF THE HEARING OFFICER

I. PROCEDURAL HISTORY

On December 7, 1998, Complainant, Jarvis Aldridge ("Complainant"), filed a complaint with the Massachusetts Commission Against Discrimination (the ""Commission"), against Thomas O'Connor Constructors, Inc. ("Respondent"). In his complaint, Complainant alleged that Respondent engaged in unlawful discrimination on the basis of race and color in violation of G.L. c. 151B, § 4(1).

On April 4, 2001, the Investigating Commissioner found probable cause to credit Complainant's allegations. On November 29, 2002, the Commission certified the case for Public Hearing. On July 1, 2003, a Public Hearing was held before me in Boston, MA. In deciding this matter, I have considered the entire record, including the testimony and exhibits introduced at the Public Hearing, and the stipulations of the parties. I have likewise considered the proposed Findings of Fact and Conclusions of Law submitted by the parties after the Public Hearing. To the extent that the proposed findings and conclusions are in accord with the findings herein, they are accepted; to the extent that they are not, they are rejected. Certain proposed findings have been omitted as not relevant or necessary to a proper determination of the material issues presented.

II. FINDINGS OF FACT

1. Complainant, Jarvis Aldridge, is an African-American male who, at all times pertinent hereto, worked as a sprinkler fitter for the firm of Rustic Fire Protection ("Rustic"). According to Complainant, Rustic was owned by Chad and John Dubuc. It is undisputed that Rustic had received a contract as a sub-bidder for the installation of a new sprinkler and fire protection system in two buildings being renovated at the University of Massachusetts at Lowell (UMass-Lowell). In August 1998, Complainant worked for Rustic on the UMass-Lowell project. He testified that he only received compensation from Rustic for his work on the project.

2. Respondent, Thomas O'Connor Constructors, Inc., is a corporation with an office in Canton, MA. At all pertinent times hereto, Respondent served as the general contractor for the UMass-Lowell project, which began in the fall of 1997 and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 1237353 (MCAD)
(Cite as: 2004 WL 1237353 (MCAD))

concluded in the fall of 1998. Paul Daley worked for Respondent as the job site superintendent on the UMass-Lowell project. Daley testified that he was responsible for overseeing the work of the sub-bidders including coordinating and assisting in the scheduling of the sub-bidders' work In addition to Rustic, two other sub-bidders (electricians and installers of ceiling tiles, respectively) worked on the project.

*2 3. With respect to Rustic's employees at the UMass-Lowell job site, Daley testified that he did not assign them work, order supplies on their behalf, or tell them what to do. Rather, he stated that Ron Russell directly supervised the sprinkler fitters, including Complainant. At all pertinent times hereto, Russell worked as a foreman for Rustic and worked alongside Complainant at the UMass-Lowell site. Russell corroborated Daley's testimony and likewise claimed that he directly told the sprinkler fitters what to do. He further testified that Daley neither supervised, nor coordinated the work of Rustic's employees. Russell also acknowledged that he provided materials to Complainant and the other sprinkler fitters at the job site. However, Russell testified that Daley did have the "ultimate authority" since he was Respondent's chief spokesperson at the site Daley and Russell also acknowledged that Daley unlocked and opened the doors to the various areas of the job site, but occasionally Daley gave the keys to the sub-bidders and their employees, including Complainant. I credit Daley and Russell's testimony on this matter.

4. Complainant testified that when Russell was on vacation, he would "take orders" directly from Daley. He also stated that he was "second in command" after Russell with respect to Rustic's work at the job site and he, thus, regularly communicated with Daley on such matters as obtaining keys to the various areas at the job site. Complainant did not provide any evidence that he performed any work at the job site other than performing sprinkler fitting work on behalf of Rustic.

5. Complainant testified that on four separate occasions, Daley made racially derogatory comments to him or James Lucas, another African-American working at the job site. Lucas worked as a laborer for Respondent. Specifically, Complainant claimed that on or about August 27, 1998, Daley referred to Lucas as a "fucking dumb nigger." Complainant stated that he and Russell were present when Daley made this comment. Complainant testified that after Daley made the offensive remark, he asked Daley, "Did you know what the word means?" According to Complainant, Daley then responded, "It's a phrase used in the holocaust with reference to Jews." Complainant stated that when he told Daley that the slur referred to "black people", Daley began to laugh. Complainant testified that he believed Daley's demeanor reflected hatred against African-Americans. At the Pubic Hearing, Russell corroborated Complainant's version of this incident and admitted to hearing Daley make the racial slur. Daley denied making this comment. I credit Complainant and Russell's testimony.

6. Complainant claimed that two weeks later, on September 21, 1998, Daley again referred to Lucas as a "fucking dumb nigger." Complainant stated that he was the only witness to this incident. He testified that after Daley made the comment, he turned around and walked away. Complainant again believed that Daley's demeanor reflected hatred toward African-Americans. Daley likewise denied making this remark. I credit Complainant's testimony.

*3 7. Complainant testified that the third incident occurred on September 22, 1998. Specifically, he claimed that during a lunch break, Daley referred to him as a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 1237353 (MCAD)
(Cite as: 2004 WL 1237353 (MCAD))


"black bastard" in the presence of Russell and the other pipe fitters. Russell corroborated Complainant's testimony and stated that Daley's remark was preceded by a discussion between Daley and Complainant regarding sports. According to Complainant, after Daley made the remark, he felt very angry and hurt, but he did not say anything. Daley again denied making the remark. I credit Complainant and Russell's testimony regarding this incident.

8. Lastly, Russell testified that on or about September 24, 1998, while driving alone with Daley to New Hampshire, Daley mentioned that Complainant is ""going to a prevailing wage job because he is a 'fucking nigger."D' Russell claimed that when they returned to the job-site, he told Complainant about Daley's remark. He testified that he then observed Complainant become very upset. Russell also stated that he told Rustic's project manager, Chad Dubuc, about Daley's comments. Complainant likewise testified that he reported the matter to Chad and John Dubuc and asked them to remove him from the UMass-Lowell job site. According to Complainant, John Dubuc stated that he needed him there and, thus, Rustic denied his request to work somewhere else. I credit Russell and Complainant's testimony.

9. Complainant testified that with the assistance of his wife, he wrote a letter, dated September 30, 1998, which detailed the four incidents. The letter was addressed, "To Whom It May Concern." Complainant stated that he gave the letter to his business agent, as well as to James Lucas because he wanted Lucas to know what was going on. Complainant believed that his business agent gave the letter to Respondent.

10. In 1998, Joseph Vogel worked for Respondent as a project manager and oversaw the UMass-Lowell project. [FN1] He testified that he visited the UMass-Lowell job site approximately one or two times per week. Vogel claimed that in October 1998, he heard a rumor that Daley had made a racial comment to Complainant. He stated that in response, he commenced an investigation into the matter and went to the work site to speak with Complainant. Complainant testified that his conversation with Vogel lasted approximately 2 1/2 to 5 minutes. Complainant claimed that Vogel merely asked him, "Jarvis, what's going on; and, in response, he angrily vented, "There is nothing wrong with being a black man." He further stated that he told Vogel to "read the letter." In addition, Complainant testified that he informed Vogel he would be pressing charges against Respondent. Complainant denied that Vogel asked him any specific questions or that he refused to provide him with any information. He stated that Vogel responded by saying he would "get to the bottom of it." Vogel admitted that Complainant clearly appeared upset, disturbed and agitated. Respondent never spoke with Complainant again regarding his complaint. I credit Complainant's testimony.

*4 11. Vogel testified that when Respondent initiated its investigation into Complainant's charges, Daley was on his honeymoon. When Daley returned from his honeymoon, Vogel told him not to report to the UMass-Lowell job site. On October 19, 1998, Vogel stated that he and other company officials met with Daley to discuss the charges. During this interview, Daley adamantly denied making any racial slur. As part of its investigation, Respondent also spoke with Russell and Lucas. Vogel claimed that Russell stated he would "back his man", meaning Complainant. Moreover, according to Vogel, Lucas denied directly hearing any of Daley's alleged racial slurs, but was instead informed of the comments by Complainant and Russell. According to Vogel, Lucas also denied ever being directly subjected to any discrimination in any form by Daley.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 1237353 (MCAD)
(Cite as: 2004 WL 1237353 (MCAD))

12. Instead of interviewing Complainant again to discuss his allegations in more detail or rendering a conclusion with respect to his complaint, Respondent began taking a defensive posture in anticipation of litigation. Specifically, Respondent prepared a statement for Lucas to sign that stated, "I have never been harassed nor suffered discrimination from any O'Connor Constructor Supervisory or other personnel during my employment with O'Connor Constructors up to an including this date." After being presented with this statement, Lucas refused to sign the document. In addition, according to investigation summary, Respondent decided that, "Since the specific situation is not known at this time we will wait until a 'claim' is actually in house and review before taking action. (The term claim in house is referencing an "official action" generated against O'Connor Constructors by the Commonwealth - this might not happen at all.)" Respondent then reassigned Daley back to the UMass-Lowell job site.

13. Complainant testified that he loved his work - it was "good money" and he worked with "good people." However, he claimed his attitude changed after Daley began making the racial comments and, consequently, he no longer wanted to work at the site. Complainant also stated that when Daley was on his honeymoon, things got better; but when Daley returned, he claimed that he could not tolerate working at the site. Thus, when Complainant first saw Daley back at the site, he packed up his tools and left the job.

14. Complainant also testified that Daley's remarks affected his life outside of work. Specifically, he claimed that he became withdrawn and isolated, stopped playing with his children, and ceased communicating with his wife. Complainant's wife, Lisa Aldridge, testified that before these events, Complainant was happy, content, and punctual. However, in August 1998, she observed Complainant coming home from work very disturbed and angry. She talked with him about his attitude and he told her it was in response to Daley's racial slurs. Mrs. Aldridge also corroborated her husband's testimony that he became withdrawn, claiming that he locked himself in his room and avoided contact with their children. She also observed his demeanor improve while Daley was away from the job site, and then deteriorate after he returned. In addition, Mrs. Aldridge claimed that her husband stopped communicating and interacting with her. Furthermore, she observed that her husband had lost a lot of weight and stopped sleeping well. I credit Complainant and Lisa Aldridge's testimony.

III. CONCLUSIONS OF LAW

A. JOINT EMPLOYER

*5 M.G.L. c. 151B, § 4(1) provides that it shall be unlawful for an ""employer" to discriminate against an individual on the basis of the race or color in compensation of in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification. As a threshold issue, Respondent has argued that it is not Complainant's "employer" and, therefore, cannot be held liable under c. 151B, § 4(1) for any alleged harm Complainant suffered as a result of Daley's conduct. Although Complainant acknowledged that he was employed by Rustic when these incidents occurred, [FN2] he claimed that Respondent should be deemed an employer because it exercised sufficient control over the aspects of his employment. [FN3]

The Commission has held that where two parties share control over an individual's employment, they may be held jointly and severally liable for unlawful discrimination under the "joint employer" theory. Specifically, the Commission has

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 1237353 (MCAD)
(Cite as: 2004 WL 1237353 (MCAD))


held that a respondent may be deemed a joint employer when it has an employment relationship with a complainant pursuant to the common law criteria. See, e.g., Keeling v. Wilfert Brothers Realty Co., 22 MDLR 201, 204 (2000), aff'd, 24 MDLR 145 (2002) (neither employer differentiated between the workers of the two entities; each directed the duties of its own and the other entity's employees; and, the employees of the two companies worked alongside each other, performed many of the same tasks, and worked at the same physical locations); Burlamachi v. Dupont Merck, 22 MDLR 35, 39 (2000), aff'd, 24 MDLR 9 (2002) (while complainant received his paychecks and other work-related documents from the other company, respondent supervised and exercised substantial control over the manner and method of complainant's work, including his place of work, hours of work, and his job duties); Holdsworth v. Adcare Educational Institute, 21 MDLR 178, 180 (1999) (respondent issued complainant's checks, managed her benefits, and ultimately terminated her employment); Robinson v. FM Management, Inc., 19 MDLR 57, 58 (1997) (complainant took direction from officers of both companies, received paychecks from both companies, and sought the assistance of respondent after being harassed). Angela Stanley v. The Gillette Company, 2 MDLR 1203, 1205 (1980) (respondent controlled complainant's place of work, hours of work, and the manner in which she performed her work); but see, Rome v. Transit Express, 19 MDLR 159, 160 (1997) (busing authority did not establish sufficient control over the bus drivers of the transportation companies it contracted with to create a joint employer relationship).

The essence of the common law inquiry is the degree of control each entity exercises over the individual. Keeling, 22 MDLR at 204, citing, Commonwealth v. Savage, 31 Mass App. Ct. 714 (1991). Thus, if more than one entity controls an individual in the workplace sufficiently that it can be said that each has a common law employer-employee relationship with the individual, then each is said to be a "joint" employer and each may be held liable for a statutory violation. Keeling, 22 at 204; Robinson, 19 MDLR at 58; Stanley, 2 MDLR at 1205-1207.

*6 I conclude that Complainant has failed to establish that Respondent exercised sufficient control over his employment to be deemed a joint employer. In particular, Respondent neither paid Complainant, nor controlled the manner in which he performed his work. Both Daley and Russell testified that Daley did not assign work to the sprinkler fitters, order supplies on their behalf, or tell them what to do Rather, they both claimed that Russell, on behalf of Rustic, directly supervised Complainant and the other sprinkler fitters and provided materials to them at the job site. Complainant also did not provide any credible evidence that he performed work directly on behalf of Respondent. To the contrary, the evidence indicates that Complainant only performed sprinkler fitting services for Rustic and he worked at the UMass-Lowell project solely because Rustic assigned him to that job site. Lastly, unlike the situation in Robinson, 19 MDLR at 58, Complainant reported Daley's racial slurs directly to his supervisors at Rustic and requested that they reassign him to another job site. He testified that Rustic refused to reassign him to another job and, therefore, he had to remain at the UMass-Lowell site. Under these circumstances, I find that Rustic exercised almost exclusive control over the aspects of Complainant's work at the UMass-Lowell project. I, therefore, conclude that Respondent cannot be deemed Complainant's employer for purposes of G.L. c. 151B, § 4(1).

B. INTERFERENCE WITH RIGHT TO A HARASSMENT-FREE WORKPLACE

Notwithstanding the lack of an employment relationship between the parties, I find

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 1237353 (MCAD)
(Cite as: 2004 WL 1237353 (MCAD))

that Complainant has established that Respondent engaged in unlawful conduct in violation of M.G.L. c. 151B, § 4(4A) by interfering with his right to work in a harassment-free environment. Section 4(4A) makes it unlawful "for any person to `enjoyment of any such right granted or protected by this chapter." It is well-settled that G.L. c. 151B protects and grants individuals the right to work in an environment free of unlawful harassment. See, Fluet v. Harvard University, 23 MDLR 145, 165-166 (2001); Berardi v. Medical Weight Loss Center, Inc. 23 MDLR 5, 11-12 (2001); Erewa v. Reis, 20 MDLR 36, 40 (1998).

More recently, § 4(4A) has been cited by the Commission in cases imposing liability against individual respondents. See, Fluet, 23 MDLR at 165-166, and cases cited therein. However, pursuant to M.G.L. c. 151B, § 1(1), the term ""person" includes, "partnerships, associations and corporations." Moreover, the Commission has imposed liability under § 4(4A) when the person charged with employment discrimination is not the complainant's employer or an agent of the employer. As stated by the Commission in Erewa, "The words 'any person' could not be interpreted, standing alone, to require any relationship to an employer." 20 MDLR at 40. Therefore, I conclude that Respondent is a "person" within the meaning of § 4(4A).

*7 Applying the terms of § 4(4A) to the case at hand, I find that as a result of Daley's actions, Respondent interfered with Complainant in the exercise of his right to be free from harassment based on his race and color. [FN4]It is not disputed that Daley held a supervisory position with Respondent and served as its chief day-to-day representative at the UMass-Lowell work site. Respondent is, therefore, strictly liable for Daley's conduct. See, College-Town, Division of Interco, Inc. v. MCAD, 400 Mass.156, 164-166 (1987) (employer strictly liable for the acts of its supervisory personnel).

With respect to Daley's conduct, I credited Complainant and Russell's testimony that Daley made four racially derogatory comments in a one-month period. Considering that Daley directed his slurs toward either Complainant or Lucas, who are both African-American, I find that Daley's conduct was sufficiently continuous and pervasive and went beyond "mere offensive utterances." In addition, Daley's conduct clearly had the effect of undermining Complainant's ability to do his job at the UMass-Lowell site and participate fully in the workplace, as evident from the fact that Complainant walked off the job when Respondent returned Daley to the worksite. Consequently, I conclude that Respondent engaged in unlawful conduct in violation of M.G.L. c. 151B, § 4(4A), by interfering with Complainant's right to a harassment-free work environment.

IV. REMEDY

M.G.L. c. 151B, § 5 authorizes the Commission to fashion remedies to make a complainant whole. **College-Town**, 400 Mass. at 168-169. Complainant has not submitted any credible evidence that he lost any wages, nor argued that he was constructively discharged; therefore, he is not entitled to any back pay award. However, he is entitled to monetary damages in compensation for the emotional distress he suffered as a direct and probable result of Respondent's unlawful conduct. Stonehill College v. MCAD, (Lawyers Weekly No. 10-084-04) (May 6, 2004) (reaffirming Commission's authority to award emotional distress damages proportionate to the distress suffered); Buckley Nursing Home v. MCAD, 20 Mass. App. Ct. 172, 181-182 (1985).

Complainant testified credibly that prior to the offensive conduct, "he loved his

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 1237353 (MCAD)
(Cite as: 2004 WL 1237353 (MCAD))

work." However, after Daley began making racial slurs, he became angry and bitter, and looked for another job. In addition, he was so distressed as a result of Daley's conduct that he walked off the job when Respondent returned Daley to the work-site. In addition, I credited both Complainant and his wife's testimony that Daley's remarks affected his life outside of work. Specifically, they testified credibly that he became withdrawn and isolated, stopped playing with his children, and ceased communicating. I also credited Mrs. Aldridge's testimony that she observed her husband lose weight and have trouble sleeping during this period. Under these circumstances, I conclude that Complainant is entitled to an award of $25,000.00 in damages in compensation for the emotional distress he suffered as a direct and probable consequence of Respondents unlawful conduct.

V. ORDER

*8 Based on the foregoing findings of fact and conclusions of law, I hereby issue the following order:
  1. Respondent, Thomas O'Connor Constructors, Inc., shall pay Complainant, Jarvis Aldridge, within sixty (60) days of receipt of this decision, the sum of $25,000.00 in damages for emotional distress plus interest at the statutory rate of 12% per annum from the date the complaint was filed until paid, or until this order is reduced to a court judgment and post-judgment interest begins to accrue.
  2. Respondent, Thomas O'Connor Constructors, Inc., shall pay the Commonwealth of Massachusetts, within 60 days of receipt of this decision, a civil penalty in the amount of $10,000.00. Payment shall be forwarded to the Clerk of the Commission.
  3. Respondent, Thomas O'Connor Constructors, Inc., shall conduct basic annual training sessions on unlawful discrimination, harassment and retaliation for all employees, managers, and supervisors employed by Respondent. With respect to such training:
a. Each training session for employees must be at least three (3) hours in length; and each training session for managers and supervisors must be at least six (6) hours in length. All managers, supervisors, and employees, as of the date of the training session, are required to attend. No more than twenty-five (25) persons may attend each training session. Respondent shall repeat this training, once each calendar year for the next five (5) years, for all new supervisors, managers, and employees who were hired or promoted after the date of the initial training session.
b. Within thirty (30) days of the receipt of this decision, Respondent shall select a trainer to conduct the initial training sessions. The trainer must be selected from the list of trainers who have completed the Commission-certified discrimination prevention-training program, available from the Commission's Director of Training. Within one week of Respondent's selection of a trainer, a copy of this hearing decision must be forwarded to the trainer for his or her review.
c. At least one month prior to the training date, Respondent must submit a draft training agenda to the Commission's Director of Training for approval; and, provide the Director of Training with one-month's advance notice of the training date(s) and location(s). If the Commission decides to send a representative to observe the training sessions, Respondent will provide the Commission representative with unfettered access to the training sessions.
d. Within one month after the completion of the training, Respondent must submit documentation of compliance to the Commission's Director of Training, signed by the trainer, identifying the training topic, the names of persons required to attend the training as identified in paragraph (a) above, the names of the persons who attended each training session, and the date and time of each training session.
e. In the event that Respondent's business is sold, materially changed, or taken over by new management, any and all successor purchasers, assignors, managers, or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 1237353 (MCAD)
(Cite as: 2004 WL 1237353 (MCAD))

operators of Respondent's business (hereinafter referred to as the "new owners") shall be responsible for fulfilling the training requirements specified in this decision if any of the following shall apply:
*9 i. The majority of the managers and supervisors employed by Respondent as of the date of this decision continue to work for the new owners as of the succession date;
ii. The majority of Respondent's governing board (e.g., board of directors, trustees) as of the date of this decision continues to serve on the new owner's board as of the succession date;
iii. The new owners are relatives of Respondent, or previously employed by Respondent as a manager or supervisor; or, iv. Respondent continues to retain an interest in the successor entity.
f. For purposes of enforcement, the Commission shall retain jurisdiction over these training requirements.
   4. The parties shall notify the Clerk of the Commission as soon as the above-described ordered payments have been made. If Respondent fails to comply with the terms of this Order within the time periods allotted, Complainant is instructed to immediately notify the Clerk of the Commission.

 This decision represents the final order of the Hearing Officer. Any party aggrieved by this Order may appeal this decision to the Full Commission. To do so, a party must file a Notice of Appeal of this decision with the Clerk of the Commission within ten (10) days after the receipt of this Order and a Petition for Review within thirty (30) days of receipt of this Order.

 So Ordered this 7th day of May, 2004.

 Edward R. Mitnick, Hearing Officer

 FN1. Vogel ceased working for Respondent in 2001.

 FN2. Complainant had filed a separate complaint against Rustic (No. 98-BEM-4043). For reasons not evident from the record in this case, the Commission entered a "Lack of Probable Cause" finding with respect to that claim.

 FN3. Complainant argued that Respondent should be held liable under the ""borrowed servant doctrine", citing Hohenleitner v. Quorum Health Resources, Inc., 435 Mass. 424 (2001). Under the borrowed servant rule, "one who is the general servant of another may be lent or hired by his master to another for some special service, so as to become as to that service the servant of such third party" Coughlan v. Cambridge, 166 Mass. 268, 277 (1896), cited in, Hohenleitner, 435 Mass. 424, 434, n. 8 (2001). The test for determining borrowed servant status is "whether, in the particular service which [the person] is engaged to perform, he continues liable to the direction and control of his master or becomes subject to that of the party to whom he is lent or hired." Id. As stated by the court in Hohenleitner, the test merely restates the general rule of control necessary to establish a master-servant relationship. Although the Commission has not explicitly relied on the ""borrowed servant" rule in determining whether an entity may be an employer within the meaning of G.L. c. 151B, the essence of the borrowed servant rule - establishing an employer/employee relationship by virtue of a respondent's control over a complainant - is similarly at the core of "joint employer" liability.

 FN4. The evidence would likewise appear to support a claim of individual liability against Daley under § 4(4A). However, since Complainant did not name Daley as an individual respondent, it would be unfair to impose liability against him without

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 1237353 (MCAD)
(Cite as: 2004 WL 1237353 (MCAD))

affording him the opportunity to be represented, in his individual capacity, in this proceeding.

2004 WL 1237353 (MCAD)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.