UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOSEPH ROSEMOND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-30072-KPN |
| | ) | |
| STOP AND SHOP SUPERMARKET | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION OF ITS MOTION FOR SUMMARY JUDGMENT

### Introduction

The Stop & Shop Supermarket Company LLC ("Stop & Shop" or the "Company")

submits this objection to certain findings and recommendations of the Magistrate Judge's Report

and Recommendation ("Report") to deny its motion for summary judgment. Specifically, Stop

& Shop objects to the Report's findings that questions of fact exist as to whether (1) the single

incident at issue in this case is sufficiently severe or pervasive to constitute racial harassment, (2)

the observation of the rope by the meat manager, a non-exempt union employee, may be imputed

to Stop & Shop for purposes of establishing that Stop & Shop "knew or should have known" that

harassing conduct had occurred, and (3) Stop & Shop took appropriate action when it learned

what had occurred.[1]  These findings were not correct because:

---

[1] The Report and Recommendation correctly recommends that this Court find that Rosemond cannot pursue his claim under a theory of supervisor harassment under Title VII or Mass. Gen. Laws c. 151B.  (Report and Recommendation ("R&R"), at 1-2.)

- The single incident of harassment at issue in this case, which was not unambiguously directed at Rosemond and lasted only a few minutes, does not meet the severe and pervasive standard.

- Given the non-exempt, union meat manager's brief exposure to the rope, the ambiguousness of its hanging, and his limited authority to take action on behalf of Stop & Shop, his knowledge that it was hung is not sufficient to impute knowledge of racial harassment to Stop & Shop.

- The undisputed facts conclusively establish that Stop & Shop believed, in good faith, that its remedial response was calculated to stop the harassing conduct and deter further such conduct.

### Stop & Shop's Specific Objections

**I.    Stop & Shop Did Not Know or Have Reason to Know of the Conduct.**

The Report correctly found that both Title VII and c. 151B permit liability for co-worker harassment only if the plaintiff can establish *both* that the employer knew or should have known of the harassing conduct *and* failed to implement prompt and appropriate action in response. R&R, at 21-22.  Accordingly, if Rosemond cannot establish *either* of these elements, summary judgment is warranted.  The Report incorrectly found that issues of fact exist as to whether Rosemond could establish these elements of his claim.

**A.    Knowledge of Racial Harassment Cannot Be Imputed to Stop & Shop.**

The Report finds that meat manager Stanley Kaletta, a non-exempt, union employee, was "uniquely" positioned to advise the store's upper level management about the rope and that his knowledge was sufficient to impute to Stop & Shop knowledge of racially harassing conduct. Neither the law nor the undisputed facts support this conclusion.

Factually, this finding is based on Plaintiff's incorrect assertion that Kaletta spent seven minutes in the mezzanine area where the rope had been hung. R&R, at 7.  As Stop & Shop established in its Reply Memorandum, Plaintiff's assertion is verifiably false.  Reply Memorandum, at 4, n.2.  Plaintiff supported his assertion with a document that he attached as

Exhibit 11, a handwritten sheet produced by Stop & Shop which noted the times individuals entered and exited the mezzanine area. Review of Exhibit 11 establishes that Kaletta was in the mezzanine for less than four minutes and that he entered the area more than two minutes after Rankin and Ingalls.[2] Pl. Exhibit 11. Further, the Report emphasized that Kaletta did not reprimand Rankin and Ingalls, but again the evidence establishes that he had no authority to discipline them. See Def. Exhibit H (Kaletta is non-exempt union employee without authority to hire, fire, set compensation or benefits, or discipline).

Applying the legal standard, the Report correctly noted that the "knew or should have known" standard requires that Rosemond establish negligence on the part of Stop & Shop. R&R, at 25. Under this theory of liability, an employer is held directly liable for its own acts or omissions, not for the conduct of the alleged harasser. Blankenship v. Parke Care Centers, Inc., 123 F.3d 868, 873 (6th Cir. 1997).

The cases the Report relies on as standing for the proposition that "[e]mployer liability for co-worker harassment could attach if information of the harassment had come to the attention of someone who is reasonably believed to have a duty to pass on the information," however, are distinguishable. See R&R, at 23, citing Crowley v. L.L. Bean, Inc., 303 F.3d 387, 403 (1st Cir. 2002), quoting Sims v. Health Midwest Physician Servs. Corp., 196 F.3d 915, 920 (8th Cir. 1999). Review of those cases as well as guidance from other courts, including the United States Supreme Court, reveals that Kaletta's limited knowledge fails to satisfy the "knew or should have known" standard because (1) the conduct at issue was not overtly targeted at any one person, much less Plaintiff, (2) no one had complained to Kaletta about the conduct, and (3)

---

[2] Specifically, Rankin and Ingalls entered together at 6:51:17, while Kaletta entered at 6:53:26 and left at 6:57:22. Pl. Exhibit 11.

Kaletta was not an employee charged with responsibility for addressing harassment in the workplace.

First, both <u>Crowley</u> and <u>Sims</u> are distinguishable and do not support a finding of negligence in this case. In <u>Crowley</u>, the Court rejected the employer's argument that the plaintiff failed to satisfy the "knew or should have known" standard because there was substantial evidence introduced at trial to establish that the plaintiff had complained, over the course of approximately two years, to her team leaders, supervisors, and Human Resources about a co-worker's ongoing harassing conduct. <u>Crowley</u>, 303 F.3d at 401-02. Moreover, the plaintiff's co-workers had also raised specific concerns about the harasser's conduct toward the plaintiff with several teams leaders. <u>Id</u>. <u>Sims</u> is largely inapposite because it addressed the issue of whether the defendant could establish the <u>Ellerth/Faragher</u> affirmative defense to supervisor harassment. In that case, the Court found that an issue of fact existed as to whether the plaintiff had lodged a complaint about her supervisor's harassing conduct with someone who had been delegated authority to act on complaints of sexual harassment. <u>Sims</u>, 196 F.3d at 919. Most important, both cases are distinguishable because in each, the Court found no factual dispute that a complaint or concern about harassing conduct had been made. In contrast, Kaletta was never confronted with either unambiguously harassing conduct targeted at an individual or a clearly articulated complaint or concern. At best, Kaletta did nothing to remedy a situation in which he did not suspect racial animus was involved.

Further, other cases suggest that the standard for establishing employer "knowledge" of co-worker harassment requires awareness of the conduct by someone of a higher level than Kaletta. For instance, the Supreme Court, in <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 807, 118 S. Ct. 2275, 2293 (1998), noted that:

[t]here have, for example, been myriad cases in which District
Courts and Courts of Appeals have held employers liable on
account of *actual knowledge by the employer, or high-echelon
officials* of an employer organization, of sufficiently harassing
action by subordinates, which the employer or its informed officers
have done nothing to stop. [Citations omitted.] In such instances,
the combined knowledge and inaction may be seen as
demonstrable negligence, or as the employer's adoption of the
offending conduct and its results, quite as if they had been
authorized affirmatively as the employer's policy.

(Emphasis added.) Id., 524 U.S. at 789, 118 S. Ct. at 2284.

In this instance, given Kaletta's modest position and limited observation, his knowledge
is insufficient to impute knowledge to Stop & Shop. Kaletta observed no conduct that was
obviously directed at Rosemond and no one, including Rosemond, had yet complained about the
rope. While Kaletta exhibited poor judgment in failing to remove the rope, his brief observation,
in isolation, is insufficient to infer knowledge by Stop & Shop of racially harassing conduct.
While in an ideal world, employers hope that all employees would have the common sense and
good judgment to report such troubling conduct by their co-workers, the reality is that a non-
exempt worker who has minimal supervisory duties and no actual authority over his co-workers,
is not an employee whose knowledge can reasonably be imputed to his employer, particularly
given the facts in this case. Under these circumstances, Kaletta's inaction, without anything
more, does not establish that Stop & Shop "knew or should have known" about harassing
conduct.

### B.    Stop & Shop's Response Was Appropriate.

Also incorrect was the finding that an issue of fact exists as to whether Stop & Shop's
remedial action was adequate. This finding was based on incorrect and irrelevant factual
assertions and a flawed legal analysis of the standard for assessing the adequacy of an

employer's remedial action.[3]  While the First Circuit has not addressed the issue of appropriate

remedial action at length, several District Courts have, as have other Circuits.  Those cases reveal

that the factual issues on which the Report's findings was based are not relevant to this inquiry

and that Stop & Shop's remedial response should be assessed under a good faith, rather than

reasonableness, standard.

      As Stop & Shop noted in its motion for summary judgment, "[t]he chief measure of

adequacy of an employer's response is not the victim's own personal sense of justice, but rather

– *particularly where there is no prior history of workplace harassment* – whether the behavior

that gave rise to the complaint *has ceased and does not threaten to reoccur*."  (Emphasis added.)

Cerqueira v. Corning Net Optix, 2004 U.S. Dist. LEXIS 17308, at *20 (D. Mass. 2004) (quoting

Saad v. Stanley St. Treatment & Resources, 1994 U.S. Dist. LEXIS 20728, at *10 (D. Mass.

1994).  Further, "'where an employer has in *good faith* taken those measures which are *both*

*feasible and reasonable under the circumstances* to combat the offensive conduct' it cannot be

charged with discrimination."  (Emphasis added.)  Id. at *20-*21, quoting De Grace v. Rumsfeld,

614 F.2d 796, 805 (1st Cir. 1980).  Remedies should be "reasonably calculated to end the

harassment."  Ellison v. Brady, 924 F.2d 872, 882 (9th Cir. 1991).  The Sixth Circuit, in

particular, has closely analyzed this standard and held that:

> [w]hen an employer responds with good-faith remedial action, we
> cannot say that the employer has itself committed an act of
> discrimination.  *In sum, although negligence as to the existence of*
> *harassment may be enough . . . for an employer to incur liability*
> *for discrimination, negligence in the fashioning of a remedy is not.*
> When an employer implements a remedy, it can be liable for sex
> discrimination in violation of Title VII *only if that remedy exhibits*
> *such indifference as to indicate an attitude of permissiveness that*
> *amounts to discrimination.*

---

[3] The Report correctly found that Stop & Shop "acted swiftly – indeed, immediately – after the
noose incident."  R&R, at 24, n.6.

(Emphasis added.) Blankenship, 123 F.3d at 873. Applying this standard in Blankenship, the Court found that an employer had taken appropriate action in response to several complaints about harassing conduct (which involved four kisses on the cheek, a tickle, three hugs, verbal comments, and the grabbing of plaintiff's breast) by taking steps to keep complainant separated from the alleged harasser and eventually giving him a warning, even though the employer could not guarantee that the plaintiff would not come in contact with him. Id., at 873-74.

Similarly, in Saad, a sexual harassment case that involved such conduct as hugging, some inappropriate touching, and hanging out near the plaintiff's office, the plaintiff argued that the employer's response was not appropriate. The employer issued an oral warning and written documentation directing the harasser not go to the plaintiff's office. (For other reasons, the employer had moved the plaintiff's office closer to the alleged harasser.) Rejecting the plaintiff's argument, the Court found that the employer's response:

> even if not a model in terms of spirit or style, appears de facto adequate: While the defendants' contentions as to when the harassment actually stopped (and, implicitly, what constitutes actionable harassment) overstate their case, nonetheless it appears that the harassment had stopped by the time of the January meetings. . . . Moreover, there are no grounds – such as pervasive abuse or past history of harassment at [employer] – to infer that the verbal warning given [the alleged harasser] was insufficient to restrain him from committing further improprieties.

Saad, 1994 U.S. Dist. LEXIS 20728, at *34-*35. In this case, the Report failed to acknowledge the most relevant evidence – the absence of either a history of prior racial harassment or further instances of harassing conduct – and instead focused on three factual allegations that are inaccurate and/or irrelevant to the analysis.

First, the Report found that a jury could find that the discipline imposed by Stop & Shop was not adequate based on testimony from Stop & Shop executives concerning conduct that "would" lead to termination. Taken as a whole, the testimony reveals that other than employee

theft, no violation automatically leads to termination, but that certain conduct *may* lead to termination depending on its nature and surrounding circumstances.[4]  See Russello Dep., at 23, Collins Dep., at 28, Flannery Dep., at 36.  Further, the Company's response to other misconduct is not relevant to the analysis of whether Stop & Shop in good faith believed that the punishment it meted out to Ingalls and Rankin was sufficient both to deter them from further similar misconduct and to deter other employees from engaging in such misconduct.  See Ellison, 924 F.2d at 882 (reasonableness of discipline depends on whether it stops harassment and persuades others to refrain from harassing conduct); Saad, 1994 U.S. Dist. LEXIS 20728, at *32 (remedy is effective if "conduct ceases and does not threaten to reoccur").

In this instance, it is beyond dispute that Stop & Shop in good faith believed that a two-week suspension, involuntary transfer to another store, final warning, and training would send a message to both the specific individuals and their co-workers that Stop & Shop would not tolerate this type of behavior.  Moreover, as the record clearly establishes, Stop & Shop conducted two investigations of this incident and undertook a thoughtful and deliberative review of all the relevant facts before imposing discipline.  It reviewed the employment records of each individual involved and found that they had not previously engaged in similar conduct – indeed, no one alleges they had.  Based on their prior work history with Company and their explanation

---

[4] In particular, Don Barsolou testified as follows:

> A:   One where there is absolutely no flexibility is if they steal from the company, they're gone.
>
> Q:   No matter how much they steal?
>
> A:   A nickel to a million dollars.  Anything other than that is up for discussion based on the situation and the parties involved and what happens, the severity of it. One other one I would have very little room for is if somebody threatened somebody else within the company and it's over an overt actual threat, which has happened, terminated offense – a direct threat.

(Barsolou Dep., at 33.)

for their conduct, Stop & Shop management made the good faith and reasonable determination that a suspension, warnings, training, and involuntary transfer were an appropriate response both to punish the misconduct and to ensure that these individuals and others would not engage in similar conduct in the future.

Rather than applying the "good faith" standard, the Report, relying on Paroline v. Unisys Corp., 879 F.2d 100 (4th Cir. 1989), applied a reasonableness standard, finding that reasonable people might disagree as to whether Stop & Shop's response, including the punishment, was adequate. R&R, at 25 ("the court suggests that the dispute about . . . the adequacy of [Stop & Shop's] response involves reasonableness assessments not easily amenable to summary judgment"). That is not the appropriate inquiry. Rather, the issue is whether reasonable people could disagree as to whether Stop & Shop in good faith believed that its response, including the punishment it imposed, was sufficient both to stop the harassing conduct and to deter similar misconduct. Blankenship, 123 F.3d at 873 (response found adequate in face of "singular lack of evidence to refute employer's claim that its actions were in good faith"; plaintiff must establish "such indifference" in employer's response as to indicate "attitude of permissiveness that amounts to discrimination").

While the Report accurately quotes the Paroline Court's holding, close review of that decision reveals that the Paroline Court actually applied the "good faith" standard articulated in Blankenship. In particular, the Court noted that, "a reasonable finder of fact could infer that Unisys intended Moore's earlier reprimand as nothing more than a slap on the wrist or perhaps even an outright sham." (Emphasis added.) Paroline, 879 F.2d at 107. In short, the Paroline Court found that a reasonable jury could find that the employer's remedial actions were not taken

in good faith and *were not* calculated to end the harassment.[5]  In contrast, the evidence in this

case cannot support such a finding.  There is a complete absence of any evidence that Stop &

Shop's actions were not in good faith or undertaken with such indifference as to amount to

discrimination.  Accordingly, no question of fact exists as to whether Stop & Shop's remedial

measures were adequate.

Also incorrect was the finding that there is "a question as to whether Rankin, Ingalls

and/or Kaletta actually attended the post-incident sensitivity training made mandatory for all

employees." R&R, at 24.  This conclusion was based on Plaintiff's unsupported assertion that

"Defendant does not cite to any evidence that the three individuals at issue, much less all Store

36 employees, attended the training.  Mr. Ingalls testified that only fifteen people attended the

sensitivity training.  Ingalls Dep. pp. 29." Pl. Statement of Facts, ¶ 36.  The fact that Ingalls

attended training with approximately fifteen co-workers does not support the inference that his

training session was the only session.  It may not have been feasible to train all store employees

at once given the store's staffing needs.  Further, Stop & Shop supported its factual assertion

with citations to the testimony of Cindy Flannery and its sworn interrogatory responses in which

it stated that it conducted the training.  Def. Statement of Facts, ¶ 36.  Notwithstanding the fact

that he conducted numerous depositions and vigorously pursued discovery in this case,

Rosemond failed to produce *any evidence* that actually contradicts Stop & Shop's statement.  Pl.

Statement of Facts, ¶ 36.  In the absence of such evidence, Stop & Shop's assertion must be

---

[5] Paroline presents starkly different facts than this case.  In Paroline, the evidence showed that
the employer's response to the complaint of harassment actually increased the likelihood that the
alleged harasser would encounter the plaintiff and that the employer's past reprimands of the
harasser had been ineffective in deterring his harassing conduct.  Paroline, 879 F.2d at 106-07.
In this instance, Stop & Shop ensured that Rankin, Ingalls, and Kaletta would not work at the
same store as Rosemond and there is no evidence that any of them was a serial harasser who had
previously been warned but continued to engage in the same type of conduct.

accepted as true for purposes of this motion. See Fed. Rules Civ. Proc. 56(e). Further

supporting Stop & Shop's assertion and undercutting Plaintiff's baseless allegation is Kaletta's

own testimony that he attended the sensitivity training.[6] Kaletta Dep., at 18-19. In short,

Rosemond failed to support with any evidence his claim that the individuals may not have

received training or to establish that Stop & Shop's claim to the contrary was inaccurate. Given

these circumstances, the Report's reliance on Rosemond's assertion as a basis for denying

summary judgment was misplaced.

Third, the Report noted that Ingalls and Rankin had "previously made 'national origin

jokes' in the presence of at least one higher-level manager, Wutka" and suggested that this

constituted evidence of prior misconduct.[7] R&R, at 24. Any reliance on this allegation was

inappropriate for several reasons. First, to the extent Ingalls and Rankin engaged in Polish jokes,

that conduct is not relevant to a racial harassment claim. EEOC v. HBE Corp., 135 F.3d 543,

552 (8th Cir. 1998) (evidence of anti-Semitic comments not relevant in race discrimination case);

Lanni v. New Jersey, 177 F.R.D. 295, 305 (D.N.J. 1998) (racial comments not relevant in sexual

harassment case). The Court noted as much at oral argument:

---

[6] Review of Rankin's deposition reveals that Plaintiff's counsel simply never asked him whether
he attended the training. Accordingly, the absence of testimony from Rankin on this issue does
not support Plaintiff's assertion.

[7] In the course of investigating Rosemond's complaint, Kathy Russello interviewed Wutka, the
Perishable Manager to whom Rankin and Ingalls reported. In her report, Russello recounted
Wutka's description of their relationship:

> They [Rankin and Ingalls] alluded to the fact that it was a joke about me, I think
> because the noose was over my desk. I'm a manager first, very direct, I do my
> job, but they also know they can joke with me. . . .[S]ince they apologized to me,
> it made it sound like it was directed at me. They will tell jokes in the back even if
> I'm present. I can't think of anything specific. They can say how they feel in
> front of me without me taking it disrespectful. Sometimes they will do Polish
> jokes because Stan's Polish and they know I was married to a Polish man.

(Defendant's Exhibit G.)

> THE COURT: There's nothing in there [referring to Russello's report of her interview of Wutka], it seems to me and Ms. Sapirstein can address this when its [sic] her turn, but it seems to me that there's nothing in her statements that deal with a racially hostile environment. I mean what she talks about is joking in the most general of ways and to the extent anything is specific it has to do with, in essence, Polish jokes.

Transcript, at 8, lines 10-15, excerpt attached hereto as Exhibit A.

Moreover, this allegation is not relevant because there is no evidence that Stop & Shop ever counseled Rankin or Ingalls to avoid such banter.[8] Had Stop & Shop instructed Rankin and Ingalls to change their behavior and they failed to do so, that fact would be an important consideration for Stop & Shop in determining what discipline to impose on them. In such a circumstance, their prior failure to respond to counseling could have warranted increasing the discipline to impart a stronger message. Given the evidence, however, that Ms. Wutka engaged in this joking with them, the allegation does not support any argument that Stop & Shop's knowledge of this voluntary banter should have influenced the action it took in response to Rosemond's complaint.

Simply put, the finding that that an issue of fact exists as to whether Stop & Shop's response was adequate is based on irrelevant and/or incorrect factual findings and the inappropriate application of a negligence standard. Summary judgment is warranted because the evidence only permits the conclusion that Stop & Shop acted in good faith with the belief that it was taking appropriate remedial action designed to stop the conduct and deter further similar conduct.

---

[8] Wutka did not state or even suggest that she found their jokes offensive, much less harassing. Accordingly, this conduct does not establish a "history" of harassment, much less racial harassment, by Rankin or Ingalls.

## II.      The Hanging of the Rope, a Single Incident, Does Not Satisfy the Severe and Pervasive Standard.

The Report correctly noted that to prevail on his claim, Rosemond must establish racially

harassing conduct that is sufficiently severe or pervasive to create a hostile work environment.

Noting that under both state and federal law, a single incident of harassment, if sufficiently

egregious, may meet this standard, the Report concluded that this single incident "may well pass

that test." R&R, at 15.  The flaw in this recommendation is that it fails to analyze the specific

facts of this case in the context of existing case law.

Review of other cases involving a noose in the work place demonstrates that a single

incident such as this one is not sufficient to meet the severe and pervasive standard.  See, e.g.,

Wilson v. Dana Corp., 210 F. Supp. 2d 867, 881 (W.D. Ky. 2002) (where evidence showed

plaintiff saw racist graffiti on bathroom wall and noose hung on cafeteria door and heard co-

worker referred to as "nigger" twice, plaintiff cannot meet severe or pervasive standard); Settle

v. Baltimore County, 34 F. Supp. 2d 969 (D. Md. 1999) (racial harassment claim based on

hanging of noose, monitoring of African-American officers, and damage to plaintiff's "post car"

does not satisfy severe or pervasive standard).  These cases demonstrate that the application of

the exacting standard for assessing racially hostile work environment claims requires that in a

case such as this, involving a single incident of conduct that it is not clearly targeted at the

plaintiff, the conduct is simply not severe or pervasive enough to support a hostile environment

claim.

In contrast, where a noose was part of an alleged pattern of racial harassment and

discrimination, the facts supported a finding that its use was motivated by racial animus and, in

some cases, that the conduct was sufficiently severe or pervasive.  See, e.g., Snell v. Suffolk

County, 782 F.2d 1094, 1098, 1101 (2d Cir. 1986) (picture of black man with a noose around his

-13-

neck part of what the court described as a virtual barrage of racially offensive slurs and demeaning epithets aimed at minority corrections officers that directly affected their work); Hardy v. USF Reddaway, Inc., 2004 U.S. Dist. LEXIS 10179, at *22-23 (D. Or. 2004) (listing a litany of racially offensive slurs and symbols of violence, slavery, and racism); Pedigo v. National Cart Co., Inc., 2004 U.S. App. LEXIS 8230, at *2-3 (8th Cir. 2004) (racist remarks and graffiti).  Here, these factors are utterly lacking.  Accordingly, Rosemond cannot establish severe or pervasive racial harassment.

## Conclusion

For the reasons set forth herein, Stop & Shop objects to that portion of the Report and Recommendation that finds that an issue of fact exists as to whether Stop & Shop may be liable for co-worker racial harassment under Title VII and c. 151B.

Respectfully submitted,

THE STOP & SHOP SUPERMARKET COMPANY LLC,

By its Attorneys,

/s/ Brigitte M. Duffy
Lisa J. Damon (BBO # 558843)
Brigitte M. Duffy (BBO # 567724)
Seyfarth Shaw LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
(617) 946-4800

DATED:  April 10, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper will be sent to those indicated as not registered participants on April 10, 2006.

/s/ Brigitte Duffy