UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 04-30072-KPN
Pages 1-35

JOSEPH ROSEMOND

vs.

STOP AND SHOP SUPERMARKET COMPANY 

--------------------------------------------------------
## DEPOSITION OF:  KATHLEEN RUSSELLO
--------------------------------------------------------

Taken before Joanne Coyle, Certified
Shorthand Reporter, Notary Public, pursuant
to the Federal Rules of Civil Procedure, at
the offices of Sapirstein & Sapirstein,
P.C., 1341 Main Street, Springfield,
Massachusetts on FEBRUARY 2, 2005,
commencing at 11:40 a.m.

Joanne Coyle
Certified Shorthand Reporter
License No. 106693

**PERLIK and COYLE REPORTING**
Certified Professional Reporters

1331 Main Street
Springfield, MA 01103
Tel. (413) 731-7931     Fax (413) 731-7451

EXHIBIT 1

**13**

1  Mr. Rosemond and tell me if there's anything that
2  you recall as you sit here today that was
3  discussed that's not included in those paragraphs?
4      A.    Not that I recall; I'm not sure.
5      Q.    If I can direct your attention to the
6  end of that paragraph, "And Joe went on to state
7  the following."
8          You have some of that in quotes. Is
9  that exactly what he said to you -- "I'm hurt, I'm
10 angry"?
11     A.    Absolutely; yes.
12     Q.    Did he appear to be upset to you?
13     A.    Yes.
14     Q.    Then, is this memo composed in the order
15 in which you met with the individuals, so in other
16 words, did you meet with the store manager next?
17     A.    Yes.
18     Q.    Was anyone else present besides you and
19 the store manager?
20     A.    No.
21         MS. DAMON: You said you and the
22 store manager, is that what you said?
23         MS. SAPIRSTEIN: Yes.
24         MS. DAMON: Okay.

**14**

1      Q.    (BY MS. SAPIRSTEIN) If you could review
2  your notes of your interview with the store
3  manager and tell me if there is anything that you
4  recall as you sit here today that's not included
5  in that paragraph?
6      A.    Not that I recall. Let me -- you know
7  what, I think how I -- in italics how I spoke --
8  what I put here, I can tell you that I spent more
9  time than just these sentences talking to Brian
10 about this.
11         I kind of put this into a condensed
12 version but I spent a decent amount of time
13 talking to Brian about other people's perceptions
14 and understanding that he saw it one way, someone
15 else will see it another and talking about the
16 seriousness of the situation. I absolutely made
17 that very clear to him.
18     Q.    Do you recall specifically what you said
19 or just that you said more than this?
20     A.    I just know I said more than this and we
21 spent some time on it.
22     Q.    Was it your opinion back in December of
23 2003 that under any circumstances a noose hanging
24 from a ceiling is extremely disturbing?

**15**

1      A.    Yes; absolutely.
2      Q.    Why did you believe that a noose hanging
3  from a ceiling was extremely disturbing?
4      A.    You know, when Al had contacted me and
5  told me about it, I was disturbed by the mental
6  picture that it would bring about.
7          Under any circumstances, absolutely, it
8  is disturbing.
9      Q.    Did it -- was your opinion in part
10 related to the fact that Mr. Rosemond is an
11 African-American?
12     A.    I'm sorry, you need to restate that.
13     Q.    The disturbing nature of the noose, was
14 it disturbing to you in part because Mr. Rosemond
15 is an African-American?
16     A.    Absolutely. It was disturbing to me
17 because in my mind it absolutely brought to mind
18 lynchings, it brought to mind people hurting
19 themselves or killing themselves, absolutely.
20     Q.    Did you know that Marcy Wutka was on
21 vacation during the week the noose was hung?
22     A.    It was identified to me by Joe during
23 the investigation.
24     Q.    When you met with him?

**16**

1      A.    Yes.
2      Q.    If you can go back to page -- well, my
3  Bate stamp is 26.
4          It says you asked Brian why Charlie and
5  Jeramie would play a joke on Marcy while she was
6  on vacation. Was that Mr. Whalen's complete
7  answer?
8      A.    As far as I can recall.
9      Q.    Do you know how long Marcy Wutka had
10 been on vacation?
11     A.    No.
12     Q.    Do you know if she had more planned
13 vacation days after the noose incident?
14     A.    No; I only know what Joe had told me.
15     Q.    And that's included --
16     A.    (Interposing) Yes.
17     Q.    -- in your narrative with your interview
18 with Joe?
19     A.    Yes.
20     Q.    Then you next met with Marcy Wutka?
21     A.    Yes.
22     Q.    If you could review that paragraph and
23 tell me if that's what your interview with Marcy
24 Wutka entailed?

**21**

1    Q.  Mr. Ranken also told you that the rope
2  was tied in a noose at the time he found it?
3    A.  Yes; he did.
4    Q.  This quote, it says, "This is S & S" and
5  it says "Chicopee"?
6    A.  Yes.
7    Q.  At the top?
8    A.  Yes.
9    Q.  Is that something Jeramie Ranken said?
10    A.  Yes.
11    Q.  Did you understand what that meant?
12    A.  He actually may have gone on to
13  explain -- he was talking about that at
14  Stop & Shop -- and it went on later in this
15  conversation so I did put it in perspective of
16  what he was trying to convey to me -- that
17  Stop & Shop -- the Stop & Shop and the store,
18  Chicopee, there are no issues like this, that the
19  associates get along well, that everyone works
20  together, there is no fighting or issues within
21  the store of people disliking each other.  They
22  haven't had those issues.
23    Q.  That's what you say later on in the
24  paragraph?

**22**

1    A.  Mmm-hmm.
2    Q.  Yes -- is that yes?
3    A.  I'm sorry; yes.  I apologize.
4    Q.  Jeramie Ranken told you that it was
5  Charlie Ingalls that said, "Let's hang this up"?
6    A.  Yes.
7    Q.  Jeramie said to you that he was shocked
8  when he found out that some people thought it was
9  racially motivated?
10    A.  Yes.
11    Q.  Was that part of a bigger conversation?
12  I mean, had you said something to which he
13  responded?
14    A.  I don't recall.
15    Q.  Was there any further discussion with
16  Jeramie Ranken about the racial implications of a
17  noose?
18    A.  I believe I had the same conversations
19  with everybody about the implications and how
20  people would take it differently and each person,
21  depending on their background, looks at it very
22  differently.
23    He clearly understood -- though, by the
24  time he talked to me, he clearly understood the

**23**

1  concern and so did Charles.
2    Q.  Did you recommend terminating their
3  employment after these interviews?
4    A.  No; I did not.
5    Q.  Why not?
6    A.  My responsibility in this investigation
7  was to understand the intent, to understand why
8  someone would do something like this.
9    If at any point I identified there was
10  malice involved or intent to harm or hurt in any
11  way, I would have recommended termination.  I, at
12  no point during this investigation, identified
13  that and that's why I didn't recommend
14  termination.
15    Q.  What kind of offenses would you
16  recommend termination for?
17    A.  If someone threatens another associate,
18  someone hurts another associate physically, theft,
19  things of that nature.
20    Q.  You met next with Isaac Kobodya?
21    A.  Yes.
22    Q.  You say in the italics at the top that
23  he was very upset when he first entered the
24  office?

**24**

1    A.  Yes.
2    Q.  How did you know that?
3    A.  He communicated it to me.
4    Q.  What did he say?
5    A.  His mannerisms actually showed that he
6  was upset and he communicated that he was upset
7  that he didn't know he was going to meet with me
8  and that he had planned to go to lunch.
9    He was angry about the fact that I was
10  detaining him from going to lunch and I offered
11  that he could go.  I gave him the opportunity to
12  go and he chose not to.
13    Q.  Is it your understanding that he was
14  upset because he had planned to go to lunch and
15  you were interviewing him?
16    A.  Both.  He was upset because he wasn't
17  aware that I was going to speak to him and that I
18  was there to speak to him and that he was planning
19  to going to lunch and got detained from doing
20  that.
21    Q.  Did you get any understanding that he
22  was upset about the incident, itself?
23    A.  Absolutely.
24    Q.  What did he tell you to make you believe

JOSEPH ROSEMOND vs. STOP AND SHOP SUPERMARKET COMPANY

KATHLEEN RUSSELLO          FEBRUARY 2, 2005

**25**

1  that he was upset about the incident?
2      A.   He spoke about the fact that he said
3  that everyone thinks this is about Joe.  This
4  isn't just about Joe.  I'm affected by this as
5  well.
6          He talked about the fact that he felt he
7  should have been communicated to more after the
8  incident with regard to what was going on and what
9  investigation was happening and what -- who the
10  associates were that were involved.
11     Q.   Did he say anything else other than
12  everybody thinks this is about Joe but I'm
13  affected as well?  Did he elaborate on that at
14  all?
15     A.   He absolutely talked about -- he talked
16  about that there is only one way for an
17  African-American to look at this situation.  He
18  was very clear.
19     Q.   It says here that Isaac said that
20  Jeramie is difficult to socialize with.  Did he
21  elaborate on that at all?
22     A.   He just spoke to the fact that Jeramie
23  comes in, does his job, very business-like.  He
24  doesn't make small talk or hang out with people.

**26**

1  He just does his job.
2      Q.   And then, a little further down there's
3  a quote from Mr. Kobodya which begins with, "I
4  know exactly," and ends with "understand us at
5  all."
6      A.   Yes.
7      Q.   Did he say anything other than that?
8      A.   Not that I recall.
9      Q.   Or is that the entire quote?
10     A.   Not that I recall.
11     Q.   How long did you spend talking to
12  Mr. Kobodya?
13     A.   I'm not sure.
14     Q.   Then you next met with Mr. Kaletta?
15     A.   Yes.
16     Q.   Was that the entire conversation you had
17  with Mr. Kaletta?
18     A.   Again, I communicated to him about,
19  again, about the fact that people need to
20  understand that people look at things differently
21  and although he may not have seen it as offensive,
22  it absolutely can be perceived that way.
23     Q.   Did you talk to him about his
24  responsibility as a manager?

**27**

1      A.   I talked to -- everybody I talked to, I
2  talked to them about their responsibility as
3  associates in a store and that if something is not
4  correct, they need to address it.
5          I don't know if I specifically focussed
6  on his responsibility as a manager.
7      Q.   And then you met with Mr. Lopez?
8      A.   Yes.
9      Q.   Why did you meet with him?
10     A.   Because Joe had identified that he was
11  there and I had absolutely planned to meet with
12  Joe and the two associates and Brian.
13         These other meetings happened as a
14  result of my communications with Joe and the other
15  associates, so Joe had mentioned that José was
16  present or that he was told José was present.
17         I had asked to speak to him because he
18  was in the store and I wanted to understand what
19  he saw.
20     Q.   Had you planned to talk to Marcy Wutka
21  or did someone suggest that you talk with her?
22     A.   I hadn't originally -- no; it wasn't --
23  basically, my goal in going in there was to
24  identify who I needed to speak to and I started

**28**

1  with that core group and then worked my way
2  through.
3          I don't think Marcy was on my original
4  plan or in my head because I hadn't understood
5  what involvement she had.
6      Q.   Do you know who suggested you speak with
7  her?
8      A.   When Joe brought up the point that he
9  was told or people were focusing on the fact that
10  it may have been directed at Marcy, I made the
11  decision to meet with her.
12     Q.   Did you ask her how long she had been on
13  vacation that week?
14     A.   I don't think I did.  I don't remember.
15     Q.   Or how long she planned to be on
16  vacation?
17     A.   Again, I don't recall.
18     Q.   Why did you talk to Isaac Kobodya?
19     A.   Because of Joe, actually.  Joe had
20  communicated to me that Isaac was a part of the
21  situation and was there when he met with Brian.
22     Q.   Did you speak to either Irene Raggnin or
23  Fran Novak?
24     A.   No; I did not.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 04-30072-KPN
Pages 1-45

JOSEPH ROSEMOND

vs.



STOP AND SHOP SUPERMARKET COMPANY

------------------------------------------------
### DEPOSITION OF:  DONALD BARSOLOU
------------------------------------------------

Taken before Joanne Coyle, Certified
Shorthand Reporter, Notary Public, pursuant
to the Federal Rules of Civil Procedure, at
the offices of Sapirstein & Sapirstein,
P.C., 1341 Main Street, Springfield,
Massachusetts on January 5, 2005, commencing
at 10:45 a.m.

Joanne Coyle
Certified Shorthand Reporter
License No. 106693

**PERLIK and COYLE REPORTING**
Certified Professional Reporters

1331 Main Street
Springfield, MA 01103
Tel. (413) 731-7931     Fax (413) 731-7451

EXHIBIT #2

**PERLIK and COYLE REPORTING**

## JOSEPH ROSEMOND vs. STOP & SHOP
## DONALD BARSOLOU            JANUARY 5, 2005

|  | 9 |
|---|---|
| 1 | A.   Do you know Cummings. |
| 2 | Q.   Is Mr. Cummings still at Stop & Shop? |
| 3 | A.   Yes; he is. |
| 4 | Q.   Was he the senior vice president? |
| 5 | A.   Yes. |
| 6 | Q.   What is he doing now? |
| 7 | A.   I believe he's executive vice president |
| 8 | out of QCP corporate headquarters. |
| 9 | Q.   Out of? |
| 10 | A.   QCP -- Quincy corporate headquarters. |
| 11 | Q.   So he was promoted? |
| 12 | A.   Correct. |
| 13 | Q.   Do you know anyone name Al Cave? |
| 14 | A.   Yes; I do. |
| 15 | Q.   Who is Al Cave |
| 16 | A.   He was at one time an attorney for |
| 17 | Stop & Shop and at one time involved in the HR |
| 18 | department. |
| 19 | Q.   Is he still with the company? |
| 20 | A.   No; he is not. |
| 21 | Q.   Do you know when he left? |
| 22 | A.   I would say about six months ago or so, |
| 23 | but I really don't know.  I can't remember. |
| 24 | Q.   So sometime in 2004? |

|  | 10 |
|---|---|
| 1 | A.   I think so.  James, do you remember |
| 2 | when? |
| 3 | Q.   Just give me your best recollection. |
| 4 | A.   About six months ago. |
| 5 | Q.   Do you know where he went? |
| 6 | A.   I think he went out to Chicago. |
| 7 | Q.   Are you familiar with Joseph Rosemond? |
| 8 | A.   Yes; I know Joe. |
| 9 | Q.   How did you first meet him? |
| 10 | A.   Joe was a customer service manager for |
| 11 | us at the time that I met him. |
| 12 | He had been transferred in from the |
| 13 | warehouse and I met him, I believe it was in |
| 14 | Store 36. |
| 15 | Q.   Which is? |
| 16 | A.   Which is the Chicopee store. |
| 17 | Q.   Did you have any interactions with him |
| 18 | on a regular basis? |
| 19 | A.   When I would visit the store and Joe was |
| 20 | on duty I would speak to him and if he was on duty |
| 21 | in charge of the store, I would walk the store |
| 22 | with him. |
| 23 | I can't remember the frequency but that |
| 24 | would be my interaction with him. |

|  | 11 |
|---|---|
| 1 | Q.   Are you aware of an incident that |
| 2 | occurred in Chicopee in December of 2003 that |
| 3 | involved Mr. Rosemond? |
| 4 | A.   Yes; I am. |
| 5 | Q.   How did you become aware of that |
| 6 | incident? |
| 7 | A.   That incident was brought to me by Scott |
| 8 | Ziter, who was our director of Security. |
| 9 | Q.   How did he do that?  Did he call you, |
| 10 | write to you? |
| 11 | A.   I believe he came into my office and |
| 12 | discussed it with him. |
| 13 | Q.   Do you remember when that was? |
| 14 | A.   It would be in December, as soon as it |
| 15 | happened. |
| 16 | Q.   Do you remember what he told you? |
| 17 | A.   From what I remember, he said that there |
| 18 | was a noose hanging in the area of the desks |
| 19 | upstairs by the water cooler; that Joe was upset |
| 20 | because he was concerned about what the |
| 21 | significance of what the noose meant and they had |
| 22 | started an investigative process. |
| 23 | Q.   Did you understand what Mr. Ziter meant |
| 24 | when he said that Joe was concerned about the |

|  | 12 |
|---|---|
| 1 | significance of the noose? |
| 2 | A.   Yes. |
| 3 | Q.   What was your understanding of what he |
| 4 | said? |
| 5 | A.   Based on Joe being African-American and |
| 6 | the significance of a noose to someone of |
| 7 | African-American descent -- people of that culture |
| 8 | and in the south that a noose had a significance |
| 9 | that was negative. |
| 10 | Q.   Did you respond to Mr. Ziter's advice to |
| 11 | you in any way? |
| 12 | A.   My response to Mr. Ziter was to -- |
| 13 | relative to the investigation, to make sure that |
| 14 | we found out exactly what did happen, who were the |
| 15 | parties involved, and that we would clearly |
| 16 | investigate the incident and make sure that we |
| 17 | took appropriate actions. |
| 18 | Q.   Did you have any other involvement in |
| 19 | the investigation or the incident? |
| 20 | A.   I was kept aware of the ongoing |
| 21 | investigation. |
| 22 | Q.   By whom? |
| 23 | A.   Scott Ziter, Brenda Broad, Cindy |
| 24 | Flannery, perhaps or Jerry Bidwell.  Those would |

## PERLIK and COYLE REPORTING

JOSEPH ROSEMOND vs. STOP & SHOP
DONALD BARSOLOU          JANUARY 5, 2005

17

1  memo to his file.
2      Q.   Why did you agree not to term?
3      A.   My mind said it was a practical joke
4  held by two people who were cutting up and it was
5  not a terminable offense.
6      Q.   That was -- was that your determination,
7  that it wasn't a terminable offense?
8      A.   That was my opinion.
9      Q.   That was your opinion?
10     A.   Yes.
11     Q.   Was there anything in the collective
12 bargaining agreement that guided you in making
13 that determination?
14     A.   No.
15     Q.   Was the union involved in the
16 disciplinary procedure?
17     A.   At the point at which we suspended the
18 individuals, the union had to become involved in
19 what we call the three-step process.  We go
20 through the first step, second step, and third
21 step and depending on the outcome, it goes to
22 arbitration because we put the people back to
23 work.
24         That's the determination that we made,

18

1  that the suspension was, I guess two, two and a
2  half weeks -- I can't remember the exact time --
3  was sufficient.
4      Q.   Did Mr. Cummings agree with that?
5      A.   As I remember, he did.
6      Q.   How about Ms. Broad?
7      A.   I believe she did.
8      Q.   And Mr. Cave?
9      A.   His recommendation, initially, was term.
10     Q.   And he changed his mind?
11     A.   I can't answer that.
12     Q.   Did he express an opinion that he agreed
13 ultimately with the decision to suspend and not
14 terminate?
15         MS. DAMON:  To him, directly?
16         MS. SAPIRSTEIN:  Well, I'm only
17 asking what he knows.
18         THE WITNESS:  He agreed with the
19 decision, because the ultimate result was the
20 suspension.
21         Whether he would have wanted it
22 differently, I can't answer that.
23     Q.   (BY MS. SAPIRSTEIN)  Nobody else had
24 input into the decision other than the four people

19

1  that you just mentioned?
2      A.   I don't know that.  I only know of those
3  four.  I don't know if anybody else was involved.
4  I don't know the background, like you mentioned
5  Maureen McGurl, I don't know what conversations
6  Maureen was involved with or anyone else at QCP
7  was involved in the discussions.
8         My connection was Brenda Broad, Al Cave,
9  Bill Cummings.
10     Q.   Did the four of you have any meetings
11 together about the incident?
12     A.   I would have had meetings with Brenda; I
13 had meetings with Bill.  I know I was on a call
14 with Al Cave with Brenda.  I don't recall a
15 meeting where all of us would have been together.
16 I do recall a conference call with Al, Brenda,
17 myself.
18     Q.   When was that?
19     A.   It would have been before the final
20 decision was made, as we were making that
21 decision.
22         I can't give you the exact time but if
23 the suspensions lasted two and a half weeks, it
24 had to have been within that time frame.

20

1      Q.   Do you remember the substance of that
2  conversation?
3      A.   We were discussing the issue of
4  termination versus suspension.
5      Q.   Do you remember what people said about
6  that subject matter?
7      A.   Al asked me if I understood the
8  significance of the rope hanging, stated that the
9  rope significance to an African-American person
10 was different than to a person like myself who
11 might have seen a rope hanging as an effigy at
12 Halloween time.  I'm walking in the store, it's at
13 a doorway so with the door opening and closing
14 there's a noose hanging with a skeleton on it with
15 the store manager's face on it, everybody is
16 getting a big kick out of it so he carefully
17 explained his viewpoint at that time.  That was
18 that basic discussion.
19     Q.   Mr. Cave is African-American, is that
20 right?
21     A.   Yes.
22     Q.   Do you know why he left Stop & Shop?
23     A.   No; I do not.  I believe what I heard
24 him say -- or what he said to me was he had family

Case 3:04-cv-30072-MAP   Document 56-2   Filed 04/26/2006   Page 8 of 21

JOSEPH ROSEMOND vs. STOP & SHOP
DONALD BARSOLOU          JANUARY 5, 2005

21

1  out in Chicago and he was leaving to go back to --
2  I thought he said, if my memory is correct -- to
3  what he used to do before and it was beneficial
4  for the family that he go back to the Chicago
5  area.
6      Q.   What did he do in Chicago?
7      A.   He was a practicing attorney, I thought,
8  but I'm not sure of that.
9      Q.   How soon -- I withdraw that; I'm sorry.
10 During this telephone conversation, do you
11 remember anything that Brenda Broad said?
12     A.   No; I don't really because the crux of
13 the conversation was between Al Cave and myself
14 discussing the issue of termination versus
15 suspension and the significance of the noose.
16     Q.   And that was the only conversation you
17 had with him regarding this incident and the
18 discipline?
19     A.   That's the one I remember.
20          MS. SAPIRSTEIN:  Can you mark this,
21 please?
22          (Plaintiff's Deposition Exhibit
23          No. 1 offered and marked.)
24          MS. SAPIRSTEIN:  This is a

22

1  confidential document.
2          (Confidential section of the
3          transcript.)
4      Q.   (BY MS. SAPIRSTEIN) I've handed you a
5  document that is confidential.  Can you tell me if
6  you've seen this before?
7      A.   Yes; I have.
8      Q.   Can you tell me what it is?
9      A.   It's a document that Scott Ziter gave to
10 me that is a chronology of events regarding the
11 case.
12     Q.   And the date is December 15, 2003?
13     A.   December 15, 2003.
14     Q.   Have you had a chance to review this
15 document?
16     A.   I read it when it was given to me and I
17 looked at it in the last couple of days.
18     Q.   To the best of your knowledge is what's
19 contained in this document accurate?
20     A.   Yes; it is.
21          MS. DAMON:  From Scott Ziter's view.
22          MS. SAPIRSTEIN:  I understand.
23          THE WITNESS:  This is the document
24 as I remember it being given to me back then.

23

1      Q.   (BY MS. SAPIRSTEIN)  Based on your
2  knowledge of the events, is Mr. Ziter's chronology
3  of events accurate?
4      A.   Appears to be.
5      Q.   Why were both Brenda Broad and Al Cave
6  involved?  Why two human resource reps?
7      A.   Because Al Cave was Brenda's boss.
8  Brenda reports to -- reported to Al Cave from the
9  human resource chain of command and she was
10 responsible for the Connecticut division.
11         Al Cave was responsible for, as I
12 understood it, both Boston and Connecticut, and
13 perhaps even New York, so it was a reporting
14 responsibility.
15     Q.   Who did he report to?
16     A.   Al Cave?  Probably Maureen McGurl -- and
17 I'm guessing at that.  I'm not exactly sure.
18     Q.   That's your best knowledge?
19     A.   To the best of my ability, to my
20 knowledge, Maureen McGurl.
21     Q.   Cindy Flannery was also an HR rep?
22     A.   She was an HR rep.  Brenda was an HR
23 director.  Cindy reported to Brenda.
24     Q.   And Mary Downing, do you know who she

24

1  is?
2      A.   Security advisor for the Massachusetts
3  area.
4      Q.   Who is Rick --
5      A.   -- Marsili is the Security individual
6  that Scott Ziter reports to.
7      Q.   When you received what's been marked as
8  Exhibit 1, did you respond to this in any way?
9      A.   To the best of my recollection, I would
10 have walked through the discussion points on here
11 to make sure I understood them clearly.
12     Q.   By yourself or with somebody else?
13     A.   With Scott.
14     Q.   Do you specifically remember doing that?
15     A.   Yes; because I remember the conversation
16 about calling the police or not calling the
17 police.
18     Q.   Can you tell me what you remember about
19 that conversation?
20     A.   That the discussion between Rick Marsili
21 and Scott was it was not necessary to call the
22 police and that when Scott got back to the agent,
23 he had already done that and the police response
24 was that if we needed their assistance, to call

JOSEPH ROSEMOND vs. STOP & SHOP
DONALD BARSOLOU                 JANUARY 5, 2005

33

1      A.    Because after reviewing the case as I
2  saw it and looking at where the noose was hung,
3  the issue of the individuals who pulled supposedly
4  the practical joke, that it was not a terminable
5  offense in my opinion.
6      Q.    Can you give me some examples of
7  terminable offenses?
8      A.    One where there is absolutely no
9  flexibility is if they steal from the company,
10 they're gone.
11     Q.    No matter how much they steal?
12     A.    A nickel to a million dollars. Anything
13 other than that is up for discussion based on the
14 situation and the parties involved and what
15 happens, the severity of it.
16           One other one I would have very little
17 room for is if somebody threatened somebody else
18 within the company and it's an overt actual
19 threat, which has happened, a terminable offense --
20 a direct threat.
21     Q.    Like I'm going to get --
22     A.    (Interposing) I'm going to take you out
23 and beat you up or I'm going to kill you.
24     Q.    That's pretty direct.

34

1      A.    If it's direct and somebody says
2  something that can be an implied threat, probably
3  not.
4      Q.    Are you the person who is responsible
5  ultimately for the discipline of the people in the
6  stores?
7      A.    No; I'm one of the people involved.
8  Discipline at Stop & Shop is -- involves many
9  people. No one individual can make that decision.
10     Q.    Anybody other than who we already talked
11 about?
12     A.    Depending on who the individual is; yes.
13     Q.    Can you tell me?
14     A.    It can go all the way to Mark Smith.
15     Q.    Before we get to Mark Smith, can you
16 tell me -- this is going to be a confusing
17 question but I'm going to try my best.
18           Based on the identity of the position of
19 the person who you're seeking to discipline, can
20 you tell me what people at Stop & Shop would be
21 responsible or have input into that disciplinary
22 process?
23           I'm basically asking who is responsible
24 for what positions.

35

1      A.    It would be me because I'm responsible
2  for the operations of the company.
3      Q.    For anybody in the stores?
4      A.    I'll call it the exempt process, exempt
5  being a person who is non-union. Anybody who is a
6  union individual, I would be involved in only at
7  the point at which a case is determined whether it
8  needs to go to arbitration or not.
9            I review the cases for union people. If
10 they are settled without my involvement, that's
11 fine. If they need my involvement, I get
12 involved.
13     Q.    This case wasn't going to arbitration
14 but you did get involved with the union people?
15     A.    This case, I was involved because of the
16 seriousness of the case and the discipline
17 involved, because it was also connected to an
18 exempt.
19     Q.    Mr. Kaletta?
20     A.    No; the exempt is Joe Rosemond. Joe
21 Rosemond is an exempt, Stan Kaletta is not.
22           I would have been involved -- just take
23 Joe Rosemond out of the picture for a minute. I
24 would have been involved with Stan Kaletta -- and

36

1  is it Jamie, the clerk?
2      MS. DAMON:  Jeramie.
3      THE WITNESS:  Jeramie on a case,
4  comes to my desk, I would read the case. If the
5  decisions appear to be acceptable, that's as far
6  as my involvement needs to be or I can choose to
7  get further involved.
8            As long as the HR process is taking
9  place -- they have proper union representation and
10 the cases are settled in an agreeable manner --
11 that's where I decide if I'm going in or not.
12 There would be discussions with me regarding a
13 union case as to whether or not it should go to
14 step two, step three or go to arbitration. That's
15 my involvement.
16     Q.    (BY MS. SAPIRSTEIN) That's all store
17 employees?
18     A.    All union employees. That's the
19 discussion for union.
20           I need to be involved before a case can
21 be determined to go to arbitration because I would
22 have part of the decision-making and I would have
23 to take it to my boss as to whether or not this
24 case should be settled at step three, a negotiated

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 04-30072-KNP

JOSEPH ROSEMOND
          Plaintiff

vs

STOP AND SHOP SUPERMARKET
COMPANY
          Defendant

 **ORIGINAL**

DEPOSITION OF GERALD BIDWELL, taken

before ANN A. PRESTON, Notary Public and

Court Reporter, pursuant to Rule 30 of the

Massachusetts Rules of Civil Procedure, at

the offices of Sapirstein and Sapirstein, PC,

1341 Main Street, Springfield, Massachusetts,

commencing at 10:30 on December 15, 2004.

Ann A. Preston
Certified Shorthand Reporter

PERLIK and COYLE REPORTING
Certified Professional Reporters
1331 Main Street
Springfield, MA 01103
Tel (413) 731-7931    Fax (413) 731-7451

PERLIK and COYLE REPORTING

EXHIBIT #3

25

1   and that Joe clarified with Brian the seriousness
2   of this. He said -- I think his words were
3   something to the effect of, He didn't seem to take
4   it serious until he saw he was pissed off, were the
5   words he gave me -- "he" meaning Brian. I said,
6   Well, describe to me what you said, and he told him
7   that to black people a noose means a hanging noose,
8   that they used to hang black people with a noose.
9   And he said then he seemed to take it serious.
10      Q.   Did Joe Rosemond tell you how he felt
11  about seeing the noose in the office?
12      A.   I think, again, that I'm articulating to
13  you as he's discussing to me that I could very well
14  see how he felt. He was upset about the idea of
15  this noose.
16      Q.   But did he say anything to you about how
17  it has made him feel?
18      A.   He said it in the way I just described
19  it, and he described it in terms of how he brought
20  this across to Brian, and I could see that he was
21  upset by it.
22      Q.   Did you take any notes at the meeting?
23      A.   Yes, I did.
24           MS. SAPIRSTEIN:  Off the record.

26

1            (A break was taken)
2            MS. SAPIRSTEIN:  Back on the record.
3       Q.   (By Ms. Sapirstein)  Did you have any
4   other involvement in investigating this incident?
5       A.   No, I didn't.
6       Q.   That was it?
7       A.   That was it, yes.
8       Q.   Did you talk with anyone else?
9       A.   In the store, no.
10      Q.   Did you talk with anyone else in the
11  company?
12      A.   I talked to Brenda Broad and Scott Ziter
13  to make them aware of my findings and then this
14  memo.
15      Q.   And when you talked to Brenda Broad, did
16  you talk to her that same day?
17      A.   Yes.
18      Q.   What did you tell her?
19      A.   I gave her an overview of what I had
20  just basically told you.
21      Q.   So essentially what you told me?
22      A.   Essentially what I told you, yes.
23      Q.   Anything else that you told her that you
24  didn't tell me or...

27

1       A.   No.
2       Q.   I'm sorry, who else did you say you
3   spoke to?
4       A.   Scott Ziter, who was our loss prevention
5   manager.
6       Q.   What did you tell him?
7       A.   Essentially the same thing I just told
8   you.
9       Q.   Did you take any pictures?
10      A.   No.
11      Q.   Did you take any written statements from
12  anybody?
13      A.   No, just my own notes.
14      Q.   Do you still have those notes?
15      A.   I believe I might. I'd have to check.
16  I think I may.
17      Q.   Could you check and let your lawyer know
18  if you have them?
19      A.   Okay.
20           (Exhibit 2, Statement,
21           marked for identification)
22      Q.   (By Ms. Sapirstein)  I'm going to hand
23  you what's been marked as Exhibit 2. Is that a
24  memo that you wrote?

28

1       A.   Yes, it is.
2       Q.   And this was based on your interviews
3   with Isaac Kobodya and Joe Rosemond?
4       A.   Yes.
5       Q.   I'm just going to briefly read this. So
6   this was essentially a synopsis of your interviews
7   with Isaac and Joe?
8       A.   Yes, it was.
9       Q.   On the second page, it says, "Brenda
10  Broad spoke to Scott Ziter to insure security
11  coverage for the store while this is being
12  investigated"?
13      A.   Yes.
14      Q.   How do you know that?
15      A.   Because she had told me that and Scott
16  Ziter was dispatched as well.
17      Q.   What do you mean by "to insure security
18  coverage for the store"?
19      A.   Because of the fact that this was taken
20  quite seriously, we could see that there was no
21  question that Joe had some serious concerns about
22  it. It was a noose, after all, hanging from a
23  ceiling, and therefore, I know that Brenda, as well
24  as myself and as well as Scott Ziter, took this

29

1   very seriously.
2       Q.   But what do you mean exactly by
3   "security coverage"?
4       A.   What that meant is that Scott would go
5   up and -- a couple of things.  He would do an
6   investigation as well, but he would also provide
7   for Joe coming and going from the car type of
8   thing.
9       Q.   And who is Mary Downing?
10      A.   Mary Downing reports to Scott Ziter.
11  She is the loss prevention field manager for that
12  area.
13      Q.   And Cindy Flannery, who is basically
14  your counterpart, who has responsibility for
15  Chicopee?
16      A.   Yes.
17      Q.   Is everything in this memo accurate?
18      A.   Yes, it is.
19      Q.   Did you write any other memoranda
20  regarding this incident?
21      A.   No, I didn't.
22      Q.   Did you have any other involvement in
23  the incident?
24      A.   No, I didn't.

30

1       Q.   Did you talk to anybody about it during
2   the course of any investigation?
3       A.   No, I didn't.
4       Q.   Did you talk to anybody about it to find
5   out what happened?
6       A.   No, I didn't.  But I somehow do know
7   that somewhere along the way they did -- I received
8   a memo, I know, from -- not a memo, but carbon copy
9   from Cindy Flannery.  She had sent her write-up to
10  Brenda Broad on her interviews of the folks that
11  she and Scott Ziter did, and I know I was on copy
12  to that.  So I was aware that there was an ongoing
13  investigation, and quite honestly with my two areas
14  and everything going on, that's where I go; I go to
15  my two areas and left it up to them at that point.
16      Q.   Do you know what happened at the end of
17  the investigation, if anything?
18      A.   I had heard that two individuals were
19  involved and that they were suspended.  That's
20  basically all I knew.
21      Q.   Did you have any input into recommending
22  the discipline?
23      A.   No, I didn't.
24      Q.   Did you agree with it?

31

1       A.   I don't know what it all ended up to be.
2       Q.   Who did decide what the discipline was
3   going to be?
4           MS. DAMON:  Objection.
5           THE WITNESS:  I don't know.
6       Q.   (By Ms. Sapirstein)  At the time that
7   you learned about the noose hanging in the office,
8   did a hanging noose have any historical
9   significance to you?
10      A.   Well, I'll tell you, as to what a
11  hanging noose stands for...
12      Q.   To you.
13      A.   To me.  The one thing that stands out in
14  my mind, quite honestly -- my dad was an Army
15  veteran under Patton, and as a boy he showed me
16  pictures of Jews that were hung in Germany, so...
17      Q.   In World War II?
18      A.   Yes.  So it had a significance in that
19  regard for me, not to mention the things that Joe
20  mentioned.  I mean, it was pretty obvious.
21  Obviously, I'm old enough to remember Martin Luther
22  King and some of the various things that happened
23  down through the ages, so yes, it had significance.
24      Q.   Have you seen Joe Rosemond's complaint

32

1   in this matter?
2       A.   I haven't.
3           MS. SAPIRSTEIN:  Off the record.
4           (A break was taken)
5           MS. SAPIRSTEIN:  Back on the record.
6       Q.   (By Ms. Sapirstein)  I'm going to show
7   you a copy of the complaint that was originally
8   filed in this matter in court.  I'd like you to
9   just take a moment to review it.  Let me just tell
10  you, because I want to make sure you understand --
11      A.   Sure.
12      Q.   -- in answers to interrogatories that
13  were served on Stop and Shop, you were identified
14  as an individual who had some knowledge of what's
15  alleged in that complaint.  So I want you to review
16  it, and I just want to make sure you've testified
17  to everything that you have knowledge about, okay?
18      A.   Okay.
19      Q.   Regarding that complaint, not anything
20  else; the allegations in the complaint.
21          MS. DAMON:  So basically anything other
22      than what you've testified here to today in
23      this case.
24      Q.   (By Ms. Sapirstein)  Right, exactly.

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 04-30072-KNP

JOSEPH ROSEMOND
            Plaintiff

vs

STOP AND SHOP SUPERMARKET
COMPANY
            Defendant

 ORIGINAL

DEPOSITION OF CHARLES INGALLS, taken

before ANN A. PRESTON, Notary Public and

Court Reporter, pursuant to Rule 30 of the

Massachusetts Rules of Civil Procedure, at

the offices of Sapirstein and Sapirstein, PC,

1341 Main Street, Springfield, Massachusetts,

commencing at 9:40 on December 15, 2004.

Ann A. Preston
Certified Shorthand Reporter

**EXHIBIT #4**

PERLIK and COYLE REPORTING
Certified Professional Reporters
1331 Main Street
Springfield, MA 01103
Tel (413) 731-7931     Fax (413) 731-7451

9

```
1      A.    Me and the meat manager and a girl.
2      Q.    Who supervises the employee -- not the
3   meat manager, but the other employee?
4      A.    The girl, the wrapper?
5      Q.    The wrapper.
6      A.    I do.
7      Q.    You do?
8      A.    Yes.
9      Q.    Who is your supervisor, the meat
10  manager?
11     A.    Yes.
12     Q.    Who was your supervisor in the Chicopee
13  store before you left in 2003?
14     A.    Stanley Kaletta.
15     Q.    Have you been subject to any progressive
16  discipline at Stop and Shop, written warnings,
17  verbal warnings, probation, suspension?
18     A.    Just this one time this happened, that's
19  all.
20     Q.    Why don't you tell me about what
21  happened?
22     A.    It was a Wednesday morning.
23     Q.    Do you remember what the date was?
24     A.    No, I'm not positive.
```

10

```
1      Q.    If I told you it was December 10, would
2   that refresh your recollection?
3      A.    Yes, probably was, yes, before
4   Christmas.  And Wednesday I don't usually come in
5   until late, but Stanley has me come in early.  So
6   we went upstairs to punch in, and there was a whole
7   group of us there.
8      Q.    Do you know who was there?
9      A.    I don't know -- no, I don't talk to too
10  many people at work unless, you know, if I know you
11  personally, fine, but like part-timers and stuff, I
12  very seldom have anything to say to them because
13  they don't have anything to do with me, I don't
14  have anything to do with them.  But Jerry and me --
15  Jeramie was there, Stanley was there.
16     Q.    That's Jeramie Ranken?
17     A.    And Pat Costello.
18     Q.    Who is Pat Costello?
19     A.    She's a meat wrapper.
20     Q.    Then what happened, if anything?
21     A.    Then I sat down at Marcy's desk.
22     Q.    At whose --
23     A.    Marcy.  And first of all I didn't pay
24  much attention to it, then I looked down on the
```

11

```
1   desk and I said to Jeramie, Look at this, somebody
2   made a noose.  It was completely rolled, you know
3   what I mean rolled, like a circle, and the noose
4   was on the top.  I'm looking at it, looking at it,
5   grabbed a hold of it.  And we play a lot of jokes
6   in the back room all the time, and some way or
7   another me and Jeramie -- Jeramie pushed the thing
8   up and stuck it in the ceiling.  Nothing was
9   mentioned about anyone or anything, you know what I
10  mean.  That was it.  Then we left, and then that
11  was Wednesday.  I worked Thursday.  Friday morning
12  we had security called us upstairs.
13     Q.    Actually, before we get to that, let me
14  just ask you a couple of questions.  Who picked up
15  the rope and --
16     A.    I picked it up and both of us put it up.
17     Q.    And you both put it up?
18     A.    Yes.
19     Q.    Why did you do that?
20     A.    I have no idea.  It was just a -- a what
21  word do I want to use -- joke.
22     Q.    Did you take it down before you left?
23     A.    No.
24     Q.    So you left it hanging up there?
```

12

```
1      A.    Yes.
2      Q.    Can you just draw a diagram for me of
3   how the office is set up and where you hung the
4   noose, to the best of your ability?
5      A.    One desk here.
6      Q.    Whose desk is that?
7      A.    That's Marcy's.  Then there's another
8   desk here.  Another one like this.  And there's --
9      Q.    Whose desks are those other two?
10     A.    I don't know who is this one.  This is
11  Joe's over here -- I think that's his desk.  And we
12  were standing here and we hung it over here.
13     Q.    If I could ask you just to put "M" for
14  Marcy and "J" for Joe and "N" for noose.
15           MS. SAPIRSTEIN:  We're going to mark
16     this.
17           (Exhibit 1, Diagram,
18           marked for identification)
19     Q.    (By Ms. Sapirstein)  Did anybody say
20  anything while this was going on?
21     A.    No.
22     Q.    How long did it take you to hang the
23  noose?
24     A.    Not very long.
```

13

1 Q. Say five minutes?

2 A. Impulse it was.  Could have been five

3 minutes or less.

4 Q. Was Mr. Kaletta there at the time?

5 A. Yes, ma'am.

6 Q. What did he say, if anything?

7 A. I don't recollect what he said, ma'am.

8 Q. Did he ask you to take it down?

9 A. No.

10 Q. Did anybody suggest that you take it

11 down?

12 A. No.

13 Q. You don't recall anyone else who was

14 there other than Pat Costello?

15 A. No.

16 Q. And Mr. Ranken and Mr. Kaletta?

17 A. No.

18 Q. But there were other people there?

19 A. There were other people there.  Like I

20 said, I don't see too many of them.

21 Q. Were they there when you were actually

22 hanging the noose, or had they left already?

23 A. I'm not positive.

24 Q. What time did you come in that morning,

14

1 do you remember?

2 A. Quarter of 7:00.

3 Q. Did you come in by yourself or did you

4 meet anybody on your way in?

5 A. We all usually eat outside.

6 Q. Who is "we all"?

7 A. Stanley and I and Pat and Jeramie don't

8 come in in the morning a lot.  We wait outside

9 until we go to work, the other manager comes in.

10 Q. Then you went to punch in, went to work?

11 A. Yes, ma'am.

12 Q. Had you punched in when you hung the

13 noose?

14 A. No.

15 Q. At the time you hung the noose, did you

16 have any understanding of any significance that a

17 noose would have?

18 A. No.

19 Q. None at all?

20 A. No.

21 Q. Were you aware that it had been used in

22 the south to lynch?

23 A. Oh, yes, I understand what it's used

24 for, but at that point in the room, no.

15

1 Q. But when you were hanging it, at that

2 time in your life, did you have any understanding

3 of the significance of a noose?

4 MS. DAMON:  Objection.  Do you mean

5 like when he was putting it up there did he

6 think about it or no...

7 Q. (By Ms. Sapirstein)  No, did he have an

8 understanding while the event was going on, at that

9 period of his life?

10 MS. DAMON:  If you talked to him that

11 day he hung it and said, Do you know what a

12 noose was for, separate and apart from when

13 he did it?

14 Q. (By Ms. Sapirstein)  Do you understand

15 the question now -- during the period of time, not

16 while you were actually hanging the noose, but that

17 general time of your life, did you have an

18 understanding of what significance a noose had?

19 A. Yes.

20 Q. What was that understanding?

21 A. Well, they used it in the Old West to

22 hang people for horse stealing, used it to hang the

23 witches.

24 Q. The what?

16

1 A. Witches.  And they used it to hang black

2 people in the South.

3 Q. When did you become aware of each of

4 those, if you know, each of those symbols?

5 MS. DAMON:  In his life?

6 MS. SAPIRSTEIN:  In his life.  If you

7 know.  If you don't know, you don't know.

8 MS. DAMON:  Objection.

9 THE WITNESS:  When I went to school.

10 Q. (By Ms. Sapirstein)  High school?

11 A. Yes.

12 Q. Are you a member of the Union, the

13 bargaining unit?

14 A. Yes.

15 Q. What unit is that?

16 A. 317.

17 Q. 317?

18 A. 371.

19 Q. What is it, Commercial Food Workers?

20 A. Yes.

21 Q. Did anything else happen that day?

22 A. No, ma'am.

23 Q. Regarding that incident?

24 A. No.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 04-30072-KPN
Pages 1-50

JOSEPH ROSEMOND

vs.

STOP AND SHOP SUPERMARKET COMPANY

**ORIGINAL**

------------------------------------------------
**DEPOSITION OF:  JERAMIE RANKEN**
------------------------------------------------

Taken before Joanne Coyle, Certified
Shorthand Reporter, Notary Public, pursuant
to the Federal Rules of Civil Procedure, at
the offices of Sapirstein & Sapirstein,
P.C., 1341 Main Street, Springfield,
Massachusetts on December 9, 2004,
commencing at 10:45 a.m.

Joanne Coyle
Certified Shorthand Reporter
License No. 106693

**PERLIK and COYLE REPORTING**
Certified Professional Reporters

1331 Main Street
Springfield, MA 01103
Tel. (413) 731-7931     Fax (413) 731-7451

**EXHIBIT #5**

**PERLIK and COYLE REPORTING**

# JOSEPH ROSEMOND vs. STOP AND SHOP SUPERMARKET COMPANY
## JERAMIE RANKEN          December 9, 2004

**9**

1  Q.  And then you came back to Massachusetts?
2  A.  Yes.
3  Q.  Where did you work after that?
4  A.  After that, I worked at Bradley's for a
5  brief period.  It was maybe two or three months.
6  Q.  What did you do there?
7  A.  Same thing -- just unloading, loading
8  trucks, docking, and stuff like that.
9  Q.  Why did you leave Bradley's?
10  A.  I got a better job for my uncle.  I was
11  a dental technician for Concept Dental on Chicopee
12  Street.  That I did for about three years.
13  Q.  Why did you leave there?
14  A.  Well, it's hard to work for family.  It
15  was just a conflict of interest so I wound up
16  leaving there and went to -- I started working at
17  C & S.
18  Q.  You say conflict of interest.  You mean
19  a personality conflict?
20  A.  Yes.  My uncle was a very difficult
21  person to work with, not very loyal or reasonable
22  for certain aspects.
23      When you've got a family member that
24  you're trying to help out, but you're also taking

**10**

1  advantage type thing.
2  Q.  What did you do at C & S?
3  A.  I selected.
4  Q.  How long were you there?
5  A.  I was there for a year and a half, maybe
6  a little over that.
7  Q.  Why did you leave there?
8  A.  It's a really good job.  You can make a
9  lot of good money there but for every way to make
10  money, there are ten ways working against you
11  making money.  They tell you you're doing
12  something one way and then the next day you can't
13  do that.
14      It's a very -- they set it up in an
15  extreme environment to where everybody is at
16  everybody's throats and that way everybody is
17  making money, picking faster, getting stuff done
18  faster because it's just pumping out the product
19  to get it to stores and stuff like that.  I didn't
20  really like working in those types of environments
21  after a while.  Tension is high and the work is
22  very long hours and the work is very hard.
23      It wasn't the work that bothered me.  It
24  was just the environment because I wanted to work

**11**

1  with people that I got along with and liked going
2  to work and had no personality conflicts or any
3  type of physical situations going on and stuff.
4      A lot of times it wound up getting like
5  that because everybody -- the way it works there
6  is you pick up boxes.  Every box is like ten
7  cents.  Everybody gets paid as a team.  If
8  somebody is not picking enough, then you're taking
9  money away from the team and then they start
10  dogging that person about it.  It's very militant,
11  very difficult to deal with at times so I just got
12  tired of it and left.
13  Q.  Where did you go then?
14  A.  To Stop & Shop.
15  Q.  Do you know about when that was?
16  A.  This July 8th, it will be three years.
17  Q.  So July of 2002?
18  A.  Yes.
19  Q.  What position did you have when you
20  started at Stop & Shop?
21  A.  I was part time meat.  I pretty much
22  stocked shelves but because I came from C & S, I
23  was in the mode of getting an extreme lot of work
24  done very, very fast.  I would come in.  I would

**12**

1  do what they call the HO and stuff like that.
2  Nobody really knows what the definition of HO is
3  but I'd do that, bring in the meat load, check it
4  in, do the freezers.
5      I'd get like an obscene amount of work
6  done in like four hours and two months after being
7  there, I made -- they promoted me to full time.
8  Q.  Who was your supervisor?
9  A.  The store manager was Michael Leach.  My
10  meat manager was Stan Kaletta.
11  Q.  Do you still hold that same position,
12  today?
13  A.  No; I am a three-to-midnight seafood
14  clerk now.
15  Q.  Did you hold any positions in between
16  full time meat and what you have now?
17  A.  When I was part time meat I got
18  promoted, I got promoted to three-to-midnight food
19  clerk but that was just a formality to make me
20  full time because they needed an actual position
21  in order to make me full time to get me into the
22  store all the time.
23      When I was in the Chicopee store, I
24  didn't do just that, I did everything.  I was

**13**

1 pretty much a utility person just because I could
2 get everything done.
3    Q.   How long were you in the Chicopee store?
4    A.   Two years.
5    Q.   Until last summer?
6    A.   Yes -- or actually, just before New
7 Year's.
8    Q.   December of 2003?
9    A.   Yes.
10    Q.   What store are you in now?
11    A.   Boston Road.
12    Q.   Is that the store you went to in
13 December of 2003?
14    A.   Yes.
15         MS. SAPIRSTEIN:  Can we go off the
16 record for a minute?
17         (Discussion off the record.)
18    Q.   (BY MS. SAPIRSTEIN)  What's your
19 position in the Boston Road store?
20    A.   Three to midnight seafood clerk.
21    Q.   Same position?
22    A.   Yes.
23    Q.   Why did you transfer?
24    A.   I was forcefully transferred because I

**14**

1 was suspended for two weeks for an incident and
2 when I got my job back, they said we're going to
3 put you back to work but we're not going to put
4 you back to work in that store.  We're going to
5 move you.
6    Q.   We'll get to that in a minute.  Just
7 some more background so we are kind of moving
8 along on the same path.
9         Was Stan Kaletta your only supervisor in
10 Chicopee?
11    A.   There was one under him, Jeff Conboy.
12 He was the lead seafood clerk so technically he
13 was above me and Stan was above him.
14    Q.   Do you know how many people Stan
15 supervised?
16    A.   Anywhere from eight to ten people.
17    Q.   Other than this incident where you were
18 suspended and then transferred, were you ever
19 disciplined by Stop & Shop?
20    A.   I was written up once because a customer
21 came in during the summertime without a shirt on
22 and it's a no shirt, no shoes, no service.  It's
23 public food, open food type thing.
24         I was off the clock and I said something

**15**

1 and the customer got upset about it because
2 somebody was telling him, you know, you can't wear
3 a shirt in a public -- we serve food here, you
4 can't do that.  I got written up for that because
5 I was off the clock and saying -- it wasn't my
6 position to say something.
7         It was -- I was supposed to notify
8 somebody to say there's a customer in the store
9 with no shirt on so I was written up for that.
10 That was the only thing.
11    Q.   Do you remember what you said to the
12 customer?
13    A.   I said, "You do realize you're in a
14 public food serving place; you're not supposed to
15 be in here without a shirt on" -- and he got upset
16 about it.
17         I was arranging time off and I went into
18 the meat room to talk to Stanley about it and
19 apparently like he started getting even more upset
20 because he assumed that I walked away from it as
21 if I was just brushing it off or whatever but I
22 thought it was resolved because he had walked over
23 to the deli and when I was in there, he apparently
24 went back over to Seafood, starting yelling at

**16**

1 Jeff and then Jeff called Marcy Wutka down and
2 this turned into a huge screaming match.
3         When I came out, I didn't think it went
4 that big but apparently there was a lot of yelling
5 and he was a little bit upset.
6    Q.   You got written up?
7    A.   Yes.
8    Q.   Do you know Joseph Rosemond?
9    A.   Yes; I do.
10    Q.   How long have you known him?
11    A.   I don't think he was in the store when I
12 started.  I'm not entirely positive about that.
13 It was longer than a year.
14    Q.   You knew him through work?
15    A.   Yes.
16    Q.   Did you ever see him outside of work?
17    A.   No; we would talk about going out for
18 drinks and stuff like that but we never really
19 actually -- it was just -- it's too busy.
20 Everybody's got a lot of stuff on their mind in a
21 store like that.
22    Q.   What do you mean?
23    A.   Well, there's a lot of work and not
24 enough people to do the work.

21

1   even know why we put it up.
2       Q.   That was going to be my next question.
3       A.   I mean, it was early in the morning.  In
4   the meat room, we have a very lax, very guy
5   environment, like behind the door -- the closed
6   doors and stuff.  We play jokes on each other,
7   like do stupid things and stuff like that, pranks
8   and stuff, just to lighten the environment, like
9   holidays and stuff, whenever people are trying to
10  get stuff done.
11          People and higher-ups and specialists
12  and district managers aren't happy with us and
13  stuff like that.  It's a lot of strain on you so
14  we just kind of like try to lighten each other up
15  and stuff like that so it's easier to come into
16  work without having to be stressed out about
17  everything.
18          In that instant, I think that's what it
19  was but it was outside of the meat back room.
20  There wasn't -- we didn't have any -- it was
21  just -- it was early in the morning.  It was
22  there.  I think there was no -- there was nothing
23  behind it because -- I mean, when I saw it, I
24  didn't think anything of it.  I was just all

22

1   right, whatever.
2           When we did it -- when we went
3   downstairs -- nobody thought anything about it for
4   like almost three days to -- three or four days
5   before we actually heard anything about it.  When
6   we heard about it, it was huh?  Because nobody had
7   said or done anything up until that point.  I
8   mean, I don't really -- I can't really give you a
9   reason why it was hung because there was no reason
10  why it was hung.
11          It was just, looking back, I most
12  definitely wouldn't have done it and I would have
13  slapped the hand of anybody who would have done it
14  because it definitely caused a lot more problems
15  and feelings that like just shouldn't -- nobody
16  would have to deal with.
17          MS. SAPIRSTEIN:  Can we mark this,
18  please?
19          (Plaintiff's Deposition Exhibit
20              No. 1 offered and marked.)
21      Q.   (BY MS. SAPIRSTEIN)  Did you and
22  Mr. Ingalls have any discussion while you were
23  hanging the noose?
24      A.   Not really.

23

1       Q.   Not at all?
2       A.   I don't recall exactly.  If we were
3   talking about anything, it was probably what we
4   had to get done for the day -- like what he had to
5   start doing.  The idle conversation, like right up
6   until we punch in, when we punch in, it winds up
7   being all business.
8           It would probably would have been
9   something like all right Charlie, when I get down
10  there I'm going to set it up and then I'll hit the
11  HO.
12      Q.   You had already punched in at this time?
13      A.   No.
14      Q.   You hadn't?
15      A.   No.
16      Q.   You went down and punched in later?
17      A.   The time clock is like right in the
18  room.  When the rope was hung, we went and punched
19  out and then went downstairs.
20      Q.   Did you know whether Marcy Wutka was on
21  vacation during that time?
22      A.   Yes.
23      Q.   You knew she was?
24      A.   Yes.

24

1       Q.   Did you know whether Joseph Rosemond was
2   on vacation during that time?
3       A.   No; he wasn't.
4       Q.   Were you, at the time, familiar with the
5   historical significance of a noose?
6       A.   Well, that depends on which historical
7   significance you're talking about.
8       Q.   Were you familiar with any historical
9   significance of a noose?
10          MS. DAMON:  Objection; you can go
11  ahead and answer.
12          THE WITNESS:  Yes.
13      Q.   (BY MS. SAPIRSTEIN)  What historical
14  significance did it have -- were you aware of?
15      A.   Well, I know that in the Old West
16  whenever a gunman or somebody robbed banks or
17  something, their extreme measurement was to hang
18  somebody or in the old -- their version of the
19  death penalty, whenever you went to jail for
20  something, there was hangings -- public hangings.
21          Then there was the post civil rights,
22  they used to hang African-Americans because they
23  weren't liked or...
24      Q.   I don't want to interrupt you.  Are you

## 29

1   When I went upstairs, it's not really
2   the vibe that I got, but when I had found out
3   about it, they had it -- they were treating it as
4   it was a direct threat to Marcy.
5       Q.   To Marcy?
6       A.   Wutka, who was on vacation, but she was
7   there on that day because they had called her in.
8       Q.   The day it was done?
9       A.   No; the day that everybody was in there
10  and doing the investigation of it, seeing what was
11  going on.
12      Q.   When you say you were called in, where
13  were you called to?
14      A.   The upstairs office.
15      Q.   That same office?
16      A.   No; it was the manager's office.  It's
17  the next one -- like the next one over down the
18  hall.
19      Q.   Who was there?
20      A.   I don't recall specific names.  I just
21  know that it was a female behind the desk, a male
22  who was sitting to my right and then Marcy was
23  there, I believe.
24      Q.   Did anybody say anything to you when you

## 30

1   came up?
2       A.   Well, when I went in, they closed the
3   door and they asked me if I knew about the
4   incident -- the noose and stuff like that.  I said
5   yeah, why?  They were like well, do you have any
6   idea who hung it and stuff.  I'm like well, yeah,
7   me and Charlie did it, just goofing off.
8            I wasn't going to lie about it.  I mean
9   it was -- we didn't mean anything by it so I
10  wasn't going to deny anything.  They asked me if I
11  had any animosity against Marcy.  I said no,
12  because above -- more than anybody in the store, I
13  respect Marcy the most because she's very up
14  front, very outspoken and very to the point.  She
15  doesn't beat around the bush and she tells you how
16  it is.  I respect that more than anything.
17           Plus, if I had a problem with somebody,
18  I'm the type of person that would just go and tell
19  them or talk about it.  I don't do like cowardly
20  acts, stuff like that.  It's just petty.  If I
21  have a problem with someone, I'll just go and talk
22  to them about it and get it out of the way up
23  front.
24      Q.   My question was: Did anybody say

## 31

1   anything to you?
2       A.   I'm sorry.
3       Q.   The answer was yes?
4       A.   Yes.
5       Q.   So you said that you knew something
6   about it, that it was you and Charlie?
7       A.   Yes.
8       Q.   Was that the end of the conversation?
9       A.   No; they went into describing in detail
10  what happened that day, why we did it.
11      Q.   And what did you tell them?
12      A.   I went through point A of the morning to
13  point B of when I was up there -- you know, me and
14  Charlie and Stan came in all together.  Stan
15  stopped, looked through the paper, we went
16  upstairs.  Me and Charlie were talking about
17  something -- I couldn't remember what.  Charlie
18  started to put it up in the ceiling.  I poked up
19  the tile and put it down.  Stan came upstairs and
20  said oh, who's the comedian, we all punched in and
21  went downstairs.
22      Q.   And you left the noose hanging, right?
23      A.   Yes.
24      Q.   Was that the end of the discussion on

## 32

1   that day?
2       A.   No; they said that I was suspended
3   pending investigation.
4       Q.   Was that with or without pay?
5       A.   Without pay.
6       Q.   How long were you out on suspension?
7       A.   Two weeks.
8       Q.   Did you have any communication with the
9   store or anybody from Stop & Shop during that
10  period?
11      A.   Halfway through -- a week through -- we
12  went -- me and Charlie had to go in with a union
13  representative to go over the details of it again.
14      Q.   Who was the union representative?
15      A.   I don't recall his name.  I can't
16  remember his name.
17      Q.   Are you covered by a collective
18  bargaining agreement?
19      A.   Excuse me?
20      Q.   Are you covered by a collective
21  bargaining agreement -- by a union contract?
22           MS. DAMON:  Are you a union member?
23           THE WITNESS:  Yes.
24      Q.   (BY MS. SAPIRSTEIN)  You said you went

33

1  in to a meeting with Charlie and the union
2  representative and who else?
3      A.   And all of the same people that were
4  there before.
5      Q.   But you don't remember any of their
6  names?
7      A.   No.
8      Q.   Do you remember their positions?
9      A.   I know that they had went to Boston for
10  it.  There's different districts.  There's the
11  Connecticut division, which is us.  That's what we
12  fall under; and then there's the Boston sales
13  division -- the Boston area falls under that.
14  It's under two different unions but they cut out
15  everybody in our division -- like Kathy Collins,
16  our district manager and stuff and they went
17  straight to Boston.
18          I assume the Stop & Shop as a whole is
19  based there and they brought in all the higher-ups
20  from there.
21      Q.   How many people were there?
22      A.   Three, I believe.
23      Q.   What was the substance of the discussion
24  at that meeting?

34

1      A.   Pretty much the same thing.  Why we did
2  it, what was the intention behind it, asking you
3  do realize that the company does not accept this
4  type of behavior and so on.
5          It's just like -- they were just
6  investigating the situation and stuff.
7      Q.   Were you told at that time what your
8  discipline was going to be?
9      A.   We were already suspended at that point,
10  so, no, they didn't -- we had asked if we were
11  going to be able to get our jobs back and they
12  said it's still under investigation; we don't
13  know.
14      Q.   You were still on suspension after this
15  meeting?
16      A.   Yes; for another week.
17      Q.   Then what happened after that week --
18  first of all, during that week, did you have any
19  contact with anybody at the Stop & Shop?
20      A.   I would have to call -- the only people
21  that I actually talked to were Stan and Charlie.
22  I talked to Stan to see how he was doing.
23          Charlie, he comes off as a big bear but
24  he's really like a teddy bear.  He worries about

35

1  everything, wants to make sure everything is done
2  and stuff like that.  He was really upset about
3  it.  He was worried that people like perceived him
4  as this big evil guy and his wife would call me
5  and ask me to talk to him.  I'm like -- I'd call
6  him and say Charlie, look, it's okay, it will be
7  all right, don't worry about it.
8          For the first week I didn't even get out
9  of bed because I couldn't believe -- these people
10  that I work with, it's a second family type thing,
11  to think that I did anything with the intention to
12  hurt somebody.  I'd have to -- but those are the
13  only two people that I really had any contact
14  with.  Nobody inside the store or occasionally --
15  actually; no.
16          The only time that I would talk to the
17  union representative was when we had to go to a
18  meeting.  It was only the second time that we had
19  a meeting with them and then the last meeting when
20  we actually got our jobs back.
21      Q.   Was Stanley put on suspension?
22      A.   No; they wanted to because he was the --
23  he was a department manager in the building and he
24  was supposed to discipline us, but he didn't think

36

1  anything of it either because that was the type of
2  environment.
3          They wanted to suspend him but they
4  couldn't or they didn't and -- well, no.
5      Q.   How do you know they wanted to suspend
6  him?
7      A.   Just by talking -- like I think it might
8  have been afterwards that I had talked to people
9  in the store, like after we had actually got our
10  jobs back.
11          When we went back the second time and
12  Stan was still working and like with the union
13  rep, we got there early, we walked around the
14  store, just said hi to everybody, how's it going
15  and ran across Stan.  Stan said that they wanted
16  to suspend him, too.  I think one of the grocery
17  managers told me that they wanted him, too.
18      Q.   They wanted him, too?
19      A.   Yes.
20      Q.   We talked about the first meeting, which
21  was three to four days after the incident
22  occurred?
23      A.   Yes.
24      Q.   You talked about the second meeting,