1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 04-30072-KPN
Pages 1-66

JOSEPH ROSEMOND

vs.

STOP AND SHOP SUPERMARKET COMPANY



---
**DEPOSITION OF:   CINDY FLANNERY**
---

Taken before Joanne Coyle, Certified
Shorthand Reporter, Notary Public, pursuant
to the Federal Rules of Civil Procedure, at
the offices of Sapirstein & Sapirstein,
P.C., 1341 Main Street, Springfield,
Massachusetts on FEBRUARY 2, 2005,
commencing at 10:00 a.m.

Joanne Coyle
Certified Shorthand Reporter
License No. 106693

**PERLIK and COYLE REPORTING**
Certified Professional Reporters

1331 Main Street
Springfield, MA 01103
Tel. (413) 731-7931     Fax (413) 731-7451

EXHIBIT #6

**PERLIK and COYLE REPORTING**

**Page 33**

1  A. Yes.
2  Q. Now you asked Marcy Wutka to come into
3  the office at some point during the interview with
4  Mr. Ranken?
5  A. That was after he admitted hanging it.
6  Q. Why did you do that?
7  A. Because we were going to suspend him.
8  Q. Why did you have Ms. Wutka there while
9  you were going to suspend him?
10 A. She was the manager of the store. She
11 was running the store at the time.
12 Q. Was it your decision to suspend
13 Mr. Ranken?
14 A. No.
15 Q. Whose decision was it?
16 A. Basically I spoke to Brenda Broad and
17 some people on the phone.
18 Q. During the course of these interviews?
19 A. Yes; these interviews.
20 Q. Can you tell me about the conversation
21 you had with Brenda Broad?
22 A. Basically what's in here, what was
23 brought forward. That's what I brought forward to
24 them.

**Page 34**

1  Q. So you told them what happened?
2  A. Mmm-hmm.
3  Q. And then -- who is "them"?
4  A. Well, I believe -- and I can't recall
5  everybody on the phone -- Don Barsolou was on the
6  phone, Brenda Broad, and Al Cave.
7  Q. Can you tell me the conversation, to the
8  best of your knowledge?
9  A. This was a very sensitive matter and we
10 basically needed to react and find out why it was
11 done and if it was vicious or not.
12 Q. That's what you talked about during the
13 conversation?
14 A. Yes; and basically what we were going to
15 do. I mean, as far as suspending these people.
16 Q. Who suggested suspending them?
17 A. I really can't recall. I mean, there
18 were numerous people on the line but that was the
19 direction I was given.
20 Q. Do you recall who gave you that
21 direction?
22 A. I don't want to guess but --
23 Q. (Interposing) Well, I just want your
24 recollection. If you don't recall, you don't

**Page 35**

1  recall?
2  A. I don't recall.
3  Q. Did you make any suggestions as to what
4  the discipline should be?
5  A. I brought the facts forward and this is
6  where --
7  Q. (Interposing) Right; but did you make
8  any recommendations? Did you say I think we
9  should --
10 A. (Interposing) I might have said suspend
11 them. I think we should suspend them.
12 Q. Did you think they should be terminated?
13 A. That wasn't my decision to make.
14 Q. I understand that but I'm asking what
15 you thought?
16 A. What I thought?
17 Q. Yes.
18 A. If they should be terminated?
19 Q. Right.
20 A. I mean, I would have had to see if they
21 had any similar cases to this, what the outcome
22 was.
23 Q. Whether who had any similar cases?
24 A. The company had a similar case to this.

**Page 36**

1  Q. So you had no opinion at the time as to
2  whether anybody should be terminated?
3  A. No.
4  Q. Back in December of 2003, what kinds of
5  offenses were subject to immediate termination?
6  A. What kind of offenses?
7  Q. Yes.
8  A. Sexual offenses.
9  Q. What do you mean, sexual offenses?
10 Sexual harassment?
11 A. Harassment; yes. Stealing -- people
12 that got caught stealing. That's what I dealt
13 with.
14 Q. Do you recall if anyone on the phone
15 conversation -- anyone who was participating --
16 suggested that Mr. Ranken be terminated?
17 A. I can't recall that.
18 Q. To the best of your recollection, it was
19 Brenda Broad, Don Barsolou, Allan Cave, and you?
20 A. And Scott Ziter. Scott Ziter was in the
21 room.
22 Q. After you spoke to Mr. Ranken, you
23 called Mr. Ingalls back in?
24 A. Yes.

**Page 53**

1 Q. In Chicopee?
2 A. I'm not sure what store, if it was
3 Chicopee.
4     I mean, during her career she was a
5 perishable manager and she worked with him.
6 Q. Worked with him?
7 A. Yes.
8 Q. How about Mr. Miller?
9 A. George was a perishable manager in the
10 Hadley store and he could have been the store
11 manager and Charles worked under him.
12 Q. How about Mr. Kertenis?
13 A. Yes; East Longmeadow store.
14 Q. How would he know Mr. Ingalls?
15 A. Basically he worked for Paul.
16 Q. He worked for what?
17 A. He worked with Paul. Paul was the store
18 manager.
19 Q. For Chicopee?
20 A. Yes; during his career.
21 Q. How about Ms. Miner?
22 A. She's a store manager in our Agawam
23 store.
24 Q. She would have worked with Mr. Ingalls

**Page 54**

1 in another store as well?
2 A. Yes; or he could have worked with them.
3 Q. How did you get the list of these
4 individuals to talk to?
5 A. I think probably from basically his file
6 as far as being transferred from store to store.
7 Q. From Mr. Ingalls's file?
8 A. Mmm-hmm.
9 Q. Did anyone ask you to do this?
10 A. Yes.
11 Q. Who?
12 A. Brenda Broad.
13 Q. She said talk to other people and see --
14 A. (Interposing) Yes; we needed to see what
15 kind of characteristics these guys had.
16     MS. SAPIRSTEIN: I want to take a
17 short break.
18     (A recess was taken.)
19     MS. SAPIRSTEIN: Can you mark this
20 for me, please?
21     THE WITNESS: Can I just say
22 something on this. This is for Jeramie and
23 Charles, right?
24 Q. (BY MS. SAPIRSTEIN) I don't know.

**Page 55**

1 A. No; I want to make sure you know that --
2 that it is on the both of them.
3     MS. SAPIRSTEIN: Now if we could
4 mark that, please?
5     (Plaintiff's Deposition Exhibit
        No. 3 offered and marked.)
6
7 Q. (BY MS. SAPIRSTEIN) I'm going to hand
8 you what's been marked as Exhibit 3.
9     Can you tell us what that is, please?
10 (Indicating.)
11 A. That's the 191.
12 Q. That's the corrective action sheet?
13 A. Yes.
14 Q. And that's for Mr. Kaletta?
15 A. Yes.
16 Q. Is that your signature that appears on
17 the bottom?
18 A. Yes.
19 Q. And Mr. Kaletta's signature?
20 A. Yes.
21 Q. Who is the bottom one?
22 A. Marcy's.
23 Q. Whose writing is in the "Explain Actions
24 Fully" section?

**Page 56**

1 A. Mine.
2 Q. I just want to make sure I can read it
3 all. When it says, "He basically" -- can you read
4 the rest of it for me?
5 A. It says, "He basically looked the other
6 way on this incident. He needs to understand that
7 the company doesn't condone this kind of
8 behavior."
9 Q. And you gave a copy of this to
10 Mr. Kaletta?
11 A. We put it in his file.
12 Q. In his file?
13 A. Yes.
14     MS. SAPIRSTEIN: Can you mark this,
15 please?
16     (Plaintiff's Deposition Exhibit
        No. 4 offered and marked.)
17
18 Q. (BY MS. SAPIRSTEIN) I'm going to hand
19 you what's been marked as Exhibit 4. Do you
20 recognize that? (Indicating.)
21 A. Mmm-hmm.
22 Q. What is it?
23 A. It is just like a 191 and they are
24 called Corrective Counseling Forms. It replaces

Case 3:04-cv-30072-MAP    Document 56-3    Filed 04/26/2006    Page 4 of 19

JOSEPH ROSEMOND vs. STOP AND SHOP SUPERMARKET COMPANY
CINDY FLANNERY                    FEBRUARY 2, 2005

**Page 61**

1 involvement with the case at all once you issued
2 these?
3     MS. DAMON: Other than what she's
4 testified to, because she's testified to the
5 sensitivity training and I think that was after.
6     THE WITNESS: Right.
7   Q. (BY MS. SAPIRSTEIN) Other than setting
8 up the sensitivity training?
9   A. Not that I can recall; no.
10  Q. When you went up to investigate this
11 incident, did you have any understanding of the
12 significance of what a noose is?
13  A. Did I?
14  Q. Did you -- when you went up to
15 investigate this incident, did you have any
16 understanding as to the significance of a noose?
17  A. Of what it meant, is that what you're
18 trying --
19  Q. (Interposing) Correct.
20  A. Yes; it means different things to
21 different people.
22  Q. What's your understanding of the
23 significance of a noose?
24  A. Well, I mean --

**Page 62**

1   Q. (Interposing) I'm asking you,
2 personally?
3   A. Personally, I could remember as a kid,
4 you know, with the rope in the yard swinging
5 around playing cowboys and Indians.
6     I think of a noose, somebody hanging
7 themselves, committing suicide, and it could be a
8 racial thing.
9   Q. What's your understanding of how it
10 could be a racial thing?
11  A. Just how people were hung.
12  Q. Black people?
13  A. Yes; black people.
14  Q. Do you have any other notes or any other
15 writings regarding this incident that you haven't
16 seen today that you personally took?
17  A. I don't have any notes; no.
18  Q. No notes, no other e-mails?
19  A. No -- from what you showed me today?
20  Q. Other than what I've shown you today, do
21 you have any other e-mails regarding this
22 incident?
23     MS. DAMON: This particular
24 incident?

**Page 63**

1     MS. SAPIRSTEIN: This particular
2 incident -- well, by this particular incident, I
3 mean your investigation, your conversations, this
4 whole particular incident.
5     MS. DAMON: You've given me
6 everything that you have?
7     THE WITNESS: Yes.
8   Q. (BY MS. SAPIRSTEIN) How about memos?
9 Are there any other memos?
10  A. Hold on, can I take a break?
11    MS. SAPIRSTEIN: Sure.
12    (A recess was taken.)
13    MS. DAMON: Could you read back the
14 last question so the witness can be accurate?
15    (Reporter read back as
            requested.)
16
17    THE WITNESS: No, there were no
18 other memos.
19  Q. (BY MS. SAPIRSTEIN) How about notes?
20  A. No.
21  Q. Any other correspondence?
22  A. No.
23  Q. Any other reports?
24  A. Not that I can recall; no.

**Page 64**

1     MS. SAPIRSTEIN: Then I think we're
2 all set.
3     THE WITNESS: I want to go back.
4 Can I go back?
5   Q. (BY MS. SAPIRSTEIN) Yes.
6   A. The people that were suspended --
7     MS. SAPIRSTEIN: (Interposing)
8 Ingalls and Ranken.
9     THE WITNESS: Those two people were
10 removed as a result of the case.
11  Q. (BY MS. SAPIRSTEIN) But not Kaletta?
12  A. No.
13  Q. Although he was ultimately moved?
14  A. Yes; I just wanted to clear that up.
15    MS. SAPIRSTEIN: Okay.
16    MS. DAMON: I have nothing.
17    (The deposition was concluded.)
18    *****

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 04-30072-KPN
Pages 1-43

JOSEPH ROSEMOND

vs.

STOP AND SHOP SUPERMARKET COMPANY  

----------------------------------------------------
**DEPOSITION OF:   STANLEY KALETTA**
----------------------------------------------------

Taken before Joanne Coyle, Certified
Shorthand Reporter, Notary Public, pursuant
to the Federal Rules of Civil Procedure, at
the offices of Sapirstein & Sapirstein,
P.C., 1341 Main Street, Springfield,
Massachusetts on 01/11/2005, commencing at
10:50 a.m.

Joanne Coyle
Certified Shorthand Reporter
License No. 106693

**PERLIK and COYLE REPORTING**
Certified Professional Reporters

1331 Main Street
Springfield, MA 01103
Tel. (413) 731-7931     Fax (413) 731-7451

EXHIBIT #7

**PERLIK and COYLE REPORTING**

Case 3:04-cv-30072-MAP    Document 56-3    Filed 04/26/2006    Page 6 of 19

JOSEPH ROSEMOND vs. STOP AND SHOP SUPERMARKET COMPANY
STANLEY KALETTA          01/11/2005

Page 5

1  STANLEY KALETTA, the Deponent, having been
2  satisfactorily identified by the production of his
3  driver's license and having been first duly sworn
4  by the Notary Public, deposes and says as follows:
5              *****
6       DIRECT EXAMINATION BY MS. SAPIRSTEIN
7    Q.  Can you state your full name for the
8  record, please?
9    A.  Stanley M. Kaletta -- K-A-L-E-T-T-A.
10   Q.  Mr. Kaletta, my name is Tani Sapirstein.
11  I'm going to be asking you some questions today
12  about Mr. Rosemond's case against Stop & Shop.  If
13  you don't understand a question, can you let me
14  know that?
15   A.  Sure.
16   Q.  If you want to take a break at any time,
17  can you let me know that as well?
18   A.  Sure.
19   Q.  What's your current address,
20  Mr. Kaletta?
21   A.  5 Little Street, Easthampton, Mass.
22   Q.  Are you on any medication that would
23  prevent you from understanding and responding to
24  my questions?

Page 6

1    A.  No.
2    Q.  Have you had your deposition taken
3  before?
4    A.  Once before.  I had done one for an
5  accident that happened in the Chicopee store.
6  That was a few years ago -- a couple of years ago,
7  anyway.
8    Q.  Did you do anything to prepare for
9  coming here today?
10   A.  Not really.
11   Q.  Can you briefly describe your
12  educational background, please?
13   A.  Sacred Heart Grammar School, Easthampton
14  High School and from there I went to the National
15  School of Meat Cutting out in Toledo, Ohio and
16  worked previously with the Local 371.
17       Prior to that, I worked for Big Y Foods
18  and went to Stop & Shop in 1979.
19   Q.  So you joined Stop & Shop in 1979?
20   A.  Right.
21   Q.  What was your position?
22   A.  I started off as a full-time meat cutter
23  and a couple of months later I was promoted to
24  head meat cutter and within a year, I became a

Page 7

1  meat manager.
2    Q.  So you've been a meat manager since the
3  early eighties?
4    A.  About twenty-five years.  With the
5  company, I'll be starting my twenty-seventh year
6  January 22nd.
7    Q.  What are the duties of a meat manager?
8    A.  To oversee the meat and the Seafood
9  Department, ordering, scheduling, just delegation
10  of work for the employees that are there.
11  Seafood, we didn't have back then but now it's a
12  subdepartment.
13       We have someone who runs the seafood but
14  I oversee the orders and the scheduling, the
15  ordering.  Basic overall department, receiving.
16   Q.  Do you supervise any individuals in your
17  position as meat manager?
18   A.  Union employees that are underneath me.
19  Belchertown is a smaller store, but if I had an
20  assistant, head cutter, assistant meat manager,
21  when I'm not there, he would take over for me and
22  just wrappers, meat wrappers, case people,
23  cleaners.
24   Q.  You are no longer at the Chicopee store?

Page 8

1    A.  No; I'm not.
2    Q.  When you were at the Chicopee store,
3  about how many employees did you supervise?
4    A.  I want to say roughly ten or twelve.
5    Q.  Was one of them Jeramie Ranken?
6    A.  Yes.
7    Q.  Is your position as meat manager an
8  exempt position at Stop & Shop?
9    A.  No; it's not.
10   Q.  At the Chicopee store, who did you
11  report to?
12   A.  Marcy Wutka was their perishable
13  manager.  She would be next in line and then Brian
14  Whalen was the store manager.  Prior to him, it
15  was Michael Leach.
16       We also have specialists, trainers that
17  are district supervisors overall in the store.
18  That's the chain of command.
19   Q.  The Chicopee store, when you were the
20  meat manager, were you considered to be part of
21  management?
22   A.  Not the exempt team but a department
23  manager.
24   Q.  Did you used to have -- did the store

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 04-30072-KPN
Pages 1-130

JOSEPH ROSEMOND

vs.

STOP AND SHOP SUPERMARKET COMPANY

---

**DEPOSITION OF: JOSEPH ROSEMOND**

---

Taken before Joanne Coyle, Certified Shorthand Reporter, Notary Public, pursuant to the Federal Rules of Civil Procedure, at the offices of Sapirstein & Sapirstein, P.C., 1341 Main Street, Springfield, Massachusetts on November 4, 2004, commencing at 10:30 a.m.

Joanne Coyle
Certified Shorthand Reporter
License No. 106693

**PERLIK and COYLE REPORTING**
Certified Professional Reporters

1331 Main Street
Springfield, MA 01103
Tel. (413) 731-7931    Fax (413) 731-7451

**EXHIBIT #8**

PERLIK and COYLE REPORTING

**Page 37**

1  You were a little bit late, is that
2  right?
3  A. Yes.
4  Q. Tell me what happened then.
5  A. I walked upstairs to my office, got to
6  the top of the stairs and I saw a rope hanging
7  from the ceiling.
8  Q. Your office was a shared office,
9  correct?
10 A. Yes; with Marcy.
11 Q. I'm going to give you a piece of paper
12 and I'm going to ask you to draw what the office
13 looked like, if you would?
14 A. What it looked like?
15 Q. Yes; and just put the desks in it.
16 A. (Witness drawing.)
17 Q. The manager's office as well?
18 A. His office is back here. There's a
19 payroll office here.
20 Q. A who?
21 A. Payroll office.
22      MS. DAMON: Let's mark this as
23 Defendant's 2.
24

**Page 38**

1      (Defendant's Deposition Exhibit
       No. 2 offered and marked.)
2
3  Q. (BY MS. DAMON) I'm going to ask you
4  some questions about your drawing, Mr. Rosemond,
5  but before I do, I just want to make sure I
6  understand the rest of the cast of characters in
7  the store at the time. Was there Loss Prevention
8  in the store?
9  A. Yes.
10 Q. Who was the Loss Prevention?
11 A. John Vey.
12 Q. Did you get along with him okay?
13 A. Yes.
14 Q. Who is Mary Downing?
15 A. John's boss.
16 Q. Was she in the store on occasion?
17 A. Yes.
18 Q. How do you know? Was her office there?
19 A. No; she didn't have an office there.
20 She just makes her rounds, I guess.
21 Q. But you knew who she was?
22 A. Yes.
23 Q. Did you get along with her?
24 A. Yes.

**Page 39**

1  Q. Any issues with either John or Mary in
2  terms of comments or actions that you believe were
3  discriminatory or harassing?
4  A. No.
5  Q. So you considered them to be trusted
6  co-workers?
7  A. Yes.
8  Q. Any other managers -- not lead clerks,
9  but managers that we have not talked about who
10 were in the store at the time? I think we
11 probably got everybody?
12 A. There's a lead clerk in every
13 department.
14 Q. But those are all unionized people,
15 correct?
16 A. Yes.
17 Q. Let's look at your diagram. The Loss
18 Prevention office was on this floor, too, correct?
19 A. That was on the other side of the
20 stairway.
21 Q. As I look at the diagram, you've got a
22 stairway coming up and if I know, most of the
23 Stop & Shop stores sort of look alike.
24      You come up the stairs and you can

**Page 40**

1  either go to the right or the left, correct?
2  A. Right.
3  Q. If you went to the left, there would be
4  the Security Loss Prevention office?
5  A. Yes; Security is over there and the File
6  Maintenance Office is over there.
7  Q. Then, if you went to the right, the
8  first room you came to is the office you shared
9  with Marcy, correct?
10 A. Right.
11 Q. That office looked out over the main
12 floor?
13 A. Right.
14 Q. You've drawn a picture here. It looks
15 as you came through the door, you would have seen
16 right in front of you the water cooler and the
17 opening that led back to Brian's office, correct?
18 A. Right.
19 Q. Then, as you came into the room, if you
20 looked a little to the right, you would see
21 Marcy's desk against the far wall and your desk up
22 against Marcy's, is that right?
23 A. Yes.
24 Q. You would -- in order to get to Brian's

Case 3:04-cv-30073-MAP   Document 56-3   Filed 04/26/2006   Page 9 of 19

| JOSEPH ROSEMOND vs. STOP & SHOP |
|---|
| JOSEPH ROSEMOND | NOVEMBER 4, 2004 |

**Page 41**

1 office, you would walk past the water cooler
2 down --
3    A.   (Interposing) Down the hall.
4    Q.   -- a small hall and then into his
5 office?
6    A.   Right.
7    Q.   Where were the computers and things that
8 you would work on in order to do some of your
9 tasks?
10   A.   In Brian's office.
11   Q.   You didn't have computers and that kind
12 of thing at your desk and Marcy's desk?
13   A.   No.
14   Q.   Did other people use your desk and
15 Marcy's desk during the day?
16   A.   Other people?
17   Q.   Trainers and people like that?
18   A.   No.
19   Q.   They are not shared desks? It was your
20 desk and Marcy's desk?
21   A.   Yes.
22   Q.   Was Marcy around on December 10th?
23   A.   No.
24   Q.   She was --

**Page 42**

1    A.   (Interposing) On vacation.
2    Q.   Had she been on vacation for a while?
3    A.   Yes.
4    Q.   Let's go back, then. You came up the
5 stairs and you came in and as you walked through
6 the door, you saw a rope hanging from the ceiling
7 next to the water cooler, is that right?
8    A.   Yes.
9    Q.   So the rope was between the water cooler
10 and Marcy's desk, is that correct?
11   A.   Yes.
12   Q.   What did you do then?
13   A.   I looked at it for a few minutes.
14   Q.   Was there anybody in the room with you?
15   A.   No.
16   Q.   Then what did you do?
17   A.   I went downstairs to the cash office to
18 speak with Jen Gatto because she would be the
19 first one in at six o'clock.
20       I asked her to come upstairs --
21 actually, I'm sorry. I called her in the cash
22 office and asked her to come upstairs. When she
23 came upstairs --
24   Q.   (Interposing) Let me stop you for a

**Page 43**

1 second. Was she an employee that you supervised?
2    A.   Yes.
3    Q.   All right. You didn't take it down.
4 The first thing you did was you called Jen, is
5 that right?
6    A.   Yes.
7    Q.   Why not just take it down?
8    A.   Because I wanted to ask her if she saw
9 that rope when she came in at six o'clock.
10   Q.   All right; go ahead. So she came up the
11 stairs?
12   A.   Yes.
13   Q.   Describe what happened then.
14   A.   She came up the stairs and I said Jen,
15 did you see that when you came in this morning;
16 and I thought she was going to faint. She said
17 no, she did not see it.
18   Q.   Then what did you do?
19   A.   I went in my desk and I took some
20 pictures.
21   Q.   You had a camera at your desk?
22   A.   Yes.
23   Q.   A Polaroid, I assume?
24   A.   Yes.

**Page 44**

1    Q.   Why did you have a camera at your desk?
2    A.   We'll, we have to have a camera. If
3 there's an accident in the store, you have to take
4 pictures. You have to have a camera available.
5    Q.   So you took a picture of the rope?
6    A.   Yes.
7    Q.   With Jen there?
8    A.   She was there.
9    Q.   Anybody else in the room?
10   A.   Just the two of us.
11   Q.   Now it's somewhere between
12 seven-fifteen, seven-thirty?
13   A.   Yes.
14   Q.   Then did you take the rope down?
15   A.   I took it down after that.
16   Q.   After you took the pictures?
17   A.   Yes.
18   Q.   So I understand, you come up about
19 seven-fifteen. How do you know it was seven-
20 fifteen, by the way?
21   A.   Because I was late.
22   Q.   So you, looking at the clock?
23   A.   I was supposed to be there for seven. I
24 wasn't any more than fifteen minutes late.

Case 3:04-cv-30072-MAP   Document 56-3   Filed 04/26/2006   Page 10 of 19

JOSEPH ROSEMOND vs. STOP & SHOP
JOSEPH ROSEMOND                                    NOVEMBER 4, 2004

**Page 77**

1  MS. DAMON: I'm just about done with
2  this.
3  MS. SAPIRSTEIN: I just wanted to
4  take a break. If you want to finish this section,
5  that's fine.
6  Q. (BY MS. DAMON) What did you do next
7  after this conversation with Mr. Whalen, the
8  second conversation?
9  A. What did I do?
10  Q. Yes.
11  A. I went back to work. I spoke with Mary
12  Downing later that morning. She told me what they
13  were doing.
14      She expressed her concern. She said
15  they were going to pull the tapes and see what
16  they could find. That was about it.
17  MS. DAMON: Let's take a break.
18      (A recess was taken.)
19  Q. (BY MS. DAMON) Mr. Rosemond, before we
20  break for lunch, I just want to go back to your
21  conversations with others in the company regarding
22  the rope.
23      Before we broke, you talked about
24  chatting with Mary Downing later that day, is that

**Page 78**

1  right?
2  A. Yes.
3  Q. To be sure we haven't forgotten
4  anything, after the second discussion with Brian
5  and Joe Vey --
6  A. (Interposing) John Vey.
7  Q. -- you go back, you're doing your job in
8  the store, and then what's the next thing that
9  happens with regard to the rope?
10  A. I don't think anything happened the rest
11  of that day.
12  Q. It is just a regular workday?
13  A. Yes. The next day, Scott Ziter was
14  there. He is the head of Security.
15  Q. For your region, for everything?
16  A. For the region, I guess. He works out
17  of North Haven.
18  Q. But he, in your view, he was Mary's
19  boss?
20  A. He was Mary's boss.
21  Q. When you got there the next day, was he
22  there?
23  A. He was there to talk to me; yes.
24  Q. So I'm clear, December 10, you have

**Page 79**

1  described for us all of the interactions you had
2  with Stop & Shop regarding the rope, is that
3  right?
4  A. Yes; to my knowledge, yes.
5  Q. So after the conversation with Brian and
6  John, you go about your workday and nothing else
7  happens that day with regard to the rope, as far
8  as you know?
9  A. As far as I know, nothing else happened.
10  Q. Now we're at the next day. You come in.
11  Do you remember what time you came in?
12  A. I don't remember. It had to be morning.
13  It had to be eight o'clock. Normally it is eight
14  to six.
15  Q. And Scott is there when you're there?
16  A. I don't remember if he was there when I
17  got there but I did speak with him that morning.
18  Q. He's somebody you knew?
19  A. I didn't know him personally. I just
20  knew who he was.
21      He did one of the seminars at the CSM
22  training.
23  Q. What was your conversation with him --
24  and again, as specifically as you can, what did

**Page 80**

1  you say and what did he say?
2  A. He told me they found out who that was.
3  He said that they interviewed -- I'm not even sure
4  if it was Thursday. I think it might have been
5  Friday. The tenth was on a Wednesday, I think.
6  December 10th, I believe, was a Wednesday. I
7  don't remember if I spoke with Scott Thursday or
8  Friday.
9      I'm thinking more now that it was Friday
10  because they wanted a day to pull the tapes and
11  talk to people.
12  Q. Did you go to work that next day?
13  A. Yes.
14  Q. You did?
15  A. Yes.
16  Q. Based on what you're remembering now, on
17  the tenth after the morning conversation, you go
18  back to work, you finish work.
19      The next day, Thursday, you may have had
20  a regular workday as well?
21  A. Yes.
22  Q. Then we're at the eleventh and I
23  understand you're not sure whether you spoke to
24  Scott on Thursday or Friday?

Case 3:04-cv-30072-MAP   Document 56-3   Filed 04/26/2006   Page 11 of 19

JOSEPH ROSEMOND vs. STOP & SHOP
JOSEPH ROSEMOND                   NOVEMBER 4, 2004

Page 81

1  A. Right.
2  Q. I understand that, but you're thinking
3  it might have been Friday because they needed a
4  day to look at the tapes, correct?
5  A. Right; that morning when I spoke with
6  him, he told me that they found the three
7  individuals that did that and he told me who they
8  were.
9  Q. Who did he tell you?
10 A. He said it was Charles Ingalls, Jeramie
11 Rankin, and Stan Kaletta.
12    He said he interviewed those three
13 people. Charlie Ingalls and Jeramie Rankin
14 admitted to doing it.
15 Q. Were you surprised?
16 A. At who it was?
17 Q. Yes.
18 A. I guess so; yes. I talked to those guys
19 all the time. Yes; I was surprised.
20 Q. Did you have good relationships with
21 Charles?
22 A. Yes.
23 Q. How would you describe Charles? Older?
24 Younger?

Page 82

1  A. He's an older guy, a fisherman.
2  Q. Where does he work?
3  A. In the Meat Department.
4  Q. I assume as a management team, you would
5  talk with him and problem solve, if necessary?
6  A. He's not a manager.
7  Q. No; you as a member of the management
8  team, would talk with him?
9  A. Yes; a lot of our conversations were
10 friendly.
11 Q. So you never had any problems with
12 Charles?
13 A. No.
14 Q. Were you aware that Charles -- were you
15 aware if Charles had had any incidents or comments
16 or actions that could be perceived as racially
17 motivated?
18 A. Not to my knowledge; no.
19 Q. As far as you knew, he was a good guy
20 and you had a good relationship with him?
21 A. Yes.
22 Q. How about Jeramie? How would you
23 describe him?
24 A. Jeramie is younger. He's I think in his

Page 83

1  twenties. I never had a problem with him, either.
2  Q. Nice guy as well?
3  A. Yes.
4  Q. Would you stop and talk with him, chat,
5  visit, that type of thing?
6  A. Yes.
7  Q. Yes?
8  A. Yes.
9  Q. Where did he work?
10 A. Seafood.
11 Q. Seafood and Meat Departments work
12 together?
13 A. Yes; they are normally side by side.
14 Q. Did you know if Charles and Jeramie are
15 friends?
16 A. Yes; they were friends.
17 Q. Inside and outside of work?
18 A. I don't know about outside.
19 Q. But possible?
20 A. It's possible.
21 Q. Did you have any reason to believe that
22 Jeramie had any kind of racial animus or bias or
23 hatred?
24 A. No; not to my knowledge.

Page 84

1  Q. Never said anything to you or done
2  anything or anything reported?
3  A. No; not to me.
4  Q. As far as you knew, he was, again, a
5  good guy and you had a good relationship with him?
6  A. Yes.
7  Q. How about Stan Kaletta? How would you
8  describe him?
9  A. He was a nice guy. We talked football
10 all the time.
11 Q. You got along very well with him, it
12 seems?
13 A. Yes.
14 Q. You talked to him most every day?
15 A. Yes.
16 Q. Where did he work?
17 A. He's the Meat Department manager.
18 Q. When you say manager, do you mean lead
19 clerk, again?
20 A. Well, his title is Meat Department
21 Manager -- department head, they call him. There
22 you go.
23 Q. So he is the lead clerk?
24 A. Yes.

Case 3:04-cv-30072-MAP   Document 56-3   Filed 04/26/2006   Page 12 of 19

JOSEPH ROSEMOND vs. STOP & SHOP
JOSEPH ROSEMOND                NOVEMBER 4, 2004

**Page 125**

Q. I also heard you to say that in looking back, you thought if they had held sensitivity classes for employees -- all employees, I guess -- before an incident like this, it would be better?

A. Absolutely.

Q. Any other ways that you think Stop & Shop dropped the ball?

A. Not that I can think of right now.

Q. You talked about the fact that in your view the rope, itself, was racist, correct?

A. The noose; yes; it was racist.

Q. You've talked about the fact that you're not aware of racist comments or racist actions among the people at the store, other than the comments that Mr. Taranova made to you, is that correct?

A. Yes.

Q. It was the rope, itself. Is it possible, given somebody's cultural or ethnic background in your view that they might have looked at the rope and not considered it to be racist?

MS. SAPIRSTEIN: Objection; I'm going to actually instruct him not to answer.

**Page 126**

It's too speculative.

MS. DAMON: He can answer it if he understands it.

MS. SAPIRSTEIN: You're not asking him anything that he personally observed as a fact witness.

MS. DAMON: Doesn't matter, I don't have to.

MS. SAPIRSTEIN: Objection.

MS. DAMON: I can ask him whatever I want to as long as its relevant -- and it's clearly relevant. You can answer it.

THE WITNESS: Do I answer it?

MS. SAPIRSTEIN: If you can answer it, you can answer it.

THE WITNESS: Would you ask that again?

Q. (BY MS. DAMON) You talked about the rope, itself, as being the racist act.

My question to you is: Is it possible based on somebody's ethnic or cultural background that they might have looked at that rope and not have considered it to be racist?

MS. SAPIRSTEIN: Objection.

**Page 127**

THE WITNESS: I don't -- how do I know that? I don't know that.

That rope means different things to different people.

MS. DAMON: I have nothing further.

MS. SAPIRSTEIN: I have a couple of questions.

*****

CROSS-EXAMINATION BY MS. SAPIRSTEIN

Q. This may be just my memory more than anything else. I don't remember if Ms. Damon asked you whether Mr. Kaletta supervised employees.

Do you know whether Mr. Kaletta supervised employees?

A. Yes; he was the department head.

Q. What employees did he supervise?

A. The Meat Department. Charlie Ingalls worked for him.

Q. Also, we've been referring to this -- during the course of the deposition, we've been referring to the rope as a rope.

Can you describe the configuration of the rope when you first saw it that morning?

**Page 128**

A. A noose -- a hangman's noose.

MS. SAPIRSTEIN: I don't have anything else.

MS. DAMON: Let me just go back.

*****

REDIRECT EXAMINATION BY MS. DAMON

Q. Let's go back to Mr. Kaletta. I think we did talk about the fact that he is a union member, correct?

A. Right. All the department heads are union.

Q. And they are called department heads?

A. Right.

Q. Do you -- are you familiar with the responsibilities of a department head?

A. Yes.

Q. Because you supervised department heads, correct?

A. Yes.

Q. You understand that department heads can't hire or fire, right?

A. I understand that; yes.

MS. DAMON: I have nothing further.

(The deposition was concluded.)

#2                                                      Stop & Shop 000251

36

2/18/03 Brian spoke to Joe (he had a Dr's appt at 11am) - Joe is out indefinitely.

Isaac was hostile - He wasn't on the orig list. He wanted to know why he wasn't told ahead of time. "I was on my way to lunch." He feels unsafe - he thought others had more respect than this. No one told me earlier what was going on. "I'm the only other African American here." He never had any other problems w/ Jeremy or Charlie. Jeremy is not a real friendly person. Isaac just thought the rope was still coiled from packaging. Kath - reiterated how seriously we are taking this. Isaac felt the other assocs. in the building were taking this lightly. He felt left out.

*Is this true?

Stan: Did see it - thought it was a joke. He didn't think much of it or that anyone would be offended by it - Warren - shop stew was present during conversation. She explained people's perception. Stan still didn't really understand the severity of this.

Other Supervisors?
She did view tape.

Meal Spec: Kathy spoke to Spec. re perf. issues w/ Charlie + Jeremy.

*Kathy Reeni: Isaac.

Brian Whalen: Said he just did not put 2+2 together.

Mary Witzke: She said that Jeremy apologized for the joke because it was her

000183

EXHIBIT #9



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.

JOSEPH ROSEMOND )
        Plaintiff )     **04-30072-KPN**
)
v. )
)
STOP AND SHOP SUPERMARKET )
COMPANY, )
        Defendant )
_____ )

## COMPLAINT

### PARTIES

1. The Plaintiff, Joseph Rosemond ("Mr. Rosemond") is a natural person with a residence in Springfield, Hampden County, Massachusetts.

2. The Defendant, Stop and Shop Supermarket Company ("Defendant"), is a foreign corporation organized under the laws of Delaware, with a principal Massachusetts office at 1385 Hancock Street, Quincy, Norfolk County, Massachusetts, and store locations throughout the Commonwealth of Massachusetts

### JURISDICTION

3. Jurisdiction is pursuant to 42 U.S.C. § 2000e - 5(f)(3), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

4. Venue is pursuant to 42 U.S.C. § 2000e - 5(f)(3).

5. On or about December 16, 2003, Mr. Rosemond filed a charge of discrimination with the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission.

6. On March 4, 2004, Mr. Rosemond requested permission to withdraw his charge of discrimination from the Massachusetts Commission Against Discrimination. More than ninety (90) days have elapsed since the filing of the charge of discrimination.



EXHIBIT #10                          1

7. Mr. Rosemond received his release of jurisdiction letter from the Equal Employment Opportunity Commission on April 1, 2004.

## FACTS

8. Mr. Rosemond is African American.

9. Mr. Rosemond has been employed with the Defendant since July of 1994.

10. Currently, Mr. Rosemond is a Customer Service Manager in the Defendant's store located at 672 Memorial Drive in Chicopee, Massachusetts (the "Chicopee Store").

11. During the summer of 2003, Mr. Rosemond attended a meeting in the Chicopee store with his supervisor, Mike Leach.

12. Mr. Leach was at all relevant times the Manager of the Chicopee Store.

13. Mr. Rosemond brought coffee to the meeting for himself and Mr. Leach.

14. When Mr. Rosemond arrived at the meeting, Mr. Leach and the manager of the Chicopee Store Bake Shop, David Taranova were in attendance.

15. Because Mr. Rosemond was not aware that Mr. Taranova would be attending the meeting, he did not bring coffee for Mr. Taranova.

16. Upon realizing that Mr. Rosemond did not have coffee for him, Mr. Taranova exclaimed, "Where's my coffee? What am I, Black?"

17. Although Mr. Leach heard Mr. Taranova's statement, Mr. Leach did not reprimand Mr. Taranova or indicate in any way that the statement was inappropriate.

18. After the meeting, Mr. Rosemond made a complaint to Mr. Leach about Mr. Taranova's statement.

19. In the Fall of 2003, Mr. Taranova approached Mr. Rosemond and said that the Defendant would not have as many problems if it did not have so many minorities in management positions.

20. Mr. Rosemond was offended by Mr. Taranova's statements.

21. On the morning of December 10, 2003, Mr. Rosemond arrived at the Chicopee Store and discovered a noose hanging from the ceiling of his office.

22. Because a noose is a symbol and instrument of racially motivated violence

2

against African Americans, the noose made Mr. Rosemond feel offended, threatened, and intimidated.

23. Mr. Rosemond was the only African American that worked in his office.

24. Mr. Rosemond shared his office with Marcy Wutka, a Caucasian Assistant Store Manager.

25. Marcy Watuka was on vacation on December 10, 2003. She had been on vacation for several days prior to December 10, 2003. She was scheduled to be on vacation for several days following December 10, 2003.

26. Mr. Rosemond complained about the noose to Mr. Leach on December 10, 2003.

27. Initially, Mr. Leach did not appear to take Mr. Rosemond's complaint seriously or indicate that he would take any action as a result of Mr. Rosemond's complaint.

28. Because it did not appear that Mr. Leach was going to take any action, Mr. Rosemond explained his serious distress regarding the noose to Mr. Leach.

29. After Mr. Rosemond expressed his distress, Mr. Leach asked the Chicopee Store's security staff to review the video surveillance tapes.

30. The video surveillance tapes revealed that three individuals from the Chicopee Store Meat Department went into Mr. Rosemond's office before Mr. Rosemond arrived at the Chicopee Store on December 10, 2003.

31. The surveillance video showed that Charles Ingalls, a meat cutter, and Jeramie Rankin, a seafood clerk, entered Mr. Rosemond's office first.

32. Stanley Kaletta, the Manager of the Chicopee Store Meat Department entered Mr. Rosemond's office after Mr. Rankin and Mr. Ingalls hung the noose.

33. Mr. Rankin and Mr. Ingalls admitted that they hung the noose in Mr. Rosemond's office.

34. Mr. Rankin and Mr. Ingalls claimed that the noose was merely a joke that was intended for the vacationing, Caucasian Marcy Watuka.

35. Although Mr. Kaletta did not physically hang the noose, he was aware of the noose incident.

36. Although Mr. Rosemond has expressed his concerns about the noose incident to several of Defendant's upper-level management employees, Defendant has not expressed any regret or apology for the behavior of Mr. Kaletta, Mr. Rankin or Mr. Ingalls.

37. Instead, Defendant has dismissed Mr. Rosemond's concerns and asserted that the noose was a joke that was intended for Mr. Rosemond's vacationing, Caucasian officemate, Marcy Watuka.

38. After the investigation was concluded, Scott Ziter, the head of the Chicopee Store Security, told Mr. Rosemond that he did not think that the three employees should be terminated.

40. Defendant did not terminate any of the employees involved in the noose incident.

41. Defendant suspended Mr. Rankins and Mr. Ingalls without pay for two and a half weeks and then allowed them to return to work.

42. Mr. Rankin and Mr. Ingalls were assigned to different stores upon their return.

43. Defendant spoke to Mr. Kaletta about the incident and placed a note about the incident in his personnel file.

44. Mr. Kaletta remains a manager at the Chicopee Store.

45. No other action was taken against Mr. Kaletta, Mr. Rankin or Mr. Ingalls.

46. Defendant regularly terminates employees upon discovering offenses that are far less severe than the physically threatening and racially motivated actions taken by Mr. Kaletta, Mr. Rankin or Mr. Ingalls against Mr. Rosemond.

47. As a result of the noose incident, Mr. Rosemond suffered severe anxiety and depression and sought treatment from his doctor.

48. Although Mr. Rosemond wants to return to work, he has been unable to return to work due to the anxiety and depression caused by the noose incident and the Defendant's failure to remove from the workplace the employees who engaged in this racially motivated threat.

## COUNT I – RACE DISCRIMINATION
## 42 U.S.C. § 2000e et seq.

49 Paragraphs 1 through 48 are repeated, reiterated and re-alleged as if fully set forth herein.

50. The Defendant, by the above-described conduct, discriminated against Mr. Rosemond based on his race in violation of 42 U.S.C. § 2000e et seq.

51. As a direct and proximate result of such conduct, Mr. Rosemond has suffered, and continues to suffer, from damages including a loss of pay and benefits, damages resulting from emotional distress and attorneys' fees.

## COUNT II – RACIAL HARASSMENT
## 42 U.S.C. § 2000e et seq.

52. Paragraphs 1 through 51 are repeated, reiterated and re-alleged as if fully set forth herein.

53. The Defendant, by the above described conduct, subjected Mr. Rosemond to racial harassment, in violation of 42 U.S.C. § 2000e et seq.

54. As a direct and proximate result of such conduct, Mr. Rosemond has suffered, and continues to suffer, from damages including a loss of pay and benefits, damages resulting from emotional distress and attorneys' fees.

### COUNT III – RACE DISCRIMINATION
### Mass. Gen. Laws ch. 151B

55. Paragraphs 1 through 54 are repeated, reiterated and re-alleged as if fully set forth herein.

56. The Defendant, by the above-described conduct, discriminated against Mr. Rosemond based on his race in violation of Massachusetts General Laws ch. 151B.

57. As a direct and proximate result of such conduct, Mr. Rosemond has suffered, and continues to suffer, from damages including a loss of pay and benefits, damages resulting from emotional distress and attorneys' fees.

### COUNT IV – RACIAL HARASSMENT
### Mass. Gen. Laws ch. 151B

58. Paragraphs 1 through 57 are repeated, reiterated and re-alleged as if fully set forth herein.

59. The Defendant, by the above described conduct, subjected Mr. Rosemond to racial harassment, in violation of Mass. Gen. Laws ch. 151B.

60. As a direct and proximate result of such conduct, Mr. Rosemond has suffered, and continues to suffer, from damages including a loss of pay and benefits, damages resulting from emotional distress and attorneys' fees.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.**

WHEREFORE, the Plaintiff, Joseph Rosemond, respectfully requests:

(a) That judgment enter in his favor on each count;

(b) Damages be assessed against the Defendant under each count of the Complaint, including, but not limited to, loss of pay and damages resulting

from emotional distress;

(c)  Multiple or punitive damages;

(d)  His attorneys' fees;

(e)  Interest and costs; and

(f)  For such other relief as this Court deems just and appropriate.

Respectfully submitted,
Plaintiff, Joseph Rosemond,
By His Attorney,


_____
Tani E. Sapirstein
BBO #236850
SAPIRSTEIN & SAPIRSTEIN, P.C.
1341 Main Street - 3rd Floor
Springfield, MA 01103
Tel:  (413) 827-7500
Fax:  (413) 827-7797

Date:  April 7, 2004

J:\WP61\CASEFILE\ROSEMOND\Complaint.wpd